IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHN DOE 1, by and through his parent and next friend PARENT OF JOHN DOE 1; JOHN DOE 2, by and through his parent and next friend PARENT OF JOHN DOE 2; and JANE DOE 1, by and through her parent and next friend PARENT OF JANE DOE 1; on their own behalf and on behalf of all those similarly situated, and<br><br>DISABILITY RIGHTS TENNESSEE, in its organizational and representative capacity, on behalf of and in conjunction with Plaintiffs John Doe 1, John Doe 2, and Jane Doe 1,<br><br>       Plaintiffs,<br><br>v.<br><br>The STATE OF TENNESSEE, The TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES; MARGIE QUIN, in her official capacity as Commissioner of the Tennessee Department of Children's Services; and LIZZETTE GONZALEZ REYNOLDS, in her official capacity as Commissioner of the Tennessee Department of Education,<br><br>       Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT |

## CLASS ACTION COMPLAINT

Plaintiffs John Doe 1, John Doe 2, and Jane Doe 1 ("Doe Plaintiffs"), individually and on

behalf of a proposed class, and Disability Rights Tennessee ("DRT"), via its associational standing

and on behalf of a proposed class (collectively, "Plaintiffs"), bring this action against the State of

Tennessee, the Tennessee Department of Children's Services ("DCS"), Margie Quin,

Commissioner of DCS in her official capacity, and Lizzette Gonzalez Reynolds, Commissioner of

the Tennessee Department of Education ("TDOE") in her official capacity, and in support thereof allege as follows:

## INTRODUCTION

1. This case is about the myriad ways in which Defendants fail Tennessee's most vulnerable population: children and young people with disabilities committed to their care.

2. Defendants are entrusted with the rehabilitation, education, and treatment of youth in Tennessee's juvenile justice system—many of whom have disabilities ("Youth"[1]). However, they fail to provide this support, refusing to address or adequately evaluate the needs of Youth in their care.

3. Instead of accommodating or treating their disabilities, Defendants punish Youth for their symptoms, using violent and abusive measures like solitary confinement, pepper spray, and peer-on-peer violence as behavior management tools.

4. Defendants' use of pervasive violence and abuse instead of treatment exacerbates the mental health, behavioral, intellectual, and developmental issues that Youth experience, including driving Youth to commit acts of self-harm and suffer suicidal ideations.

---

[1] "Youth" refers to young people who have a disability or disabilities who are now, or are at imminent risk of being, in DCS custody and/or kept in a DCS-licensed or approved facility from which they cannot leave on their own by reason of being found to be delinquent or unruly by a juvenile court in Tennessee and committed to DCS pursuant to Tenn. Code Ann. § 37-1-131 or Tenn. Code Ann. § 37-1-132 ("Post-Adjudication Youth"), or who are now, or are at risk of being, in a DCS-licensed or approved facility from which they cannot leave on their own by reason of a finding of probable cause to believe that the child has committed a delinquent or unruly act with which the child is charged pursuant to Tenn. Code Ann. § 37-1-114 ("Pre-Adjudication Youth"). *See* Class Allegations, Section I, *infra*.

2

## I. Defendants Neglect and Abuse Youth in Their Custody and Care

5.      Defendants' mistreatment starts when Youth first enter juvenile justice custody,[2] as Defendants fail to evaluate Youths' individualized needs and do not place them in the most integrated environment appropriate for their needs. Despite caring for a large population of young people with disabilities, Defendants fail to maintain a continuum of placements and services that would allow Youth and their families to access rehabilitative treatment, mental and behavioral healthcare, and other supports in home and community-based settings. Rather, Defendants place Youth in facilities based on convenience and facility capacity instead of the needs of the Youth. Defendants confine Youth in prisons (called "hardware secure" facilities)—many of which are far from Youths' homes and communities—even though less restrictive placements would be more appropriate for their individual needs.

6.      When Youth enter Defendants' facilities, they struggle to find the basic support that every child needs and deserves, such as education, mental healthcare, medical care, and physical safety. Defendants fail to provide evidence-based services designed to treat or rehabilitate Youth. Indeed, Defendants lack any coherent strategy for rehabilitating young people in their care or addressing behavioral issues, instead defaulting to incarceration. Youth therefore have no meaningful way to progress in their treatment and rehabilitation.

7.      Youth with disabilities face especially high barriers to accessing these bare necessities. Since Defendants fail to evaluate Youth, Defendants do not provide them with the reasonable accommodations they need to obtain rehabilitative services, healthcare, physical

---

[2] For many Youth, Defendants mistreatment begins even earlier. 86.2% percent of young people in state juvenile justice custody were previously in contact with the child welfare system, where Defendants failed to meet Youth's needs.

3

security, recreation, or other indicia of meaningful access to Defendants' programs. In some instances, Defendants fail to provide access to these services at all.

8.      Defendants provide Youth with woefully inadequate education and routinely fail to provide even the bare-minimum level of instruction mandated by applicable regulations. In particular, Youth trapped in solitary confinement often receive no education at all.

9.      Defendants also fail to provide Youth with appropriate access to mental and behavioral healthcare. Defendants allow Youth to go months on end without being evaluated by a licensed mental healthcare provider, often provide Youth with conflicting and inaccurate diagnoses, abruptly discontinue medications, and over-prescribe psychotropic medications.

10.     Nor do Defendants offer Youth access to appropriate medical care. Defendants allow Youth to suffer illness and injuries for days, weeks, and even months on end without providing them with health services. As a result, Youths' conditions deteriorate, resulting in discomfort, pain, and permanent injury.

11.     Defendants fail to use licensing, oversight, and enforcement mechanisms to maintain consistent standards across facilities and frequently shuffle Youth between facilities, often far from their families or out of state. This leads to inconsistencies in Youths' education, care, and conditions of confinement and allows abusive and unsafe conditions to flourish.

12.     Defendants' utter failure to assess and evaluate Youth or to offer Youth evidence-based services, education, medical or mental healthcare, or stability creates a powder keg environment that threatens the safety of all Youth.

13.     Instead of providing Youth with proper treatment, Defendants opt for abuse that only exacerbates mental health conditions.

14.     Defendants routinely warehouse Youth in solitary confinement instead of treating their mental health problems.

15.     Defendants subject Youth to pepper spray, even when they pose no threat to others or themselves.

16.     Further, Defendants subject Youth to barbaric violence at the hands of both Facility Staff[3] and other young people, whom Facility Staff bribe to attack Youth that stand up for their rights or complain about mistreatment.

17.     As a result of these and other policies and practices detailed below, Defendants cause Youth to suffer trauma, psychological deterioration, physical injuries, and worsened underlying conditions. Youth continue to experience negative effects of Defendants' abuse, mistreatment, and utter failure to provide adequate education and transition services long after they are formally released.

## II.     The Horrific Experiences of Youth Trapped in Defendants' Custody

18.     The experiences of Youth, recounted below and throughout this Complaint, attest to cruel and inhumane conditions in Defendants' facilities and Defendants' failure to evaluate and treat Youths' needs. Some examples of Defendants' horrific treatment of Youth are as follows:

- **S.W.[4] –** While S.W. was shackled in his cell, five Facility Staff held him in a kneeling position and pepper sprayed his face and hair for allegedly being disrespectful. Afterward, Facility Staff turned off the water in S.W.'s room so that he could not wash his face. He was not allowed to see a nurse for twelve hours.

---

[3] "Facility Staff" refers to individuals and entities who provide staffing and services at juvenile detention centers, youth development centers, or any other facility where Youth are placed. Facility Staff act as agents of Defendants and pursuant to Defendants' policies, practices, and procedures. *See* Parties, Section II, *infra*.
[4] Youth described in this Complaint are identified using randomized initials.

- **John Doe 1** – John Doe 1 was attacked by peers who demanded that he perform sexual acts and beat him when he refused. He alerted Facility Staff. Instead of protecting John Doe 1, they encouraged youth to beat him again.

- **J.T. -** Defendants placed J.T., a fifteen-year-old boy, in a highly restrictive facility. He immediately suffered four violent assaults, in which Facility Staff failed to intervene, one of which broke his hip. Defendants refused to transfer J.T. to a safer facility, forcing him to live in solitary confinement for months at a time, where he slept on a bare bed frame near cockroaches, mold, and urine.

- **John Doe 2** – Defendants failed to address John Doe 2's severe mental health needs for over six months after he entered DCS custody at eleven years old, despite DCS records showing that he required treatment and was engaging in self-harm. John Doe 2's mental health issues worsened in DCS custody, and he began hearing "a scary voice in his head telling him to do things."

- **O.V. -** Defendants forced O.V., a boy with depression and post-traumatic stress disorder ("PTSD"), to live in solitary confinement for over six months. He spent at least twenty-three hours per day in his cell. Facility Staff slipped homework packets under his door instead of allowing him to go to school. As a result of the solitary confinement, O.V.'s mental state deteriorated. He became suicidal.

- **R.A. -** Defendants locked R.A. in his cell for 22.5 hours a day. The resulting anguish caused him to rip his hair out.

- **C.K. -** Facility Staff repeatedly pepper sprayed C.K. for having autistic meltdowns. On one occasion, three Facility Staff entered C.K.'s room and pepper sprayed him in order to more easily remove his belongings.

6

- **M.G. -** M.G., a boy with bipolar disorder, argued with a Facility Staff member. The Facility Staff member then told him "I'm going to have your ass beat." Days later, twelve peers violently beat M.G. after the Facility Staff member promised them ramen noodles for the assault.

- **Jane Doe 1** - Jane Doe 1, a girl with a history of mental health issues and sexual victimization, was shackled, dragged across the floor, and placed in solitary confinement after a minor disciplinary incident. On a separate occasion, two male Facility Staff members pepper sprayed her while she was naked.

***

19.     This abuse must stop.

20.     Plaintiffs bring this action to hold Defendants accountable for the harm they have caused to the Doe Plaintiffs, S.W., J.T., O.V., R.A., C.K., M.G., and all other members of the proposed class, and to protect and defend the long-neglected statutory and constitutional rights of Youth in Defendants' control or custody.

**JURISDICTION AND VENUE**

21.     Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, this being a case arising under the laws of the United States, and 28 U.S.C. §§ 1343(a)(3) and (4) to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

7

22.     Plaintiffs' claims are authorized by 42 U.S.C. § 1983, 29 U.S.C. § 794a, 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 12133. Plaintiffs seek declaratory judgment, injunctive relief, and other appropriate relief, pursuant to Fed. R. Civ. P. 57, and 65.

23.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and because a substantial part of the actions and omissions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

### I.  Plaintiffs

### A.  Plaintiff Disability Rights Tennessee ("DRT")

#### 1.  The Protection and Advocacy ("P&A") System

24.     DRT is part of the nationwide P&A system, which is mandated by Congress to protect and advocate for the rights of people with disabilities in the United States. There is a P&A in each of the fifty states and in each United States territory. Together, the P&As make up the National Disability Rights Network.

25.     Congress has given the P&As the statutory responsibility to represent, advocate for, and redress the rights of persons with disabilities, including Youth.

26.     DRT is the P&A organization designated in the State of Tennessee.

27.     As Tennessee's P&A organization, DRT is authorized by multiple federal statutes to, among other things, pursue administrative, legal, and other remedies on behalf of people with disabilities.

#### 2.  DRT's Mission and Services

28.     DRT's mission is to protect the rights of Tennesseans with disabilities, including those with mental illness, intellectual disabilities, and behavior disorders, with the vision that

8

Tennesseans with disabilities will experience freedom from harm, freedom to participate in the community, and freedom from discrimination.

29.     DRT provides legal advocacy services to people with disabilities, including those with mental illnesses, across Tennessee, including in the areas of employment discrimination, safety in schools, abuse and neglect, and community resources and services.

30.     DRT serves the entirety of Tennessee, with offices in Memphis, Nashville, and Knoxville.

31.     DRT routinely seeks input from individuals with disabilities when formulating its specific areas of work and collaborates regularly with local and state disability organizations and taskforces that consist, in part, of people with disabilities.

32.     DRT receives input from its constituents through, *inter alia*: (a) its board of directors, at least one-third of which is comprised of people with disabilities and/or immediate family members of people with disabilities; (b) its Protection and Advocacy for Individuals with Mental Illness Advisory Council, which is comprised of people with mental illness, family members, and others who have experience advocating for or serving people with mental illness; and (c) surveys of constituents and stakeholders, focus groups, and public comment.

### 3.  DRT's Associational Standing

33.     Individuals with disabilities, including those with mental illness, intellectual disabilities, and behavior disorders, are among the constituents who are served by, and who inform the work of, DRT (DRT's "Constituents"). The interest of these Constituents goes to the heart of DRT's mission to ensure that people with disabilities, including individuals with mental illnesses, intellectual disabilities, or behavior disorders, are free from harm and discrimination, receive the education they need, have equal access to services, and are placed with their families or in family-like situations, rather than in institutions, for their services and supports.

9

34.     All of the Youth described in this Complaint, including S.W., J.T., O.V., R.A., C.K., M.G., and the Doe Plaintiffs, are DRT Constituents who have disabilities that limit one or more of their major life activities.

35.     DRT brings suit in its associational capacity as the State's P&A, and in conjunction with Doe Plaintiffs, to redress the rights of its Constituents to treatment and rehabilitation in the most integrated setting and equal access to services, programs, and supports, pursuant to Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"), as well as to enforce their rights to education and to adequate conditions of confinement.

36.     DRT has worked extensively with the Doe Plaintiffs, as well as various other Youth, to monitor their treatment, investigate claims of abuse and/or neglect involving them, and to advocate for appropriate services for them. DRT has published two extensive reports on services for Youth generally, commented extensively on DCS's proposed rulemaking notices, and helped educate policy decisionmakers regarding appropriate services that are consistent with the ADA, Section 504, and the United States Constitution. DRT has also delivered continuing legal education courses about these issues.

**B.  Plaintiff John Doe 1**

37.     John Doe 1 is a seventeen-year-old boy who enjoys playing guitar and performing magic tricks with cards. He has depression, PTSD, attention-deficit/hyperactivity disorder ("ADHD"), and anxiety disorder. He has a history of suicidal ideation and self-harm.

38.     John Doe 1's diagnosed and undiagnosed conditions substantially limit one or more major life activities including thinking, learning, concentrating, and interacting with others.

39.   He currently resides in the custody of his adoptive mother in Tennessee after experiencing maltreatment and traumatization while in the custody of DCS in various juvenile justice facilities.

40.   John Doe 1 first came into DCS custody as a foster child when he was eleven years old. He was adjudicated delinquent in September 2023. DCS shuffled him between five different facilities in his first six months of DCS juvenile justice custody, including Memphis Youth Academy, John S. Wilder Youth Development Center ("Wilder"), Richard L. Bean Center ("Bean JDC"), and the Upper East Tennessee Regional Juvenile Detention Center ("Upper East JDC"). He was then re-entered into foster care and has since been adopted.

41.   John Doe 1 remains at imminent risk of being in DCS custody and/or kept in a DCS-licensed or approved facility from which he cannot leave on his own.

**C.  Plaintiff John Doe 2**

42.   John Doe 2 is twelve years old and loves basketball, drawing, and his family.

43.   He is currently in DCS juvenile justice custody at a hardware secure facility, Bill's Place at Youth Villages ("Bill's Place").

44.   John Doe 2 became involved with DCS in 2021 through a DCS investigation into possible neglect when, shortly after witnessing the traumatic shooting death of his older brother, he began to run away from home and to use alcohol and cigarettes. He was also the subject of multiple law enforcement reports of a missing child.

45.   John Doe 2 has been in DCS juvenile justice custody since 2022, with placements including Shelby County Juvenile Detention Center ("Shelby JDC"), Natchez Trace Youth Academy ("Natchez Trace"), Davidson County Juvenile Detention Center ("Davidson JDC"), Middle Tennessee Juvenile Detention Center ("MTJDC"), and Bill's Place.

11

46. John Doe 2 has a history of trauma, with diagnoses of ADHD, conduct disorder, PTSD, and developmental disorder of scholastic skills.

47. He has an IQ of sixty-three, indicating an extremely low ability in the areas of verbal comprehension, visual, spatial, and fluid reasoning, working memory, and processing speed. He also scored "Extremely Low" on the Wide Range Achievement Test, indicating a very low ability to understand, comprehend, and act. He has experienced hallucinations and has reported hearing "a scary voice in his head telling him to do things."

48. John Doe 2's diagnosed and undiagnosed conditions substantially limit one or more major life activities including thinking, learning, concentrating, and interacting with others.

**D. Plaintiff Jane Doe 1**

49. Jane Doe 1 is a fifteen-year-old girl who enjoys playing volleyball and dreams of working as a NICU nurse. She has close relationships with her mother, three siblings, and father.

50. Jane Doe 1 has a history of mental health struggles and has been the victim of sexual abuse. In 2020, she ran away from home. She has also attempted suicide and self-harm.

51. Jane Doe 1 currently resides in Tennessee in the care of her mother.

52. Jane Doe 1 has disruptive mood dysregulation disorder ("DMDD"), ADHD, PTSD, major depressive disorder ("MDD"), and oppositional defiant disorder ("ODD").

53. Jane Doe 1's diagnosed and undiagnosed conditions substantially limit one or more major life activities including thinking, learning, concentrating, and interacting with others.

54. Jane Doe 1 entered DCS custody in 2022, with placements including Hollis Residential Treatment Center ("Hollis RTC"), Walnut Youth Academy, and the Rhea County Juvenile Detention Center. She was then returned home.

55. Jane Doe 1 remains at imminent risk of being in DCS custody and/or kept in a DCS-licensed or approved facility from which she cannot leave on her own.

12

## II. Defendants

56.     Collectively, Defendants have authority and responsibility for creating, providing, managing, and enforcing the laws, services, and programs affecting Youth as outlined herein.

### A. Defendant State of Tennessee

57.     Defendant the State of Tennessee is one of the fifty states that comprise the United States of America, with central offices in Nashville, Tennessee.

58.     The State of Tennessee is a public entity as defined by 42 U.S.C. § 12131(1)(A).

59.     The State of Tennessee receives Federal financial assistance.

60.     The State of Tennessee operates and oversees the administration of DCS and TDOE, state agencies that receive federal funds.

### B. Defendants Tennessee Department of Children's Services and DCS Commissioner Margie Quin

61.     Defendant DCS, a state agency that receives federal funds, oversees Tennessee's juvenile justice and foster care systems.

62.     In its role overseeing the juvenile justice system, DCS maintains custody over children and young people found to be delinquent or unruly by a juvenile court in Tennessee and committed to DCS custody.

63.     DCS also has oversight responsibilities for detention facilities that hold young people awaiting adjudication where there has been a finding of probable cause to believe that the child has committed a delinquent or unruly act with which the child is charged.

64.     DCS is responsible for licensing and regulating juvenile detention centers and post-adjudication facilities and placements for young people in its custody.[5]

---

[5] Tenn. Code Ann. § 37-5-502.

65.     DCS is responsible for operating Youth Development Centers ("YDCs"), which are hardware secure facilities housing children adjudicated delinquent and meeting certain other criteria.[6]

66.     DCS is responsible for contracting and coordinating with other state agencies and state-licensed facilities, such as the Department of Mental Health, Department of Intellectual and Developmental Disabilities, TennCare, and others to coordinate care for young people in its custody.[7]

67.     DCS is responsible for the education of young people in its custody.[8]

68.     For post-adjudication facilities that operate in-house schools, DCS is responsible for approving in-house school applications.[9]

69.     DCS also serves as a special school district for the schools within YDCs and other facilities designated by the DCS Commissioner.[10]

70.     Defendant Margie Quin, Commissioner of DCS, has the authority and responsibility of properly administering, overseeing, and operating DCS, including by creating policies, rules, and regulations for DCS and DCS-licensed or approved facilities, providing care for children DCS serves, and setting the powers and responsibilities of DCS officers and employees. She is responsible for DCS's operation, including the proper placement of young people in DCS-licensed or approved facilities and programs in compliance with all applicable laws

---

[6] Tenn. Code Ann. §§ 37-5-103(16), 37-5-201(a).
[7] Tenn. Code Ann. § 37-5-106(a)(8).
[8] *See Serving the Educational Needs of the Child/Youth*, Tenn. Dep't of Child.'s Servs. Admin. Pol'ys & Procs. 21.14 (Aug. 24, 2022), https://files.dcs.tn.gov/policies/chap21/21.14.pdf.
[9] *Education Standards*, Tenn. Dep't of Child's Servs. Cont. Provider Manual 13 at 8 (May 2024), https://files.dcs.tn.gov/policies/contractProviderManual/Section_13-Education.pdf.
[10] Tenn. Code Ann. § 37-5-119(a).

14

and regulations.[11] She serves as the board of education and the director of schools for the DCS special school district[12] and has "supervision and control" over YDCs.[13]

71.     Commissioner Quin has promulgated and enforced rules, regulations, and written and unwritten policies and practices pursuant to which DCS and its agents: (1) fail to assess and accommodate Youths' disabilities; (2) fail to administer services, programs, and activities in the most integrated setting appropriate to the needs of Youth; (3) fail to provide Youth with medical and mental health treatment; (4) expose Youth to violence; (5) subject Youth to excessive force through the use of pepper spray; (6) place Youth in solitary confinement in circumstances that constitute cruel and unusual punishment and are not rationally related to any legitimate government objective or are excessive in relation to that purpose; and (7) deny Youth education. Commissioner Quin has failed to enforce existing state and federal law, department policies, and regulations that protect Youth from the aforementioned conduct.

72.     Commissioner Quin is a person within the meaning of 42 U.S.C. § 1983 and is sued in her official capacity. At all relevant times, Commissioner Quin has acted and continues to act under color of state law.

73.     DCS and Commissioner Quin are referred to collectively as "DCS Defendants."

74.     DCS Defendants are responsible for caring for and protecting Youth in DCS custody.

75.     Through their licensing and regulatory authority and contracts with facilities, DCS Defendants are responsible for exercising control over the operations, policies, practices, and

---

[11] Tenn. Code Ann. §§ 37-5-105(3), (5), (6).
[12] Tenn. Code Ann. § 37-5-119(b).
[13] Tenn. Code Ann. § 37-5-201(a).

actions of the facilities where Youth are placed, such that the actions taken by the staff of those facilities are taken pursuant to DCS Defendants' policies and customs.

### C. Defendant TDOE Commissioner Lizzette Gonzalez Reynolds

76.     Defendant Lizzette Gonzalez Reynolds, the Tennessee Commissioner of Education, is chief executive of TDOE and is responsible for implementing and ensuring compliance with laws and policies governing TDOE. She must also prepare and present to the state Board of Education rules necessary to implement state education laws and Board policies, standards, and guidelines.[14]

77.     As the head of TDOE, Commissioner Gonzalez Reynolds establishes TDOE's official and unofficial policies, procedures, and practices, including the policies, procedures, and practices alleged in this Complaint.

78.     TDOE, a state agency that receives federal funds, oversees public education in Tennessee.

79.     TDOE is responsible for developing rules to ensure that Youth incarcerated in detention centers licensed by DCS are given an education, including by establishing procedures for funding the education of those Youth, promptly transferring Youths' educational records, and providing educational instruction for a minimum of four hours per instructional day.[15]

80.     TDOE is also responsible for monitoring the education provided in detention centers.

---

[14] Tenn. Code Ann. §§ 4-3-802, 4-3-803; 49-1-201(a), (c)(5), (c)(20)(A).
[15] Tenn. Code Ann. §§ 49-6-3023(a)–(c).

16

81.     Through its oversight of all local education agencies in Tennessee, TDOE is responsible for ensuring that the DCS special school district complies with state education laws and State Board of Education rules.[16]

82.     TDOE individually approves in-house schools in post-adjudication facilities as Category I Special Purpose Non-Public Schools.[17]

83.     TDOE administers state and federal funding programs for schools serving pre- and post-adjudication Youth, including the Title I Part D Prevention and Intervention Program for Children and Youth Who Are Neglected, Delinquent, or At-Risk. As part of this program, TDOE receives yearly applications from school districts and facilities on education in these schools and facilities and is required to monitor facilities for compliance with state law, the Every Student Succeeds Act, and the Individuals with Disabilities Education Act.[18]

84.     Commissioner Gonzalez Reynolds has promulgated and enforced rules, regulations, and written and unwritten policies and customs pursuant to which TDOE, DCS Defendants, and Facility Staff deny Youth an education.

85.     Commissioner Gonzalez Reynolds is a person within the meaning of 42 U.S.C. § 1983 and is sued in her official capacity. At all relevant times, Commissioner Gonzalez Reynolds has acted and continues to act under color of state law.

---

[16] *See* Tenn. Code Ann. § 49-6-3023.
[17] *See* Rules of the Tenn. Dep't of Educ. and Sch. Bd. of Educ. 0520-07-02 (Aug. 2023), https://publications.tnsosfiles.com/rules/0520/0520-07/0520-07-02.20230815.pdf.
[18] *See* Title I, Part D Subpart 2: Prevention and Intervention Programs for Children and Youth Who are Neglected, Delinquent, or At-Risk 1–2, Tenn. Dep't of Educ., (Sept. 2018), https://eplan.tn.gov/documentlibrary/ViewDocument.aspx?DocumentKey=1443057&inline=true; Monitoring, Tenn. Dep't of Educ., https://www.tn.gov/education/districts/federal-programs-and-oversight/results-based-monitoring.html (last visited June 25, 2024).

17

## FACTS

### I. Tennessee's Juvenile Justice System

86.     Among the purposes of Tennessee's juvenile justice system are "the care, protection, and wholesome moral, mental and physical development of children coming within its provisions[,]" to "remove . . . the taint of criminality and the consequences of criminal behavior and substitute therefor[e] a program of treatment, training and rehabilitation[,]" and to "[p]rovide developmentally appropriate interventions based on current scientific research in related fields, including neuroscience, psychology, sociology, and criminology."[19]

87.     Under Tennessee law, DCS Defendants are prohibited from expending state funds on programs, service models, or delivery systems that are not "evidence based." This means that DCS's "policies, procedures, programs, and practices" must be "demonstrated by scientific research to reliably produce reductions in recidivism or ha[ve] been rated as effective by a standardized program evaluation tool[.]" They must also be "accompanied by monitoring and quality" ensuring "that they are delivered as prescribed" by applicable standards; "corrective action" is required if these are not met.[20]

88.     However, the juvenile justice system administered by Defendants fails to uphold these principles.

89.     Tennessee has a patchwork of juvenile justice placements for Youth, ranging from highly restrictive prison-like facilities to home-based or foster care-based placements. However, in practice, Tennessee rarely uses home or foster care-based placements, instead defaulting to institutional settings in which Youth are cut off from family and community support.

---

[19] Tenn. Code Ann. § 37-1-101(a).
[20] Tenn. Code Ann. §§ 37-5-121(a)(1), (b), (c).

18

90. Defendants' policy and practice of placing Youth in facilities without assessing their needs leads to the over-institutionalization of Youth in highly restrictive prison and institutional settings.

91. Within these facilities, Defendants subject Youth to mistreatment and violence and fail to provide them with the mental, physical, and behavioral healthcare and education they need to access "treatment, training and rehabilitation" and move forward in their lives.[21]

92. Youth do not have the same rights across all settings; there is no consistent licensing and oversight mechanism through which Defendants ensure that all Youth are safe from harm and have access to the treatment, education, and services that they need. Additionally, Defendants do not utilize the enforcement mechanisms available to them to protect Youth in their custody, despite actual knowledge that licensed and contracted facilities are engaging in abusive and illegal practices.

93. Below, this Section provides an overview of the mechanisms by which Youth enter Tennessee's juvenile justice system and the facilities and settings in which DCS Defendants place Youth in their custody.

**A. Pre-Adjudication Placement**

94. Youth enter Tennessee's juvenile justice system through the juvenile courts, which are responsible for handling cases involving young people alleged to be delinquent or unruly.

95. Tennessee's juvenile courts are authorized to detain young people prior to adjudication if there is probable cause to believe they have committed a serious delinquent offense, or a probation or aftercare violation, if they have escaped from another facility, or if there is probable cause to believe they are an unruly child who has violated a court order or has run away

---

[21] *See* Tenn. Code Ann. § 37-1-101(a)(2).

from another jurisdiction; and there is no less restrictive alternative that will reduce the risk of flight or of serious physical harm to the child or to others.[22]

96.     Pre-Adjudication Youth are primarily detained in Juvenile Detention Centers ("JDCs"), which are overseen by DCS.[23]

97.     Under Tennessee law, juvenile courts may also detain Pre-Adjudication Youth in other settings, such as licensed foster homes or facilities operated by DCS-licensed child care agencies.[24]

**B.  Post-Adjudication Placement**

98.     Youth who are adjudicated delinquent or unruly for certain repeat or serious first-time offenses may be committed to DCS for post-adjudication services, which can include community-based placements or placement in a facility.

99.     DCS Defendants have authority over placement decisions for young people committed to their custody; judges are not permitted to order that Post-Adjudication Youth be placed in a specific facility.[25]

100.    As of 2023, DCS Defendants contracted with eight of the state's seventeen JDCs for short-term post-adjudication placements. During short-term post-adjudication placements, DCS Defendants are supposed to work with each young person and their family to identify their needs, relevant services, and a long-term placement where they can receive those services.

101.    As short-term placements do not offer any treatment or services, these short-term post-adjudication placements are supposed to last no longer than fourteen days under DCS's

---

[22] Tenn. Code Ann. § 37-1-114(c).
[23] *See* Tenn. Code Ann. §§ 37-5-501(b)(10), 37-1-114(c).
[24] Tenn. Code Ann. § 37-1-116(a). "Place of detention" is a term that is inclusive of but not exclusive to a juvenile detention center.
[25] Tenn. Code Ann. § 37-1-129(c)(1); Tenn. Code Ann. § 37-1-137(a)(5); Tenn. Op. Att'y Gen. No. 97-111 (Aug. 6, 1997).

20

written policy,[26] but DCS Defendants' actual practices confine young people in JDCs for much longer, an average of fifty-five days.[27] DCS Defendants also have a policy and practice of using unlicensed transition homes, which have no regulatory oversight, as short-term placements.

102.   The facilities where DCS Defendants confine Post-Adjudication Youth in long-term placements include YDCs; hardware secure and staff secure Residential Child Care Agencies ("RCCAs"); other contracted hardware secure and staff secure facilities licensed by the Tennessee Department of Mental Health and Substance Abuse Services ("DMHSAS"); and out-of-state contracted facilities.[28]

103.   Post-Adjudication Youth are entitled to placement in the most integrated setting appropriate for their individual needs, including community placements, foster homes, and kinship placements, but DCS Defendants primarily—and inappropriately—utilize unnecessarily restrictive hardware secure and staff secure placements without consideration of Youths' individual needs and appropriate treatment and services.

**C.  Existing Placement Options for Youth in Tennessee's Juvenile Justice System**

104.   Tennessee utilizes approximately fifty in-state facilities and at least twelve out-of-state facilities for juvenile justice placements.

105.   These facilities include five different kinds of hardware secure facilities, each regulated under a different scheme, in addition to staff secure facilities, and a range of group home facilities and hospital placements that are referred to as "Community Placements," despite their institutional nature. DCS places only a small number of young people in foster homes or trial home

---

[26] *Juvenile Detention*, Tenn. Dep't of Child.'s Servs. Cont. Provider Manual 3 (May 2024), https://files.dcs.tn.gov/policies/contractProviderManual/Section_9-Juvenile_Detention.pdf.
[27] *Real Estate Strategic Plan*, Tenn. Dep't of Child.'s Servs. at 57.
[28] Tenn. Code Ann. §§ 37-5-103(16), 37-5-501(b).

visits, which are family-based placements; the majority are placed in hardware or staff secure facilities.

106. As Youth move through the juvenile justice system, they are subjected to multiple placements at facilities that do not operate under consistent standards, causing a discontinuity of care and access to services that inhibits their treatment and rehabilitation. These differences vary based on more than written policy—differences in DCS-established practice diverge even further, as facilities do not comply with state law and licensing requirements.

### 1. Hardware Secure Facilities

107. Hardware secure facilities restrict freedom of Youth using architectural features such as locks, bars, and fences. They are DCS Defendants' most restrictive facility type, with razor wire around fences and roofs.

108. Tennessee law establishes two types of hardware secure facilities where DCS may place Youth: YDCs, which are for Post-Adjudication Youth, and JDCs, which are for both Pre-Adjudication Youth and short-term placements of Post-Adjudication Youth awaiting permanent placement.

109. DCS Defendants also confine young people in hardware secure facilities licensed as RCCAs, out-of-state hardware secure facilities, and other facilities licensed by DMHSAS.

110. All of these are locked facilities that DCS Defendants describe as belonging to the same category, serving youth with the highest-level charges and safety concerns. Yet, Youths' rights and access to services in each facility differ significantly as a matter of written policy, and even more in practice.

### a. Juvenile Detention Centers ("JDCs")

111. A JDC is established by Tennessee law as "a place or facility operated by any entity or person, governmental or otherwise, for the confinement in a hardware secure facility of a child

22

or children who meet the criteria" established by law "and who: (A) Are in need of legal temporary placement; (B) Are awaiting adjudication of a pending petition; or (C) Are awaiting disposition or placement."[29]

112.    Tennessee has seventeen JDCs, four of which are owned and/or operated by private providers. The remaining thirteen are operated by a county, sheriff, or juvenile court. DCS Defendants are responsible for oversight of JDCs, which are either licensed by DCS Defendants or approved by them under the publicly administered entity exemption to licensure.[30]

113.    DCS Defendants oversee the practices of contracted JDCs through DCS's licensing and approval division and through its contracting relationship with the facilities. All JDCs are subject to the standards and practices promulgated by DCS Defendants.

114.    Under state law, solitary confinement is banned in JDCs; residents are only allowed to be isolated from others as a temporary response to behavior that threatens immediate harm. Isolation "shall not be used for discipline, punishment, administrative convenience, retaliation, [or] staffing shortages."[31]

115.    The written policies applicable to JDCs restrict the use of mechanical restraints[32] and bar pepper spray except "in the case of an emergency, when the youth is at imminent danger of self-harm or of harming others and no other option exists to protect the safety of the youth and staff members."[33]

---

[29] Tenn. Code Ann. § 37-5-501(b)(10).
[30] Tenn. Code Ann. §§ 37-5-109, 37-5-510, 37-5-503(3).
[31] Tenn. Code Ann. § 37-5-214.
[32] *Minimum Standards for Juvenile Detention Centers and Temporary Holding Resources*, Rules of the Tenn. Dep't of Child.'s Servs. Legal Div. 0250-04-08-.11(3) (June 2017), https://publications.tnsosfiles.com/rules/0250/0250-04/0250-04-08.20170615.pdf.
[33] *Minimum Standards for Juvenile Detention Centers and Temporary Holding Resources*, Rules of the Tenn. Dep't of Child.'s Servs. Legal Div. 0250-04-08-.11(2)(c)(4) (June 2017), https://publications.tnsosfiles.com/rules/0250/0250-04/0250-04-08.20170615.pdf.

23

116. TDOE regulates education of young people in JDCs.[34]

117. State regulations do not require the JDCs to provide any educational programming until residents have been present for twenty instructional days. After twenty instructional days, state regulations only require that the JDC provide four hours of "basic educational services" in English Language Arts and Math.[35]

**b. Youth Development Centers ("YDCs")**

118. A YDC is "a hardware secure facility that houses children who have been adjudicated delinquent and who meet the criteria as established by [DCS Defendants] for placement at such facility."[36]

119. Wilder is currently the only YDC operating in Tennessee.

120. DCS Defendants have an obligation to supervise and control YDCs.[37]

121. Statutes and department policy flowing from a series of court decisions concerning the rights of young people in YDCs ban the use of pepper spray,[38] require the provision of mental health and education services,[39] and restrict the use of mechanical restraints.[40] Solitary confinement in YDCs is governed by the same statute as in JDCs.[41]

---

[34] Tenn. Code Ann. § 37-5-131.
[35] *Basic Educational Services*, Rules of the Tenn. Dep't of Educ. and Sch. Bd. of Educ. 0520-01-12-.04, https://www.tn.gov/content/dam/tn/stateboardofeducation/documents/pendingrules/7-27-18%20II%20R%20Education%20of%20Incarcerated%20Students%20Rule%200520-01-12%20Attachment%20Clean%20Copy.pdf (last visited May 2024).
[36] Tenn. Code Ann. § 37-5-103(16).
[37] Tenn. Code Ann. § 37-5-201(a).
[38] *DOE Policy 27.36 Directive*, Tenn. Dep't of Child.'s Servs. Admin. Pol'ys & Procs. (Oct. 3, 2022), https://files.dcs.tn.gov/policies/chap27/DOEDirective27.36.pdf.
[39] *See* Tenn. Code Ann. §§ 37-5-102(a)(2), (3), 37-5-119; *Suicide/Self Harm Prevention and Intervention in a Youth Development Center (YDC)*, Tenn. Dep't of Child.'s Servs. Admin. Pol'ys & Procs. 19.1 (Sept. 29, 2022), https://files.dcs.tn.gov/policies/chap19/19.1.pdf.
[40] *Use of Mechanical Restraints*, Tenn. Dep't of Child.'s Servs. Admin. Pol'ys & Procs. 27.35-DOE (Oct. 19, 2016), https://files.dcs.tn.gov/policies/chap27/27.35DOE.pdf.
[41] Tenn. Code Ann. § 37-5-214.

24

122.    State law requires that education services at Wilder meet the same instructional standards as public schools and the school at Wilder is part of a special public school district for which the DCS Commissioner is the director of schools.[42]

123.    These statutes and policies prohibit DCS Defendants from placing young people with moderate, severe, or profound intellectual disabilities in YDCs under any circumstance.[43]

124.    Youth with mild intellectual disabilities cannot be placed in YDCs without a waiver from the DCS Commissioner.[44] DCS Defendants cannot lawfully place youth with mild intellectual disabilities in a YDC if necessary support services, such as academic and vocational education, medical treatment, or psychological and psychiatric treatment, cannot be provided at the YDC, or if qualified evaluators find that YDC placement would be inappropriate.[45]

125.    As alleged in Facts Section II, *infra*, DCS Defendants have a practice of disregarding these requirements and placing Youth with these disabilities at YDCs.

### c. Residential Child Caring Agencies ("RCCAs")

126.    Tennessee law only provides for two types of hardware secure juvenile facilities: JDCs and YDCs.

127.    But DCS Defendants have established new hardware secure facilities for the placement of Post-Adjudication Youth. These hardware secure facilities are licensed as Residential Child Caring Agencies, or RCCAs.

---

[42] Tenn. Code Ann. § 37-5-119(a)-(b).
[43] *Assessment and Placement of Youth With Intellectual Disabilities In a Hardware Secure Facility*, Tenn. Dep't of Child.'s Servs. Admin. Pol'ys & Procs. 19.6 (Oct. 29, 2018), https://files.dcs.tn.gov/policies/chap19/19.6.pdf.
[44] *Id.*
[45] *Placement Decisions and Justifications*, Tenn. Dep't of Child.'s Servs. Admin. Pol'ys & Procs. 18.25-DOE (June 15, 2008), https://files.dcs.tn.gov/policies/chap18/18.25DOE.pdf.

25

128.   Because of court cases concerning past violations of Youth rights in YDCs, DCS Defendants have been forced to enact written policies restricting the use of pepper spray, mechanical restraints, and solitary confinement. But DCS Defendants have found a way to evade these written policies in practice by creating this new class of hardware-secure facilities. DCS Defendants claim that RCCAs do not have to follow YDC- or JDC-related laws and policies because they are privately operated and licensed under a different category.

129.   DCS Defendants' licensing requirements for RCCAs are wholly inadequate for establishing appropriate oversight in a hardware secure setting.

130.   For instance, there is no reference in these licensing requirements to hardware secure or locked facilities. The regulation refers to "cottages" that have a "man and wife serving as house parents" and "must be a family type setting" with "living arrangements which enhance family living."[46]

131.   DCS Defendants license youth prisons such as Hollis RTC, Mountain View Academy (a former YDC that was privatized), and Standing Tall Music City ("Standing Tall") as RCCAs, despite the fact that these facilities are in clear violation of the licensing requirements.

132.   RCCA licensing requirements restrict the use of solitary confinement and do not permit the door to be locked, ban the use of pepper spray as punishment, and do not provide for other uses of pepper spray or mechanical restraint.[47]

---

[46] Standards for Residential Child Caring Agencies, Rules of the Tenn. Dep't of Child.'s Servs. Stds. for Reg. Insts. 0250-04-05-0.7(1)(a), 0250-04-05-0.6(1)(c), 0250-04-05-0.9(3) (March 1999), https://publications.tnsosfiles.com/rules/0250/0250-04/0250-04-05.pdf.
[47] *Id.* at 0250-4-5-.07(2)(d), 0250-4-5-.07(3)(b).

26

133.   Hollis RTC, which is Tennessee's youth prison for girls, is also licensed as a "Maternity Home" for "illegitimately pregnant women"; attendant regulations do not contemplate restraints, pepper spray, or isolation. [48]

134.   However, in practice, licensed RCCAs routinely flout these rules. DRT has documented multiple instances of Youth being handcuffed, put in solitary confinement, and chemically sprayed at facilities licensed as RCCAs, often as a means of punishment or behavior management.

135.   Moreover, according to the facility operators, pepper spray is permitted at Hollis RTC, Mountain View, and Standing Tall, and Standing Tall's operator permits the use of solitary confinement for hours at a time.

136.   DCS Defendants have actual notice of these incidents and, upon information and belief, have not pursued licensing action against the facilities, even though these practices conflict with their licensing requirements for RCCAs and with DCS's contract provider manual. [49]

137.   Rather than enforce its own regulations and policies, DCS Defendants have proposed new rules for these facilities that would establish a new category of facility called "Hardware Secure RCCAs." These proposed rules would permit the use of physical and mechanical restraints, pepper spray, and solitary confinement, but without the standards, requirements, or limitations on the use of these practices that are present in the JDC and YDC rules and policies.

---

[48] *Standards for Maternity Homes*, Rules of the Tenn. Dep't of Child.'s Servs. Soc. Servs. Div. 0250-04-07-.01(2)(a) (March 1999), https://publications.tnsosfiles.com/rules/0250/0250-04/0250-04-07.pdf.
[49] *Core Standards*, Tenn. Dep't of Child.'s Servs. Cont. Provider Manual 36–37 (May 2024), https://files.dcs.tn.gov/policies/contractProviderManual/Section_1-Core.pdf; According to the list of applicable policies to Residential Treatment, policy 27.36-DOE "Use of Chemical Agents (Mace)" applies to these facilities. *DCS Policies Applicable to Residential Treatment*, Tenn. Dep't of Child.'s Servs. (Feb. 2017), https://www.tn.gov/dcs/program-areas/juvenile-justice/policies-applicable-to-residential-treatment.html.

138. DRT, the Youth Law Center ("YLC"), and other advocacy groups commented on these proposed rules in July 2023, pointing out that the establishment of Hardware Secure RCCAs would conflict with statute, exceed DCS Defendants' administrative authority, and undermine important protections established in the laws and policies related to JDCs and YDCs. DCS Defendants have not yet responded to those comments.

139. Schools at RCCAs are not required to meet the same requirements as state public schools. Instead, they are licensed as Category I Special Purpose Non-Public Schools by TDOE and approved by the DCS Education Division. As they are not public schools, no educational performance or enrollment data is publicly available for Category I Special Purpose Non-Public Schools.

140. The written policy for placing Youth with intellectual disabilities in hardware secure settings is less stringent than that for YDCs. It requires only that a DCS disability committee and coordinator find that a young person's "treatment and security needs" require it, as well as written approval from the Commissioner or a designee.

### d. Other Hardware Secure Facilities

141. In addition to the hardware secure facilities listed above, DCS Defendants place youth in hardware secure facilities licensed by DMHSAS.[50]

142. DCS Defendants also place youth in at least twelve out-of-state facilities across ten states that are not licensed by any Tennessee state entity. At least one of these facilities, Rockdale Youth Academy ("Rockdale") in Texas, is hardware secure.

143. DCS Defendants' use of out-of-state placements allows youth to be placed in facilities that use practices that are forbidden in Tennessee's YDCs. Texas regulations, which

---

[50] Hardware secure facilities licensed by DMHSAS are subject to the Mental Health Residential Treatment Facilities for Children and Youth regulations described in Section I.C.2, *infra*.

28

govern Rockdale, permit mechanical restraint types that are banned in Tennessee, such as restraint beds and restraint chairs.[51] They authorize the use of pepper spray in instances of "riot," whereas pepper spray is banned from YDCs entirely.[52] Rockdale has reported at least seventy instances of disciplinary solitary confinement lasting between twenty-four and forty-eight hours.[53] Tennessee has banned solitary confinement as a disciplinary measure.[54]

144.    Rockdale's school is a charter school subject to Texas law and standards.

145.    As DCS Defendants change Youths' placements as described in Facts Section II, *infra*, Youth are potentially subject to at least five different sets of regulatory schemes and/or DCS policies—YDC, RCCA, JDC, DMHSAS, and the state of Texas. This does not account for other states and other in-state facility types with which DCS Defendants contract for juvenile justice placement, albeit in smaller numbers.

### 2. Staff Secure Facilities

146.    Staff secure facilities are those with (a) continuous presence by staff or contractors who have exclusive control of all entrances and exits; or (b) staff or contractors who use physical intervention to prevent youth from exiting.

---

[51] *Use of Force*, Tex. Juv. Just. Dep't General Admin. Pol'y Manual GAP.380.9723(g), GAP.380.9723(j) (Feb. 15, 2016), https://www2.tjjd.texas.gov/policies/gap/380/97/gap3809723.pdf.
[52] *Secure Juvenile Pre-Adjudication Detention and Post-Adjudication Correctional Facilities*, Tex. Admin. Code 37-11-343.816(1) (Feb. 1, 2018), https://www.tjjd.texas.gov/index.php/doc-library/send/451-tac343-standards/1545-tac-chapter-343-standards-effective-on-020118.
[53] *The Center for Success and Independence Rockdale Academy*, Tex. Juv. Just. Dep't Juv. Facility Registry (2022), https://www2.tjjd.texas.gov/publications/other/searchfacilityregistry.aspx (choose "Post-Adjudication (Secure)" from facility type dropdown, click "display information," then select "The Center for Success and Independence Rockdale Academy") (last accessed June 20, 2024).
[54] Tenn. Code Ann. § 37-5-214.

29

147.   DCS Defendants describe staff secure facilities as being for "youth with a variety of charges and behavioral concerns."[55] Staff secure facilities receiving DCS placements include the Rosewood/Walnut Complex at Clover Bottom and Hollis Academy.[56]

148.   One of DCS Defendants' listed staff secure juvenile justice facilities is licensed as an RCCA, but the rest are licensed by DMHSAS as Mental Health Residential Treatment Facilities for Children and Youth ("MHRTFs"), which have an entirely different set of regulations.[57]

149.   DMHSAS regulations do not contemplate the use of pepper spray and restrict the use of solitary confinement and mechanical restraint, which must be overseen by a licensed medical practitioner.[58]

150.   DMHSAS-licensed facilities must provide or arrange for education in compliance with TDOE rules and minimum standards.[59] The state board of education rule on residential mental health facilities refers only to out-of-state facilities.[60]

151.   Tennessee law provides for the allocation of education funds for students in state licensed residential mental health facilities only if certain criteria are met, including that the residential mental health facility operates as a Category I special purpose school, the student was

---

[55] *Real Estate Strategic Plan*, Tenn. Dep't of Child.'s Servs. at 20.
[56] *Id.* at 10.
[57] *Mental Health Residential Treatment Facility for Children and Youth*, Rules of the Tenn. Dep't of Mental Health and Substance Abuse Servs. Off. of Licensure 0940-05-37 (Dec. 2022), https://publications.tnsosfiles.com/rules/0940/0940-05/0940-05-37.20221201.pdf.
[58] *Use of Isolation, Mechanical Restraint, and Physical Holding Restraint in Mental Health Residential Treatment Facilities*, Rules of the Tenn. Dep't of Mental Health and Substance Abuse Servs. 0940-03-09-.02(1), 0940-03-09-.07(1) (Dec. 2022), https://publications.tnsosfiles.com/rules/0940/0940-03/0940-03-09.20221201.pdf.
[59] *Mental Health Residential Treatment Facility for Children and Youth*, Rules of the Tenn. Dep't of Mental Health & Substance Abuse Servs. Off. of Licensure 0940-05-37(1), https://publications.tnsosfiles.com/rules/0940/0940-05/0940-05-37.20221201.pdf (last accessed June 12, 2024).
[60] *Residential Mental Health Facilities*, Rules of the Tenn. Bd. of Educ. 0520-01-20 https://www.tn.gov/content/dam/tn/stateboardofeducation/documents/2022-sbe-meetings/february-4,-2022-sbe-meeting/2-4-22%20IV%20E%20Residential%20Mental%20Health%20Facilities%20Rule%200520-01-20%20Clean.pdf (last accessed June 12, 2024).

30

admitted to the facility under a signed, written order of a qualified physician, based on medical necessity, and the facility provides a minimum of 16.5 hours per week of educational instruction.[61] This is the lowest amount of educational instruction required in any facility type.

152. Per the state's directory of nonpublic schools, it appears that these facilities are providing education services via Category I Special Purpose Non-Public School licensure by TDOE, and approval by the DCS Education Division.

### 3. Community Placements

153. DCS Defendants define Community Placements as residential facilities including children's homes, youth centers, youth academies, hospitals, and churches.[62] The least restrictive of these facilities include "Level 2" facilities, which are non-locked residential facilities that may allow Youth to attend public school and receive services within the community.[63] Upon information and belief, Level 2 facilities do not always allow Youth these freedoms.

154. Therapeutic foster homes, family-based placements with specially trained caregivers and higher levels of mental health support, may be categorized as "Level 2,"[64] although they are largely unavailable for young people in juvenile justice placements.

155. Facilities categorized by DCS Defendants as Community Placements include highly restrictive congregate care facilities that function like closed psychiatric institutions, in which young people have little privacy or control over their daily activities and limited contact with family or other supportive adults who are not Facility Staff. Community Placement does not include family-based placements or supportive independent living placements.

---

[61] Tenn. Code Ann. § 49-3-370.
[62] Real Estate Strategic Plan, State of Tenn. Dep't of Children's Servs. at 10, 20, 56.
[63] *Id.* at 56.
[64] *Id*.

156.    Most Community Placements house a mix of juvenile justice-involved youth and young people in DCS Defendants' custody as a result of a dependency and neglect case.

### 4.    Other Placements

157.    Other placements where DCS Defendants may place Youth include foster homes, trial home visits,[65] and kinship foster care,[66] which are all home and family-based placement options, rather than institutional settings.

158.    DCS Defendants' Annual Report shows that only 1% of young people were served in a foster or kinship home in FY 2022–23. This aligns with DRT observations that family-based care is functionally unavailable either as a long-term or step-down placement.

159.    DCS Defendants' use of highly restrictive placements has increased significantly over the past few years. In 2016, only 24% of "youth justice placements" were in hardware secure or staff secure settings; by mid-2023, it was 68%.[67]

160.    DCS Defendants' failure to use family and home-based placements violates its legal responsibility to place young people in the most integrated environment that can meet their needs and is contrary to research on effective practices.[68]

---

[65] "The first thirty (30) days after the child's return to home placement supervision shall be a trial home pass with [DCS] retaining legal custody of the child. If the child successfully completes the trial home pass, at the end of the thirty-day trial home pass the child shall automatically continue on home placement supervision status, unless the court has ordered that supervision status is not necessary, and [DCS's] legal custody of the child shall terminate. Such home placement supervision by [DCS] shall continue until the court orders a discharge of such supervision under subdivision (g)(1)." Tenn. Code Ann. § 37-1-137 (c)(1)(C).

[66] Kinship foster care is foster care placement with a caregiver who is related to the child. A traditional foster care placement places a child with unrelated caregivers. Tenn. Code Ann. §§ 37-5-501(b)(11); 37-2-414.

[67] *The State of the Child in Tennessee 2023*, Tenn. Dep't of Child's Servs. at 83, https://www.tn.gov/content/dam/tn/tccy/documents/stateofthechild/StateoftheChild2023Final.pdf.

[68] The National Academies of Science found community-based programs to have better development and recidivism outcomes than institutional settings, even for high-risk young people. *See Reforming Juvenile Justice; A Developmental Approach,* Nat'l Rsch. Council of the Nat'l Acads. 139-82, 241-80, https://nap.nationalacademies.org/read/14685/chapter/1.

32

161. Tennessee's 2017 Joint-Ad Hoc Tennessee Blue Ribbon Task Force found community-based services to be largely unavailable, causing young people to unnecessarily be placed out of their home, and recommended the expansion of community-based services.[69]

162. DRT and YLC have published multiple public reports on how DCS Defendants could improve the availability of integrated community-based settings and have offered to help identify and implement evidence-based programs allowing more Youth to be served at home and in the community, but DCS Defendants have declined.

**D. Defendants' Licensing and Oversight Failures**

163. Tennessee and DCS Defendants have failed to establish adequate oversight and accountability measures to ensure that youth in state juvenile justice custody are cared for, protected, and rehabilitated.

164. There is no clear standard of care across the system; youths' rights and services are dependent on the licensing category of the facility in which they are placed.

165. DCS Defendants do not exercise their authority and responsibility as a licensing and placing agency to ensure that youth in its care are safe and receive appropriate services regardless of where youth are located.

166. DCS Defendants have failed to respond to basic requests for licensure and oversight information, even when the documents requested are limited to ones mandated to be maintained under regulation or policy.

167. DCS Defendants do not make information about licensure status, licensing actions, or complaints regarding DCS-licensed or contracted entities publicly available.

---

[69] *Joint Ad-hoc Tennessee Blue Ribbon Task Force on Juvenile Justice, Final Report,* Tenn. Gen. Assemb. 5, 10-11 (Dec. 2017) https://www.tn.gov/content/dam/tn/tccy/documents/youth-justice/JJ-BlueRibbon-Report-2018.pdf.

33

168. In fact, DCS Defendants admitted in their April 26, 2024 response to a record request from DRT that they *do not collect* "information regarding facilities' policies, plans, forms, etc." from the DCS-licensed or approved facilities housing the youth for which DCS Defendants are responsible.

169. DCS Defendants lack processes to even track which facilities are juvenile justice facilities. Facilities that primarily house youth in the juvenile justice system are subject to the Prison Rape Elimination Act ("PREA"), which provides important protections against sexual abuse for youth in residential settings. Compliance with PREA is a basic responsibility of any juvenile justice state agency.

170. The 2022 Tennessee Comptroller's Audit revealed that in 2021, DCS Defendants should have monitored thirty-one facilities in Tennessee for PREA compliance. However, DCS Defendants had only identified eighteen of these facilities as PREA facilities and had monitored just three.[70] In response to a March 2023 request from DRT, DCS Defendants identified seventeen PREA facilities.

171. DCS Defendants fail to identify PREA-applicable facilities, and facilities seem unaware of their obligation to comply with PREA. As a result, DCS Defendants and the state of Tennessee fail to implement PREA-mandated standards and reporting, putting youth at risk of sexual violence.

172. DCS Defendants have actual knowledge of licensing violations at facilities, including but not limited to violence by staff, punitive use of pepper spray and chemical restraint, illegal use of solitary confinement, failure to provide timely medical treatment, and deprivation of education, and they have failed to use their licensing and oversight powers to address these issues.

---

[70] *Performance Audit Report Department of Children's Services*, Tenn. Comptroller of the Treasury 58–59 (Dec. 2022), https://comptroller.tn.gov/content/dam/cot/sa/advanced-search/2022/pa22033.pdf.

173. Indeed, DCS Defendants have continued to contract with providers who violate licensing requirements. Upon information and belief, DCS Defendants have even instructed licensing and oversight staff not to inspect certain facilities or to rewrite reports to cover up such issues.

## II. Defendants Unnecessarily Place Youth in Highly Restrictive Institutions

174. Defendants fail to place Youth in the most integrated setting appropriate for their individual needs, instead unnecessarily incarcerating them in juvenile facilities. Defendants exacerbate the issue by placing Youth in facilities far from their families and communities, frequently transferring them between facilities, and failing to allow them to attend public school.

### A. Youth with Disabilities are Disproportionately Represented in Tennessee's Juvenile Justice System, Yet Defendants Fail to Appropriately Assess, Evaluate, and Account for Youth with Disabilities.

175. Young people with disabilities and mental health diagnoses are significantly over-represented in the juvenile justice system in Tennessee, as DRT has observed in monitoring and investigating complaints in DCS-licensed or approved facilities. Nevertheless, Defendants often underreport the number of Youth with disabilities in their custody because they do not appropriately assess and evaluate Youth. As a result, Defendants routinely fail to place Youth in the most integrated setting appropriate for their needs or provide Youth with reasonable accommodations to provide meaningful access to services and programs to meet their needs.

#### 1. Youth with Disabilities are Over-Represented in Tennessee's Juvenile Justice System

176. DRT observations indicate that the rate of young people with disabilities, which includes intellectual, developmental, learning, and mental health or emotional disabilities, in DCS-

35

licensed or approved juvenile justice facilities is much higher than in the general population.[71] Between 2020 and 2021, thirty-eight of fifty-five youth interviewed by DRT at Wilder said that they had mental health diagnoses, and forty-five stated that they were being prescribed psychotropic medications. Mental healthcare professionals cannot prescribe Youth psychotropic medications absent a mental health diagnosis.

177. Similarly, Facility Staff at Wilder are aware of the high proportion of Youth with mental health diagnoses. Facility Staff stated that more than 80% of Wilder youth were prescribed psychotropic medications and that all have PTSD.

### 2. DCS Defendants and DCS-Licensed or Approved Facilities Fail to Properly Track Youth with Disabilities, Yet They Still Admit to Having a Significant Number of Them in Their Care and Custody

178. DCS Defendants do not maintain statistics on the number of Youth with disabilities in juvenile justice custody, as they lack appropriate screening and evaluation procedures that would allow them to track these statistics.

179. In May 2024, DCS Defendants admitted that they do not maintain records related to youth eligible for special education upon admission to a JDC.

180. Moreover, despite national, state, and DRT internal data indicating a high prevalence of disabilities in the juvenile justice system, DCS-licensed or approved facilities have

---

[71] Nationally, between 65% and 85% of youth in the juvenile justice system have disabilities. Common disabilities found in youth in the juvenile justice system include intellectual, developmental, learning, and mental health or emotional disabilities. The National Council on Disability found high rates of learning and/or emotional disabilities among youth involved in the juvenile justice system, including "invisible disabilities" such as PTSD, emotional disturbance, specific learning disability, or ADHD. *See* Jessica Snydman, *Unlocking futures: Youth with learning disabilities and the juvenile justice system*, Nat'l Center for Learning Disabilities at 2 (2022), https://ncld.org/wp-content/uploads/2023/08/NCLD-Unlocking-Futures-Final-7th-Dec-Updated-.pdf; *Breaking the School-to-Prison Pipeline for Students with Disabilities*, Nat'l Council on Disability (June 18, 2015), https://www.ncd.gov/report/breaking-the-school-to-prison-pipeline-for-students-with-disabilities/.

36

disputed DRT's access to records and monitoring on the basis that no residents at their facilities have disabilities.

181.    But when applying for federal funding, these same facilities often say that they need funds to support special education programming in their facilities—programming that is only available to young people with an eligible disability.

182.    For instance, Standing Tall submitted an application to TDOE for federal Title I Part D funds that stated, "We have a certified special education teacher on site working directly with special education students and a certified special education teacher off site reviewing all special education paper work and [Individualized Education Program] goals."[72]

183.    Similarly, Wilder submitted an application to TDOE stating that "since a great deal of our population is either behind academically or receives special education services (around 33–35%) we believe that all teachers need to have a basic understanding of special education."

184.    MTJDC also submitted an application to TDOE stating, "Students under the Special Education umbrella receive services while at the facility from a licensed SPED teacher."

185.    MTJDC reported that forty-five of 198 students served prior to April 2023 were students with Individualized Education Programs for special education.

186.    Yet, in their March 2023 PREA audit, MTJDC stated that they had *zero* youth present with a physical, cognitive, or functional disability.[73]

---

[72] An Individualized Education Program is a written plan developed for a child with a disability in accordance with the Individuals with Disabilities Education Act. 34 CFR § 300.320.
[73] *PREA Facility Audit Report,* Tenn. Dep't of Child.'s Servs. Middle Tenn. Juv. Det. Ctr. at 6 (May 2, 2023), https://www.tn.gov/content/dam/tn/dcs/documents/juvenile-justice/prea/MTJDCPREAAudit2023.pdf.

187.    MTJDC, Standing Tall, Hollis Academy, and Hollis RTC, all of which are owned by the same operator, reported having only one youth with a cognitive or functional disability out of 170 in their care on their PREA audits.[74]

188.    Wilder's 2021 PREA Audit reported zero youth with disabilities present out of a population of seventy-six, but Wilder also told TDOE in 2023 that approximately 33–35% of the population received special education or was behind their grade level. Approximately 80% of Wilder residents DRT interviewed in 2020-21 reported having a disability and/or being prescribed psychotropic medication.

189.    While it is not uncommon for there to be slight differences in disability statistics based on differing disability definitions between statutes and programs, implementation guidance from the National PREA Resource Center specifically mentions physical disabilities, cognitive or intellectual disabilities, learning disabilities, psychiatric disabilities (including MDD, bipolar disorder, anxiety disorder, schizophrenia, and PTSD), and sensory disabilities as relevant to facility responsibilities under both PREA and the ADA to make PREA and victim services accessible for people with disabilities.[75]

190.    Given how broadly the National PREA Resource Center defines disability, it is highly unlikely that the discrepancies in data reporting are the result of a good-faith application of differing definitions.

---

[74] This operator also runs Mountain View Academy, for which there is no PREA report available.

[75] *See* Sandra Harrell et al., *Making PREA and victim services accessible for incarcerated people with disabilities*, Nat'l PREA Res. Ctr. & Vera Inst. of Just. at 3-6 (Oct. 2015), https://www.vera.org/downloads/publications/prea-victim-services-incarcerated-people-disabilities-guide.pdf.

38

191. Even DCS-contracted facilities that are specifically licensed by DMHSAS as MHRTFs—for young people with "mental illness or who are seriously emotionally disturbed" —show inconsistencies in their PREA data regarding disability status.[76]

192. Under DCS contractor criteria, MHRTFs serve children with significant mental health disorders, severe social, educational, familial and occupational impairments, and significant mental health needs unable to be provided for at a lower level of care.

193. According to the criteria for admission, every child admitted to residential treatment facilities of this type has a mental impairment that substantially limits one or more major life activities.

194. However, these facilities report that a substantial majority of residents *do not* have disabilities.

195. For example, at the time of Standing Tall's PREA audit, Standing Tall was licensed as a MHRTF; yet it reported only one student with a disability present out of forty-nine. A single DRT monitoring visit in mid-2024 identified fifteen young people with disabilities.

196. Similarly, the Rosewood/Walnut Complex at Clover Bottom and Memphis Youth Academy, both MHRTFs, reported having only eight out of forty-eight and thirteen out of forty-eight residents with disabilities, respectively, in their 2022 PREA audits.

197. Therefore, either the MHRTFs are not appropriately tracking and reporting disability-related data, or they are accepting children who do not actually meet the psychological and/or educational criteria for admission.

---

[76] *Mental Health Residential Treatment Facility for Children and Youth*, Rules of the Tenn. Dep't of Mental Health and Substance Abuse Servs. Off. of Licensure 0940-05-37-.01 (Dec. 2022), https://publications.tnsosfiles.com/rules/0940/0940-05/0940-05-37.20221201.pdf.

198. DCS Defendants and their licensed or approved facilities engage in a pattern of acknowledging disability when it benefits them, but not when it could lead to increased oversight or accountability with regard to the treatment of children and young people in their custody.

199. The result is a haphazard approach in which DCS Defendants prioritize the needs of the agency and facilities over the lives of Youth and routinely fail to place Youth in the most integrated setting appropriate for their individual needs.

**B. DCS Defendants' Policies and Practices Lead to Over-Institutionalization of Youth**

**1. DCS Defendants Place Youth Based on Convenience and Capacity Considerations, Rather Than the Youth's Treatment Needs.**

200. DCS Defendants' placement decisions are rarely related to youths' treatment needs and are in large part driven by space limitations or the whims of DCS Defendants.

201. By Commissioner Quin's admission, DCS's assessment procedures and placement decisions are little more than guesswork. In March 2024, Commissioner Quin stated that, in its current state, DCS could not "assess a child's true needs, [including] clinical, educational, behavioral health . . . . If we don't have that information, we're just sort of guessing about where a child needs to be placed."[77]

202. Despite the Commissioner's statement about lacking information about children's needs, DCS Defendants have pre-existing information about Youth in the vast majority of juvenile justice cases. According to DCS, 86.2% of youth in juvenile justice custody were previously involved with DCS in the child welfare system. But DCS Defendants ignore information indicating that Youth have disabilities in DCS's own records and those provided to DCS by courts, health providers, or schools, and fail to procure evaluations to assess for disabilities.

---

[77] Tennessee House Government Operations Committee, B1751, at 16:41 (Mar. 4, 2024), https://tnga.granicus.com/player/clip/29772?view_id=733&redirect=true.

203.   For example, John Doe 2's DCS records from 2021 and 2022 showed that a child welfare caseworker had recommended that his mother take him for a mental health assessment, that he was seen by multiple mental health providers, that he had been recommended for trauma therapy, and that his mother had communicated concerns about her son punching himself in the head while in detention, but this information is never referred to in subsequent juvenile justice intakes, caseworker files, or evaluations. Indeed, in May of 2023, his juvenile justice caseworker reported that he had no mental health history.

204.   DRT's review of records for eleven Youth placements at Wilder in 2020 and 2021 found that none contained IQ scores in paperwork submitted to justify their placement at a YDC, and that two of the Youth had evaluations (one prior to placement at Wilder, and one after) reflecting an IQ below seventy. Those Youth could not legally have been placed or allowed to remain at Wilder absent a waiver from the Commissioner, but no such waivers were present in the files.

205.   DCS Defendants' failures to assess Youth to understand their individualized needs results in placing Youth in highly restrictive facilities without proper consideration of whether they could be served in a more integrated setting. These failures are not new. The Tennessee Commission on Children and Youth noted in 2012 that juvenile justice facilities are unable to treat and rehabilitate Youth with significant mental and behavioral health issues—yet these Youth are disproportionately represented in DCS juvenile justice custody.[78]

206.   More than a decade later, these problems remain unaddressed. In 2022, DRT and YLC released a joint report detailing grave concerns about the failure to assess and treat Youth at

---

[78] A survey of six hundred young people in DCS custody revealed that 52% met diagnostic criteria for at least one disorder; however, only 14% were referred to a mental health professional.

Wilder, including numerous specific suggestions about ways DCS Defendants could remediate these issues.

207. DRT and YLC have submitted hundreds of individual recommendations through public comment on DCS regulations on licensing and oversight, placement, evaluation, and conditions issues in DCS licensed facilities.

208. DCS Defendants continue the default practice of institutionalizing Youth, rather than implementing assessment and evaluation protocols to determine what the most integrated environment is for each Youth, and continue to place Youth in detention centers and secure facilities oriented around punishment with no regard for Youths' needs or disabilities. The result is that DCS Defendants systematically fail to place Youth in the most integrated setting appropriate for their individual needs.

## 2. DCS Defendants Frequently Move Youth Between Facilities.

209. DCS Defendants move Youth between facilities frequently, without regard for the needs of each individual Youth, contributing to DCS Defendants' failure to place Youth in the most integrated environment appropriate for their needs. These frequent transfers put all Youth at imminent risk of being placed at, and subjected to mistreatment or disparate regulations at, any DCS-licensed or approved facility, or even an out-of-state facility, at any time.

210. This frequent movement is disruptive to the care, stability, and relationships of Youth, as well as to the education and treatment of Youth.

211. DRT has frequently observed that Youth are moved to facilities far from their families and support structures—sometimes even out of state—causing further damage to Youth.

212. In at least some instances, changes in placement are perceived as punitive in nature—Facility Staff threaten Youth that they may be shipped off to Texas or a hardware secure facility across the state if they do not follow orders.

42

213. In multiple instances, DCS Defendants have moved Youth to another facility or out of state after DRT has opened an investigation into allegations of abuse or mistreatment of that Youth.

214. A 2017 state report found that young people were sent to an average of 4.4 placements while in DCS juvenile justice custody, with some experiencing up to fifteen placements.[79]

215. This frequent placement disruption is consistent with DRT interviews and record reviews, which show Youth cycling through hardware secure and staff secure facilities, at times stopping over in JDCs while DCS Defendants seek another long-term setting.

216. For example, DCS transferred T.K., a girl with depressive disorder with psychotic symptoms, PTSD, and bipolar disorder, numerous times in quick succession. One transfer to an out-of-state residential institutional facility ignored the recommendation of a DCS psychologist that she be placed in a less restrictive setting. T.K. was then transferred again to an institutional facility five hundred miles away, from which she was discharged after turning eighteen. T.K.'s frequent transfers hindered instituting a plan for her severe mental health challenges. Her mental state deteriorated to the point of self-harm and suicidal ideation.

217. DCS Defendants frequently shuffle young people between JDCs, YDCs, RCCAs, and MHRTFs, suggesting that these facilities are essentially viewed as a pool of interchangeable beds, rather than offering substantially different services that may or may not be tailored to youths' needs.

---

[79] *Joint Ad-hoc Tennessee Blue Ribbon Task Force on Juvenile Justice, Final Report,* Tenn. Gen. Assemb. 5 (Dec. 2017) https://www.tn.gov/content/dam/tn/tccy/documents/youth-justice/JJ-BlueRibbon-Report-2018.pdf.

43

218. For example, young people placed in MHRTFs are required to have qualifying diagnoses and life impairments, and thus, mental health related disabilities. Therefore, it would be inappropriate for DCS Defendants to transfer those same young people to JDCs, which do not provide any mental health treatment, and yet this occurs.

219. RCCAs and YDCs are also not structured as therapeutic mental health settings, yet DCS Defendants frequently move young people between these facilities and MHRTFs, indicating that there are Youth present at all these facility types with significant mental health disabilities. In fact, one of these facilities, Standing Tall, changed from a MHRTF license to a RCCA license in summer 2023.

220. Youth interviews also indicate that there is relatively little difference between some DCS-contracted MHRTFs and hardware secure facilities. For example, Facility Staff at Wilder threatened to send Youth to Memphis Youth Academy, an MHRTF, as a punishment. John Doe 1 reported that while he was no longer at high risk of assault by peers at Memphis Youth Academy, he felt that Facility Staff there were more aggressive than those at Wilder.

221. As detailed above, DCS Defendants move Youth so frequently between facilities that all are at imminent risk of being placed at—and suffering mistreatment or disparate regulations at—any DCS-licensed or approved facility, or even an out-of-state facility, at any time. Therefore, all Youth are at imminent risk of experiencing all the conduct alleged herein.

222. These frequent transfers, often between different facility types, illustrate DCS Defendants' failure to place Youth in the most integrated environment appropriate for their needs.

### 3. DCS Defendants Deny Youth Reasonable Accommodations in Disciplinary and Reward Practices, Blocking Youths' Access to Activities and Programs and Lengthening Their Sentences

223. DCS Defendants deny Youth reasonable accommodations relating to the Point and Level Systems ("P&L Systems") and Youth Commitment Reduction Credits ("YCRCs), which the DCS Defendants use to reward youth for "good" behavior, and to punish youth for "bad" behavior.

224. In doing so, the DCS Defendants punish Youth for their disabilities, denying them access to activities and programs and lengthening their time in DCS custody.

### a. DCS Defendants' Failure to Provide Reasonable Accommodations Punish Youth for Their Disabilities and Prolongs Their Incarceration

225. DCS-licensed or approved facilities use P&L Systems, which can vary by facility, to reward and punish youth.

226. Under these systems, Youth can earn points each week for various behaviors. For example, Youth at Wilder can earn points for behaviors like following directions, raising their hand and waiting to be called on before speaking, staying in their seat, speaking quietly, and lining up quietly.

227. Facility Staff can also deduct points from Youth for negative behaviors, including "Major Offenses" like fighting and stealing and "Minor Infractions" like disruptive behavior, failure to follow rules, and horseplay. In practice, points are often deducted at the whims of Facility Staff, who arbitrarily decide whether an offense is "Major" and how many points to deduct.

228. The number of points each Youth earns per week determines each Youth's level for the following week. A Youth's level impacts things such as how much contact a Youth can have with their family and other residents, the ability of Youth to engage in physical exercise and recreation, a Youth's ability to go outside or access portions of the facility, and whether a Youth receives education.

45

229.   For example, at MTJDC, Youth who are on "restriction", or the lowest level of the P&L System, may only have one phone call a week and are not entitled to visitation.[80]

230.   Mountain View Academy uses its P&L System to deprive Youth of education by barring Youth from attending school during the first 24 hours after they are placed on restriction.[81] Mountain View also isolates Youth on its restriction or "precaution watch" levels, requiring them to stay in a "staff designated area" and obtain staff permission before interacting with peers, barring them from group recreation activities, and limiting their phone calls to five minutes in length.[82]

231.   DCS Defendants fail to screen Youth for or provide Youth with reasonable accommodations for their disabilities as it pertains to these systems.

232.   As a result, Youth are punished for their disabilities.

233.   For example, R.A., a child with mental health disabilities who did not receive necessary reasonable accommodations, has been unable to achieve the goals set for him in Standing Tall's P&L System.

234.   T.K., a Youth who engaged in self-harm during an untreated mental health crisis, lost 100 "points" for claiming self-harm. She also lost points for behavioral issues such as refusing to clean her room, not practicing proper hygiene, and yelling—all issues related to her severe mental and behavioral disabilities. Her loss of points prevented her from accessing activities and programs given to other Youth.

---

[80] Middle Tennessee Juvenile Detention Center Resident Handbook at 2, 4 (Revised Jan. 13, 2022), https://mtjdc.yolasite.com/resources/MTJDC%20Resident%20Handbook_jan%202022.pdf (last accessed June 22, 2024).
[81] Mountain View Academy Program Handbook for Residents and Staff at 10 (Revised Feb. 2021), https://www.waynehalfwayhouse.com/copy-of-resources-1 (click "Resident Handbook") (last accessed June 21, 2024).
[82] Mountain View Academy Program Handbook for Residents and Staff at 11 (Revised Feb. 2021), https://www.waynehalfwayhouse.com/copy-of-resources-1 (click "Resident Handbook") (last accessed June 21, 2024).

46

235.   Facility Staff repeatedly punished J.T., a Youth with ADHD and insomnia, for "major" disciplinary infractions, including standing in a doorway and going to other residents' rooms, limiting his access to programs and activities.

236.   For Youth committed to DCS custody for an indeterminate period, a Youth's progress (or lack thereof) in the Point and Level System can impact whether and when the DCS Defendants recommend that a Youth be transitioned to a home placement or discharged, or if the DCS Defendants determine that a Youth should remain in DCS custody beyond the standard six-month maximum custody period.

237.   For example, Mountain View Academy's Program Handbook states that each Youth's progress in its P&L System will determine the Youth's discharge date.[83]

238.   Therefore, the DCS Defendants' failure to provide Youth with reasonable accommodations relating to the Point and Level System can also prolong the Youths' incarceration.

### b. DCS Defendants' Failure to Provide Reasonable Accommodations Relating to Youth Commitment Reduction Credits Prolongs Youths' Incarceration

239.   Youth that are placed in DCS custody on a determinate sentence are eligible to earn YCRCs, which can reduce the length of a youth's sentence.

240.   DCS Defendants fail to provide reasonable accommodations to Youth relating to YCRCs, meaning that Youth fail to earn YCRCs and lose previously earned YCRCs, effectively lengthening their sentences, due to Youths' behavioral and mental health disabilities.

---

[83] Mountain View Academy Program Handbook for Residents and Staff at 7 (Revised Feb. 2021), https://www.waynehalfwayhouse.com/copy-of-resources-1 (click "Resident Handbook") (last accessed June 21, 2024).

47

241.   Youth may be awarded YCRCs for satisfactory behavior and treatment program progress. A Youth's progress (or lack thereof) in the P&L System can impact whether the DCS Defendants deem a youth's behavior "satisfactory."

242.   DCS Defendants often refuse to award Youth YCRCs because of minor behavioral incidents that are related to the Youths' disabilities, like refusing to stop talking, staying in a bathroom for too long, and acting disrespectfully toward Facility Staff.

243.   For example, O.V., who struggles with listening comprehension due to his ADHD, depression, and conduct disorder, was given multiple Major Offenses for refusing to follow instructions.

244.   According to DCS written policy, Youth may only lose previously earned YCRCs for refusing to participate in a treatment program or for committing a Major Offense.

245.   However, in practice, Facility Staff revoke YCRCs for minor infractions that Facility Staff deem "Major."

246.   For example, Facility Staff repeatedly revoked YCRCs from M.O., who has ADHD and cognitive deficits, for minor behavioral infractions like "talking out loud" and ignoring instructions, which Facility Staff designated as Major Offenses.

247.   DCS Defendants' failure to provide Youth with accommodations contributes to the over-institutionalization of Youth by cutting off their access to activities and programs and prolonging their incarceration.

248.   DCS Defendants are aware of these practices. They have received numerous detailed reports from DRT laying out these issues and proposing solutions, but have allowed them to continue.

### III. Defendants Systematically Deny Youth an Adequate Education

249. Defendants fail to provide Youth with a free and equal public education, as required by Tennessee law.[84]

250. DCS is responsible for ensuring that young people in its custody are "enrolled in an appropriate education program based on developmental and academic needs" and for complying with relevant state and federal law around education placement.[85]

251. State regulations require that youth in JDCs receive only four hours a day of instruction, and only in English Language Arts and Math.[86]

252. However, many JDCs fail to meet even these bare minimum educational requirements.

253. For example, MTJDC's Resident Handbook from January 2022 provides a daily resident schedule with only two hours and fifty minutes of educational instruction per day and prohibits those removed from a classroom from returning to school until the next week.[87]

254. Further, Facility Staff at MTJDC force Youth to sign forms indicating that they refuse to go to school that day, threatening them with the loss of recreational time if they do not sign. MTJDC then uses these signed forms as an excuse for not providing the required education.

255. Defendants also fail to give any educational instruction for long periods after Youth enter a DCS-licensed or approved facility, including allowing JDCs to delay enrolling Youth in

---

[84] Tenn. Const. art. XI, § 12; *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 140-41 (Tenn. 1993); *see also* Tenn. Code Ann. § 49-6-3001.
[85] *Serving the Educational Needs of the Child/Youth*, Tenn. Dep't of Child.'s Servs. Admin. Pol'ys & Procs. 21.14 (Aug. 24, 2022), https://files.dcs.tn.gov/policies/chap21/21.14.pdf.
[86] *Basic Educational Services*, Rules of the Tenn. Bd. of Educ. 0520-01-12-.04, https://www.tn.gov/content/dam/tn/stateboardofeducation/documents/pendingrules/7-27-18%20II%20R%20Education%20of%20Incarcerated%20Students%20Rule%200520-01-12%20Attachment%20Clean%20Copy.pdf (last visited May 2024).
[87] Mid. Tenn. Juv. Det. Ctr. Resident Handbook 8, 5 (Jan. 13, 2022), https://mtjdc.yolasite.com/resources/MTJDC%20Resident%20Handbook_jan%202022.pdf.

education programs for as long as twenty instructional days.[88] The twenty-day delay restarts when Youth are moved to a new JDC, so Youth may be deprived of education for even longer than twenty days. This delay is significant; under Tennessee state law, a student need only have five unexcused absences to be declared truant and subject to court intervention.[89]

256. For example, R.A., a child with depression, anxiety disorder, and mood disorders, was not given any educational instruction in the first month he was placed at MTJDC in summer 2022. When his instruction finally began, he was instructed only in English Language Arts and Math.

257. In all facility types, education essentially comes to a halt when Youth are placed in solitary confinement.

258. For example, O.V. was isolated on-and-off for two years at Wilder, during which time he often did not go to school at all. When multiple Youth were placed in solitary confinement at the same time, O.V. only received lessons once per week. Facility Staff often placed written lesson packets under O.V.'s door in lieu of providing educational instruction.

259. During his time in solitary confinement at Wilder, L.V. received packets of schoolwork under his door instead of educational instruction.

260. Bean JDC submitted documents to TDOE in May 2023 stating that students are placed in "lock up pod" during their first eight hours in a facility or after behavioral issues, during which they are barred from classrooms and denied education. Those in the "lock up" pods for extended periods "may be offered an opportunity" to access instruction using an electronic tablet.

---

[88] *Basic Educational Services*, Rules of the Tenn. Bd. of Educ. 0520-01-12-.03(6), https://www.tn.gov/content/dam/tn/stateboardofeducation/documents/pendingrules/7-27-18%20II%20R%20Education%20of%20Incarcerated%20Students%20Rule%200520-01-12%20Attachment%20Clean%20Copy.pdf (last visited May 2024).
[89] Tenn. Code Ann. §§ 49-6-3007, 49-6-3009.

50

261. Even in facilities that provide more than the bare minimum educational requirements, the education is woefully inadequate to fulfill Youths' right to education.

262. For instance, education for Youth often consists of students completing packets on their own rather than receiving instruction from a teacher.

263. Youth can also be removed from or denied school entirely by teachers and Facility Staff, including for incidents that occur outside of school.

264. Youth are frequently moved between facilities, which disrupts their course enrollment, relationships with teachers, ability to earn credits towards high school graduation, and implementation of educational accommodations.

265. As acknowledged by DCS Defendants, research on highly mobile youth populations shows that youth lose four to six months of academic progress with each placement move.[90]

266. Defendants are aware of these practices, and have received numerous reports on these issues from DRT, but have failed to stop them.

## IV. DCS Defendants Subject Youth to Chemical Spray in an Arbitrary and Abusive Manner

267. Facility Staff regularly spray Youth at JDCs, RCCAs, and other facilities contracting with DCS with oleo-capsicum resin or "OC" spray, a chemical agent commonly known as pepper spray. DCS Defendants refer to pepper spray as "chemical restraints" and/or "chemical defense agents."

---

[90] *Project Wrap Around Works to Address Needs, Improve Graduation Rates of Foster Kids in School*, Tenn. Cts. (May 14, 2021) https://www.tncourts.gov/news/2021/05/14/project-wrap-around-works-address-needs-improve-graduation-rates-foster-kids-school#:~:text=Jennifer%20Woods%2C%20an%20education%20consultant,likely%20to%20exhibit%20behavioral%20problems.

51

268.    Although Wilder and other DCS-run juvenile justice facilities do not use pepper spray, DCS Defendants allow contracting facilities to use pepper spray on Youth.

269.    For example, pepper spray was the most-used form of restraint at MTJDC in 2021, with over forty-eight instances of spray *per month*.

270.    Pepper spray causes severe pain. Medical studies have shown that pepper spray produces toxic effects in confined spaces, such as restrictive cells.[91]

271.    Pepper spray also has significant negative impacts on young people's mental health and is ineffective against youth with mental illness, likely exacerbating a youth's anger and trauma instead of ameliorating it.[92]

272.    Facility Staff compound this harm by regularly misusing pepper spray as a tool for punishment and behavior management, causing Youth extreme pain, humiliation, and emotional harm.

273.    DCS's written policy prohibits contracting facilities from using pepper spray except in the case of emergencies, medical need, or when a youth poses a risk to themselves or others and no other restraint options are available to protect youth or Facility Staff.

274.    However, Facility Staff routinely spray Youth in situations where they do not pose a threat to themselves or others. Indeed, Facility Staff regularly use pepper spray as a punitive measure, even after Youth are already restrained, confined to their cell, or both.

275.    For example, Facility Staff at MTJDC pepper sprayed S.W., who has an intellectual disability, PTSD, and conduct disorder, in the face and hair while he was shackled in his room and held in a kneeling position by at least five other Facility Staff.

---

[91] Leah Pinney, *Pepper Spray in the Texas Youth Commission: Research Review and Policy Recommendations*, Tex. Crim. Just. Coal., 2, 6 (Nov. 2007), https://www.njjn.org/uploads/digital-library/pepper.pdf.
[92] *Id.* at 5.

276. In September 2022, Facility Staff at Hollis RTC sprayed E.O., who has asthma, even though other Facility Staff were already physically restraining her. After E.O. was pepper sprayed, she went to her room and took her shirt off to decontaminate. Male Facility Staff then entered her room while she was undressed and sprayed her again. This experience was especially traumatizing because E.O. had a history of being assaulted by males while in DCS custody.

277. Similarly, in January 2022, Facility Staff sprayed Q.S., who has ADHD, bipolar disorder, and depression, even though they had already handcuffed and physically restrained him.

278. Facility Staff also routinely pepper spray Youth for administrative convenience or to force Youth to comply with instructions.

279. For example, in the summer of 2022, Facility Staff at Hollis RTC pepper sprayed T.K. for refusing to go to her room.

280. Facility Staff at MTJDC pepper sprayed L.W., who has Oppositional Defiant Disorder and ADHD, in his room after he refused instructions to stop yelling. A month later, Facility Staff sprayed him twice in one day for yelling and cursing, and again one week later for refusing to return to his cell.

281. Some Youth have difficulty complying with instructions or managing their emotions because of their disabilities, yet Facility Staff still respond by spraying them.

282. For example, Facility Staff at MTJDC repeatedly sprayed C.K., a boy with autism, depression, ADHD, and asthma, in situations where he could not manage his emotions or behavior due to his autism. In February 2023, Facility Staff at MTJDC entered C.K.'s room to remove his belongings, during which time C.K. ignored Facility Staff instructions. In response, Facility Staff pepper sprayed C.K.

53

283. DCS's written policy requires immediate decontamination after the use of pepper spray, including access to fresh air, a shower, assistance with flushing eyes, and fresh clothing. It bans the denial or delay of medical attention or decontamination for punitive purposes and requires that facilities doing so be subject to adverse licensing action. It also requires that Facility Staff debrief youth after they spray them. However, in practice, Facility Staff have a clear and persistent pattern of denying Youth these protections.

284. For example, S.W. was made to wait twelve hours before seeing a nurse after Facility Staff at MTJDC sprayed him in the face.

285. Similarly, Q.S. waited over eleven hours for medical attention after Facility Staff sprayed him in 2022.

286. In 2023, C.K., who has asthma, was denied medical attention for over three hours after Facility Staff at MTJDC sprayed him. Facility Staff then failed to clearly state the aggressive behavior that justified the use of spray.

287. Facility Staff at MTJDC refused to allow L.W. to decontaminate after they sprayed him. Nor did Facility Staff offer L.W. medical attention, move him to a location with fresh air, or debrief him afterward.

288. Facility Staff intentionally exacerbate the pain pepper spray causes Youth, including by chaining Youth to their beds before spraying them and spraying Youth in the hair so that the pain lasts longer.

289. Facility Staff also purposefully shut off water to the cells of Youth after pepper spraying them to prevent Youth from decontaminating, an extreme punitive measure that worsens the medical and traumatic effects of pepper spray with no legitimate purpose.

54

290. On one occasion, Facility Staff pepper sprayed S.W. and then turned off the water in his cell to prevent him from washing off his face and hair.

291. Similarly, Facility Staff shut off water in Q.S.'s cell after spraying him. Instead, Facility Staff only offered Q.S. a hot shower, which worsens pepper spray's painful effects.

292. DCS Defendants have acknowledged the harm caused by pepper spraying youth, especially when used in such arbitrary and punitive manners.

293. DCS Defendants have also received numerous reports from DRT laying out these issues in detail.

294. Nevertheless, the Defendants allow Facility Staff to continue subjecting Youth to such abuse, such that the DCS Defendants, through their policy of inaction, condone the use of these measures.

## V. DCS Defendants Subject Youth to Solitary Confinement and Isolation on an Arbitrary and Punitive Basis

295. DCS Defendants allow DCS-contracted or approved facilities to place Youth in solitary confinement for extended periods, often as a means of discipline, behavior management, or administrative convenience, despite ample evidence and notice that it harms Youth and state law prohibiting such conduct.

### A. Solitary Confinement is Harmful to Youth

296. Research by the U.S. Department of Justice found that more than 50% of the suicides of children detained in juvenile justice facilities occurred while youth were confined alone in their room (a form of solitary confinement), and that more than 60% of young people who committed suicide had a history of being held in isolation.

55

297. Removing Youth from their regular routines, school, mental health treatment, and opportunities for interaction with peers also results in long-term lack of trust, hypervigilance, and paranoia.

298. Federal courts in four states have ordered facilities to cease improper solitary confinement, while seven states have limited its use in the past three years. The federal First Step Act of 2018 bans punitive isolation for youth in federal facilities and allows only brief isolation when there is an immediate risk of physical harm.

299. Several national health and juvenile justice organizations have concluded that solitary confinement should never be used for children and adolescents.[93]

300. Standards published by the Juvenile Detention Alternatives Initiative prohibit all solitary confinement other than as a temporary response to behavior that threatens immediate harm. The standards ban isolation over four hours for any reason, as a disciplinary measure, and as a substitute for education and mental health treatment.[94]

301. Studies show that children experience time differently—a day for a child feels longer than a day to an adult—and have a greater need for social stimulation. Accordingly, long periods of isolation put young people at risk of depression, anxiety, and psychosis.[95]

---

[93] These include the National Commission on Correctional Health Care, American Medical Association, and the American Academy of Child & Adolescent Psychiatry. *See Position Statement: Solitary Confinement,* Nat'l Comm'n on Correctional Health Care 4 (Apr. 2016), https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf; *Solitary Confinement of Juveniles in Legal Custody*, Am. Med. Ass'n H-60.922 (2016), https://policysearch.ama-assn.org/policyfinder/detail/youth%20solitary%20confinement?uri=%2FAMADoc%2FHOD.xml-0-5016.xml; *Solitary Confinement of Juvenile Offenders*, Am. Acad. of Child & Adolescent Psych. (Apr. 2012), https://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx.

[94] *See Juvenile Detention Facility Assessment 2014 Update 11*, Annie E. Casey Juv. Det. Alternatives Initiative at 177-78 (2014), https://assets.aecf.org/m/resourcedoc/aecf-juveniledetentionfacilityassessment-2014.pdf.

[95] *See, e.g.*, *Position Statement: Solitary Confinement,* Nat'l Comm'n on Corr. Health Care at 2 (Apr. 2016), https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf; *Solitary Confinement of*

56

302.    According to the Council of Juvenile Correctional Administrators, solitary confinement has negative public safety consequences, does not reduce violence, and likely increases recidivism. Further, there is no research showing the benefits of using solitary confinement to manage behavior. Facilities that have reduced or eliminated solitary confinement have seen a reduction in violence and infractions; these facilities isolate only after multiple attempts to defuse tensions, and not as an alternative to treating mental illness.

303.    Solitary confinement is antithetical to maintaining safety and security in juvenile detention facilities. When young people experience anger as a symptom of mental illness, solitary confinement often causes additional anger, and additional time in solitary confinement.

304.    The psychological harm of solitary confinement is acknowledged by the DCS Defendants in their written policies, which prohibit solitary confinement except for in emergencies, due to medical necessity, or for short periods of time when a child poses a threat of harm to themselves or others.

**B. DCS Defendants Allow the Use of Solitary Confinement for Administrative Convenience or Punishment, Often for Extended Periods of Time and in Dangerous Conditions, Despite Policies and Laws to the Contrary**

305.    DCS Defendants have a widespread practice of condoning violations of state law and its written policies limiting the use of solitary confinement, resulting in an unwritten policy, practice, or custom of subjecting Youth to solitary confinement for administrative convenience or punishment, resulting in severe harm to Youth.

---

*Juvenile Offenders*, Am. Acad. of Child & Adolescent Psych. (Apr. 2012), https://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx.

306.    In 2019, DCS settled Fourteenth and Eighth Amendments claims against it for using solitary confinement for punitive reasons at Rutherford County Juvenile Detention Center, enjoining the facility from using solitary confinement as punishment in the future.[96]

307.    In 2019, MTJDC forced young people to remain in solitary confinement for twenty-four hours per day. DCS's Director of Licensing insisted that the practice did not constitute solitary confinement because young people could yell through their doors at others, and he admitted that residents were commonly held on room restriction for twenty-three hours daily during their first week of incarceration.

308.    In 2021, Tennessee enacted new restrictions on the circumstances and duration for which DCS Defendants can use solitary confinement at JDCs and YDCs, limiting solitary confinement for no more than four consecutive hours or six hours in a twenty-four-hour period,[97] but DCS and DCS-licensed or approved facilities continue their isolation practices in keeping with their custom of disregarding such restrictions.

309.    For example, John Doe 1 was held in solitary for twenty-three hours per day at Bean JDC and Upper East JDC. Similar practices occur at Shelby JDC and MTJDC.

310.    At Upper East JDC, all young people are kept in solitary confinement for twenty-three hours per day. Facility Staff permit them out for one hour daily, during which time they sit with one other resident in a common area.

311.    DCS Defendants found in 2023 that Bean JDC violated legal restrictions on solitary confinement and failed to comply with DCS's licensing rules for years.[98] But DCS continues to

---

[96] *See* Final Order Approving Class Settlement, Ordering Permanent Injunctive Relief, and Dismissing Case with Prejudice at 5, *Doe ex rel. Frazier v. Hommrich, et al.*, 3:16CV00799 (M.D. Tenn. July 19, 2019).
[97] Tenn. Code Ann. §§ 37-5-214(c), 37-1-102(26), 37-1-116(1).
[98] Paige Pfleger, *This Youth Detention Center Superintendent Illegally Locks Kids Alone in Cells. No One Has Forced Him to Stop*, ProPublica (Nov. 16, 2023), https://www.propublica.org/article/knoxville-detention-center-illegally-locks-kids-alone-in-cells.

contract with Bean JDC for post-adjudication placement and has not sought adverse licensing or enforcement action against facilities using solitary confinement, nor has it provided technical or staffing assistance to reduce its use.

312. Instead, DCS Defendants claim that county-run facilities are subject to a publicly administered child care agency exemption preventing DCS Defendants from pursuing licensing action against them.

313. However, DCS is legally required to publicize violations by out-of-compliance publicly administered facilities and is entitled to pursue enforcement actions against them via filing a complaint in Chancery Court. DCS Defendants could also stop contracting with such out-of-compliance state facilities in order to protect Youth. Nevertheless, DCS Defendants fail to act.

314. DCS Defendants also allow private facilities like MTJDC, which are not exempt from licensing, to continue operating despite violations, and have awarded MTJDC's operators additional state contracts.

      **1. DCS-Licensed or Approved Facilities Place Youth in Solitary Confinement for Administrative Convenience and Punishment, Not for Safety or the Needs of Youth**

315. DCS Defendants and DCS-approved and licensed facilities routinely use solitary confinement in ways that break Tennessee law and harm Youth. Placement in solitary confinement is arbitrary, used not for safety or the needs of Youth, but administrative convenience and punishment.

316. Facility Staff routinely use solitary confinement as a punishment for low-level disciplinary infractions like refusing to follow instructions.

317. For example, Facility Staff placed G.B., who has PTSD and ADHD, in solitary confinement dozens of times for failing to follow instructions, including failing to put on his clothes, leaving his classroom, staying in a shower, refusing to go to his room, spraying soap, not

59

leaving a toilet quickly enough, refusing to take off his shoes, and refusing to line up and go to the gym. In total, G.B. was sent to solitary confinement approximately fifty times.

318. Similarly, Facility Staff sent M.O., who has ADHD and conduct disorder, to solitary confinement for refusing to go to his room, refusing to stop watching TV, horseplaying, yelling, and throwing clothes.

319. On one occasion, Facility Staff sent J.W., who has PTSD and MDD with psychotic symptoms, to solitary confinement as punishment for laughing.

320. Facility Staff also placed R.E., who has ADHD, PTSD, and depression, in solitary confinement for refusing to remove his pants at the direction of Facility Staff searching for a missing cell phone.

> **2. DCS-Licensed or Approved Facilities Place Youth in Solitary Confinement for Extended Periods of Time, Exacerbating their Mental Health Conditions**

321. DCS Defendants routinely isolate Youth for twenty-three hours or more per day, sometimes for months at a time. Youth in solitary confinement are often permitted to leave their cells for only one to two hours per day, if at all.

322. For example, O.V., who has depression, was forced to live in solitary confinement for nearly all of the approximately two years he spent at Wilder, including for seven consecutive months. He was often denied even one hour of daily recreation time and could not exercise or go outdoors.

323. Similarly, G.B., who has PTSD and ADHD, spent months living in solitary confinement, including a full month in 2020, during which time he was denied required time outside of his cell.

324. Q.S., who has MDD, conduct disorder, bipolar disorder, and ADHD, was in solitary confinement on a near-permanent basis at Wilder between 2021 and 2022.

60

325.    A.N., who has bipolar disorder and ADHD, was kept in solitary confinement for nine continuous weeks at MTJDC.

326.    Facility Staff at Bean JDC falsely claim certain Youth are suicidal, which they then use as a pretext to strip them of their clothes, force them to wear green turtlenecks, and isolate them in solitary confinement for three days or more, only feeding them by passing crackers through their cell door.

327.    Prolonged isolation causes withdrawal and lethargy in young people. As a consequence of the lack of stimulation and sensory deprivation in solitary confinement, many Youth sleep or simply lie on their beds for long periods during the day, exacerbating their mental health issues. As a result, they suffer withdrawal, extreme loneliness, anxiety, depression, and suicidal thoughts.

328.    For example, after being isolated in the Therapeutic Response Unit ("TRU"), Wilder's solitary confinement facility, for over five months, G.B. said that he was tired of life and discussed a plan to hang himself.

329.    O.V. exhibited severe behavioral and mood management problems while in DCS Defendants' custody; instead of serving his needs, however, confinement in the TRU made his mental state further deteriorate. He stated that multiple months of isolation made him lose his mind and want to kill himself.

330.    Unfortunately, many Youth already have depression, PTSD, anxiety, and psychosis when they are committed to DCS Defendants' care. Subjecting them to solitary confinement, especially for extended periods, exacerbates these problems and irreparably harms them.

331.    For example, R.A, who has ADHD, MDD, anxiety disorder, and DMDD, began pulling his hair out due to the stress of being confined to his cell 22.5 hours per day at MTJDC.

332. Many JDC residents, even those who are not placed in solitary confinement, are forced to stay in their cells for long periods, sometimes up to twenty-three hours or more per day.

333. For example, residents at Williamson County JDC and Davidson JDC are regularly confined to their cells from 4 pm until the next morning.

### 3. DCS-Licensed or Approved Facilities Subject Youth in Solitary Confinement to Dangerous Conditions and Harassment and Impede their Access to Services or Education

334. Some facilities used to isolate Youth in solitary confinement are often dangerously deteriorated and unsanitary.

335. For example, the TRU at Wilder has had holes in the walls, mold, roaches, spiders, mosquitoes, and lizards. Youth have seen blood left on the walls of the dorm from others self-injuring themselves during mental health crises.

336. J.T., who had ADHD and insomnia, lived in the TRU for protective custody for much of his time at Wilder, where he was exposed to cockroaches, spiders, lizards, mosquitos, mold, and human urine.[99]

337. While isolated for a month, E.M., who has ADHD and conduct disorder, was forced to sleep on a bare metal bedframe after Facility Staff removed the mattress from his bed.

338. Isolated Youth are also housed near those who have assaulted them.

339. For example, J.T., who had been severely beaten four times at Wilder, was housed in "protective custody" near his attackers, making him fear for his life and causing extreme emotional distress.

---

[99] J.T. passed away shortly after being released from DCS custody. But his experiences at Wilder are representative of those routinely faced by Youth.

62

340. M.G., who has bipolar disorder and ADHD, was also housed in Wilder's TRU near peers who had beaten him. After a Facility Staff member left the keys to his room in his door, they assaulted him again.

341. Facility Staff also harass Youth placed in solitary confinement for protective custody.

342. For example, M.G. was confined in solitary confinement in protective custody for approximately a month after being repeatedly assaulted.

343. While M.G. was in the TRU at Wilder, Facility Staff referred to protective custody as "pussy control," called those housed there "little bitches," and told isolated Youth, including M.G., that they needed to return to the general population and get "what was coming to them."

344. DCS Defendants also fail to provide Youth in solitary confinement with adequate education, counseling, recreation, or other rehabilitative treatment.

345. For example, O.V. was isolated on-and-off for two years, during which time he received only lesson packets placed under his door, received school lessons once per week, or received no instruction at all.

346. Bean JDC allows Youth to opt out of school and, when they do, confines those Youth to their cells for days at a time.

347. DCS Defendants are aware of these practices. They have received numerous reports from DRT laying out these issues in detail but have condoned them by allowing them to continue.

**VI. DCS Defendants Allow Facility Staff to Orchestrate Violent Attacks on Youth**

348. DCS Defendants are aware that Facility Staff routinely target Youth for violent assaults at the hands of other young people by placing bounties on them in the form of ramen noodles, cannabis, and other incentives.

63

349. Facility Staff often orchestrate these attacks, an extreme form of corporal punishment, to punish Youth for misbehavior or for filing grievances against Facility Staff. The resulting beatings severely injure and traumatize their targets.

350. Facility Staff promise youth incentives like ramen noodles to attack those they dislike, a practice they refer to as Facility Staff putting "noodles on [the] heads" of targeted young people.

351. For example, in 2021, M.G. and a Facility Staff member had a verbal altercation, during which the Facility Staff member told M.G., "I'm going to have your ass beat." The Facility Staff member then offered ten to twelve youth ramen noodles in exchange for assaulting M.G. Shortly before the attack, the Facility Staff member again told M.G., "You are going to get your ass beat." As the Facility Staff member promised, the group of youth then violently attacked M.G., injuring him and making him fear for his life. The Facility Staff member in question smiled and clapped while watching the assault, doing nothing to intervene. Immediately after the assault, the Facility Staff member rubbed the neck and bare back of one of the attackers.

352. Often, Facility Staff repeatedly target youth they dislike for violent attacks.

353. For example, E.G., who has bipolar disorder and ADHD, and a Facility Staff member had a verbal argument, during which the Facility Staff member told E.G., "Imma get these kids to beat your ass." The Facility Staff member in question then offered packets of ramen noodles to a group of youth in exchange for attacking E.G.[100] The group of youth attacked E.G. in his dorm shortly thereafter, telling E.G. that he needed to "be respectful to" the Facility Staff member in question. The Facility Staff member gave the attackers the promised ramen noodles the next day.

---

[100] An uninvolved youth that overheard the interaction reported it to DRT.

The attacks then continued over the next month, as youth attacked E.G. four more times without provocation.

354.    Similarly, J.W. was beaten by his peers four times at the behest of a Facility Staff member who had made it clear that they did not like him. Multiple Youth corroborated J.W.'s account that Facility Staff had placed "noodles on his head" by offering other youth packs of ramen noodles to beat him.

355.    These practices cause significant harm to the Youth, including serious bodily and mental harm, and are not justified by any nonpunitive governmental purpose.

356.    For example, an attack by four or more youth orchestrated by Facility Staff against E.G. broke E.G.'s nose, requiring corrective surgery. The attack also caused E.G. to fear going to school, where he would be around the youth who attacked him.

357.    Facility Staff use bounties to instill fear in Youth, making it clear that they will be beaten for complaining about Facility Staff or filing grievances.

358.    For example, E.M. suffered an unprovoked attack by four or five other youth who had, upon information and belief, been offered ramen noodles by Facility Staff in exchange for the assault.

359.    After the attack, E.M. opted against filing a grievance out of fear that Facility Staff would retaliate against him by ordering more assaults, having heard Facility Staff refer to youth who filed grievances or called DCS's child protective services hotline as "snitches."

360.    Facility Staff also wield this fear of retaliation to orchestrate the attacks in the first place. Youth feel they cannot refuse Facility Staffs' incentives to attack other youth, or they themselves will be targeted.

65

361. For instance, one Youth who was offered a reward for assaulting another youth feared retaliation if he refused, even though he did not want to participate.

362. Upon information and belief, a former Superintendent of Standing Tall allowed Facility Staff to target Youth by offering their attackers contraband cannabis vapes.

363. DCS Defendants are aware of these practices, including receiving numerous reports from DRT, but have failed to stop them. Instead, the DCS Defendants have allowed Facility Staff to continue targeting Youth, condoning this pattern of violence as a routine practice.

**VII.   DCS Defendants Fail to Prevent Violent Attacks Between Youth**

364. DCS Defendants are also aware that Facility Staff routinely fail to intervene in the fights between youth that they do not orchestrate.

365. DCS Defendants do not provide adequate capacity and training to respond to emergencies such as behavioral disturbances and violence. As a result, violent fights between youth frequently take place in cells and common areas without Facility Staff intervening.

366. For example, G.B. was the victim of an unprovoked assault by another youth, who punched him in the jaw. Instead of intervening or assisting G.B., Facility Staff observed from a distance, allowing the assault to continue until security arrived and causing G.B. to suffer further injuries.

367. Similarly, J.T. was seriously beaten by other youth multiple times, forcing him to spend months in solitary confinement for protective custody.

368. Facility Staff's failure to intervene in violent fights, paired with their failure to provide timely medical attention after assaults, results in serious injuries to Youth.

369. In June 2022, C.O., who has anxiety disorder and insomnia, was assaulted by three youth who punched and stomped his head, concussing him. During the assault, Facility Staff stood

66

idly by without intervening, failing to secure the area and get C.O to safety. Facility Staff then failed to give C.O. medical attention for over one hundred minutes after the assault.

370.   Similarly, in summer 2019, G.B.'s jaw was fractured during an unprovoked attack while Facility Staff failed to intervene.

371.   At Wilder, Youth report a widespread practice called "dorm racking" in which Youth are forced to fight every member of their dorm to become initiated into the dorm. Upon information and belief, Facility Staff are aware of this practice and do not intervene.

372.   DCS Defendants are aware of these practices, including from receiving numerous reports from DRT, but have allowed this pattern of violence to continue as a regular practice.

## VIII.   DCS Defendants Allow Facility Staff to Assault Youth

373.   DCS Defendants also subject Youth to excessive force at the hands of Facility Staff, allowing Facility Staff to assault Youth as a form of punishment and behavior management.

374.   These practices cause significant physical and mental harm to Youth, are not justified by any nonpunitive governmental purpose, and are grossly inconsistent with accepted juvenile justice practices.

375.   For example, after A.N. was handcuffed, physically restrained, and taken to solitary confinement, multiple Facility Staff body slammed him, placed him in a chokehold, and punched him in his stomach. The assault injured A.N.'s hand, resulting in a protruding abscess. Facility Staff forbade A.N. from making a complaint to the DCS  child services hotline for four weeks after the assault. The Facility Staff who assaulted A.N. had been the subjects of a combined thirty-seven misconduct investigations.

376.   Facility Staff often assault Youth in response to misbehavior, but not any legitimate threat.

67

377. For example, in late 2021, Q.S. argued with and slapped a Facility Staff member before walking away, ending the altercation. Despite the de-escalation, Facility Staff restrained Q.S. on a table in his cell, cuffing his hands in front of his body. After five Facility Staff members gathered in the cell, a Facility Staff member placed Q.S. in a chokehold and pulled him backward onto the ground, after which Facility Staff kicked him multiple times and stood on his arm, leg, and groin. One Facility Staff member rested the weight of their body on Q.S.'s neck for nearly a minute. Facility Staff twisted Q.S.'s wrists, pulled him in different directions, ripped his shirt, and continued assaulting him. Video footage captured the assault.

378. Similarly, G.B. was assaulted by Facility Staff in 2020, when a Facility Staff member punched G.B. in the eye while G.B. was already being physically restrained by another Facility Staff member. Other Youth report similar assaults by Facility Staff in Wilder's TRU dorm rooms, where there are no cameras.

379. A 2020 Comptroller audit found that DCS Defendants employed a deficient Facility Staff hiring process that failed to protect youth from dangerous employees.

380. DCS Defendants are aware of these practices, including receiving numerous reports from DRT, but have failed to stop them. Instead, the DCS Defendants have allowed Facility Staff to continue targeting Youth, condoning this pattern of violence.

**IX. DCS Defendants Fail to Provide Mental and Physical Healthcare**

381. Despite the considerable medical and mental health needs of many Youth, DCS Defendants routinely fail to evaluate, diagnose, treat, and properly place Youth, causing them serious mental and physical harm.

382. DCS Defendants do not adequately assess Youths' needs for reasonable accommodations or medical and mental healthcare upon admittance and fail to provide timely medical and mental health care to Youth.

68

## A. DCS Defendants Fail to Provide Sufficient Mental Health Treatment for Mental or Emotional Disabilities

383.   Nearly all of the Youth in DCS-licensed or approved facilities have one or more mental or emotional disabilities.

384.   Despite being aware of this fact, *see* Facts Section II(A) *infra*, DCS Defendants fail to provide regular individualized psychiatric assessment, treatment, counseling, or psychotherapy to Youth in need of such services, let alone the full continuum of mental health services necessary to meet their needs.

385.   As a result, Youths' mental health deteriorates, often into crisis, and Youth are denied meaningful participation in programming intended to aid in their rehabilitation.

### 1. DCS Defendants Fail to Properly Evaluate Youth for Mental Health Conditions upon Their Incarceration

386.   DCS Defendants' failure to meet the mental health needs of Youth starts at the outset of each Youth's incarceration—by failing to properly evaluate them for mental health conditions upon their incarceration.

387.   For example, S.W., who has multiple documented mental health diagnoses and has been institutionalized multiple times, was not given counseling, group therapy, recreational therapy, occupational therapy, or transition services at any of his DCS placements. All indications of S.W.'s mental health conditions were present from early childhood but were never effectively recognized or addressed while he was in DCS Defendants' custody.

388.   Additionally, DCS Defendants ignored an order by the juvenile court and the recommendation of one of DCS's own psychologists that T.K. receive a psychological evaluation upon incarceration. As a result, DCS Defendants failed to treat her mental illnesses for years and they worsened to the point of T.K. feeling suicidal and cutting herself.

69

389. DCS Defendants routinely fail to sufficiently evaluate and recognize the need for evidence-based mental health treatment in Youth displaying symptoms of severe mental illness, including maladaptive and aggressive behavior.

390. Many Youth have experienced personal trauma related to adverse childhood experiences, including abuse and neglect.

391. DCS Defendants not only fail to address the childhood trauma of Youth through effective mental health treatment but exacerbate their mental health symptoms and make care harder to access by placing them in unnecessarily restrictive facilities and subjecting them to physical restraints, pepper spray, acts of violence, and solitary confinement.

392. As a result, Youth in DCS Defendants' custody are cycled between facilities without getting the care that they need. DCS Defendants routinely fail to carry out the recommendations of its evaluators when considering placements for Youth.

393. For example, John Doe 2 was shuffled between at least five facilities in two years, preventing him from receiving the mental health care that he needed.

**2. DCS Defendants Do Not Provide Adequate Mental Health Treatment to Youth in DCS Custody**

394. Further, DCS Defendants either fail to provide mental health treatment or provide treatment that is not sufficient to allow them to participate in and gain the benefits of juvenile justice rehabilitation programs and services.

395. For example, DCS Defendants failed to adequately adjust O.V.'s treatment based on his mental health needs, causing him to further deteriorate and suffer extreme emotional distress.

396. O.V., who was prescribed medications used for depression, was given therapy while in DCS Defendants' custody. However, his treatment plan remained the same despite clear

70

indications that he was not responding. DCS Defendants offered no reinforcement strategies, change in routine, or interventions focused on choice-making, increasing engagement or motivation. As a result, O.V. became suicidal.

397. Further, DCS Defendants do not require JDCs to provide any mental health services.

398. DCS Defendants also fail to employ a sufficient number of qualified mental health professionals to counsel and treat Youth.

399. For example, Wilder had no staff psychologist or psychiatrist until April 2022. Wilder currently has one psychologist available via videoconferencing, which is often not provided in a timely manner and does not allow in-person observation or interaction.

400. Further, Bean JDC had no nurse on staff from approximately May through July 2023. Instead, it relied on outside contacts to enter the facility and portion out medicine in cups for each Youth, which was then distributed by Facility Staff without proper medical training. Upon information and belief, medication administration still functions this way at MTJDC and Hollis RTC.

401. DCS Defendants also fail to adequately train and supervise Facility Staff to respond appropriately to Youth with mental health issues.

402. For example, Q.S., who has multiple severe mental health diagnoses including bipolar disorder, depression, ADHD, had a breakdown in late 2021, yelling at Facility Staff and acting erratically. DCS Defendants failed to assess Q.S. and train staff to adequately respond to behavior caused by his mental health and behavioral health disabilities.

403. After secluding Q.S. and placing him in his cell, Facility Staff restrained and assaulted Q.S., placing him in a chokehold that restricted his breathing; kicking him multiple times;

71

and standing on his arm, leg, and groin. Facility Staff responded to Q.S.'s disability by assaulting him instead of sending a trained staff member like a therapist or counselor to speak with him and deescalate the situation, resulting in further mental anguish and bruising to his neck and arms.

404.   DCS Defendants' failure to assess and sufficiently evaluate Q.S. unnecessarily prolonged his placement at Wilder.

405.   DCS Defendants also fail to maintain adequate mental health records for Youth, which results in a pattern of segregating Youth in highly restrictive placements and denying them treatment for their disabilities.

406.   For example, while Q.S.'s intake paperwork listed diagnoses of specific learning disability, ADHD, bipolar disorder, MDD, and conduct disorder, the records DCS Defendants used to justify his placement in a hardware secure facility listed only his conduct disorder.

407.   DCS Defendants fail to provide adequate or effective evidence-based mental health treatment through group-based methodologies.

408.   While Wilder's website refers to the provision of Aggression Replacement Training (ART), such programming was not offered to any youth while John Doe 1 was at Wilder, nor is it clear that ART would be an appropriate match for John Doe 1's treatment needs. Upon information and belief, ART has effectively been unavailable at Wilder since 2020, when DRT observed that Wilder was using untrained staff such as security guards to attempt to facilitate the program.

409.   DCS Defendants fail to provide adequately for Youth who are suicidal or in emotional crisis, opting instead to punish Youth for their disabilities. Youth in DCS Defendants' custody experiencing mental health symptoms, including self-harm and suicidal ideation, are subject to punitive conditions of confinement and excessive force instead of evidence-based treatment.

72

410. For example, T.K. was given no medical attention for over two weeks after cutting herself. Instead, DCS Defendants punished T.K. for her mental health crisis by assessing her 100 "points" or disciplinary demerits for claiming self-harm.

411. Similarly, E.O. was pepper sprayed by Facility Staff at Hollis RTC in late 2022, after refusing instructions to stop cutting herself with screws.

412. DCS Defendants also routinely fail to give Youth their prescribed medications at the proper dosages and intervals or fail to provide them their prescribed medications at all.

413. For example, Youth at Bean JDC did not receive their prescribed medications for over one month in late 2023.

414. Facility Staff also have a practice of withholding prescribed medications as punishment.

415. When R.E., a boy incarcerated at Standing Tall, declined to take a voluntary drug test, Facility Staff retaliated against him by withholding his prescribed psychotropic medications.

416. Other times, medications are abruptly changed without explanation.

417. For example, while at MTJDC, R.A.'s mental health medications were changed without medical justification from Adderall and Seroquel to Guanfacine, Melatonin, and Hydroxyzine. As a result, he struggled to focus, sleep, control his anger, and maintain his impulse control, and he suffered from headaches.

418. Similarly, C.O.'s medication was changed five times over a three-month span in 2022, cycling through numerous psychotropic prescriptions rapidly, which caused worsening mental health symptoms including depression, insomnia, anxiety, and despair.

419. O.V. was prescribed six different psychotropic medications at Wilder alone.

73

420. In the place of evidence-based mental healthcare like therapy, DCS Defendants over-prescribe psychotropic medications to Youth with mental health conditions as a means of behavior management—a practice DCS Defendants sometimes refer to as "chemical restraints."

421. DCS Defendants routinely administer "off-label" psychotropic medications not intended for the purposes for which DCS uses them and without medical justification. Often, the only recorded justification by DCS Defendants for a prescription is "conduct disorder," "sleep," or "ODD."

422. Overuse and misuse of psychotropic medications can cause exacerbated mental health symptoms including suicidality.

423. DCS Defendants' psychotropic medication policies explicitly note that prescribing two or more medications of the same class "suggests the need for additional review of a patient's clinical status."[101]

424. But in practice, DCS Defendants often simultaneously administer multiple psychotropic medications of the same class or type to Youth, a tell-tale sign of improper use.

### 3. DCS Defendants Fail to Coordinate Mental Health Treatment for Youth Upon Their Release from DCS Custody

425. DCS Defendants routinely fail to coordinate follow-up care with community-based mental health and medical providers for Youth upon their release from DCS custody.

426. For example, DCS Defendants failed to administer a psychological evaluation on T.K. prior to her trial home visit, against the recommendations of a DCS psychologist and court order. T.K. was eventually re-committed to an institutional setting.

---

[101] *Psychotropic Medication Utilization Parameters for Children in State Custody*, adopted by Tenn. Dept. of Child.'s Servs. Pharmacy and Therapeutics Comm. at 5 (last visited May 2024), https://files.dcs.tn.gov/policies/chap20/PsychoMedUtilGuide.pdf.

74

**B. DCS Defendants Fail to Provide Sufficient Medical Treatment**

427.   DCS Defendants routinely disregard the medical needs of Youth.

428.   Facility Staff fail to provide emergency medical care in a timely manner after Youth suffer serious injury, self-harm, and suicidal ideation, further injuring their physical and mental health.

429.   Despite DCS Defendants' policy requiring twenty-four-hour access to emergency medical and dental care, in practice, DCS's pattern of practice forces Youth in emergency situations to wait days, weeks, or months for medical attention.

430.   For example, G.B. was made to wait three days before receiving emergency care after his jaw was fractured in an unprovoked attack, requiring surgery. Soon after, G.B. was placed on suicide watch after commenting that he planned to hang himself.

431.   Similarly, after A.N. seriously injured his hand in an altercation with a peer, he was not x-rayed or taken to the emergency room until two and three days after his injury, respectively.

432.   J.T. had his hip broken in an unprovoked attack by other young people. Facility Staff at Wilder failed to give him a wheelchair, forcing him to move around the facility in a rolling desk chair or on crutches.

433.   DCS Defendants and contracting facilities routinely fail to hire appropriate qualified health professionals.

434.   For example, Bean JDC had no nurse on staff for approximately three months (May through July 2023).

435.   Facility Staff also routinely ignore Youths' non-emergent medical issues, allowing those issues to progress and seriously endanger Youth.

436.   For example, in late 2021, C.H., who has ADHD and a conduct disorder, reported feeling weak and completed a "sick request"; a nurse recorded that "nothing was wrong with" him.

75

Two days later, C.H. reported swelling throughout his body. Two weeks later, his hand, feet, eyes, and lower body were swollen to the point of limiting his mobility. A nurse gave C.H. an unspecified medication and sent him to rest. C.H.'s swelling did not subside, however, and he suffered kidney damage. Weeks later, only after C.H.'s case manager noticed swelling throughout his body, he was hospitalized and underwent kidney excision, requiring five medications, a strict diet, limited mobility, and regular doctor's visits.

437.    Similarly, Facility Staff routinely deny Youth access to medical specialists.

438.    T.K. was denied access to a gynecologist at Hollis RTC after reporting vaginal pain repeatedly over an eight-month period, during which she experienced multiple vaginal infections.

439.    Similarly, G.B. was denied dental care for over six months despite complaining of jaw pain and asking to see a dentist at least five times. G.B. did not receive dental attention until nine months after he first complained of pain, at which point he required a root canal.

*** 

440.    DCS Defendants are aware of these practices. They have received numerous investigation reports and notices from DRT detailing these practices, including several detailing the allegations described in this section, but have refused to stop them.

441.    DCS Defendants' failure to provide Youth with the proper medication, therapy, and other mental and medical health treatment causes Youth harm and prevents them from even accessing, let along meaningfully participating in, programs intended to further DCS's stated rehabilitative purpose.

## X. Defendants' Actions Have Harmed Youth, Including Doe Plaintiffs

### A. Plaintiff John Doe 1

442.    DCS Defendants have subjected John Doe 1 to violent attacks by other youth, medical neglect, and the arbitrary and punitive use of solitary confinement. When, out of desperate

76

fear for his safety, he complained about DCS's failure to protect him, DCS retaliated by encouraging further attacks.

443. John Doe 1, a seventeen-year-old boy, experienced intense childhood trauma. He suffered severe neglect from parents, who had substance abuse issues, and witnessed domestic violence. At eleven, he was adjudicated as dependent and neglected and committed to foster care, where he cycled through twenty-eight different placements. John Doe 1's father died when John Doe 1 was fifteen. He has no contact with any immediate family.

444. John Doe 1 has depression, PTSD, anxiety, and ADHD. He has a history of suicidal ideation and has cut himself repeatedly. A psychological evaluation of John Doe 1 recommended grief counseling and group and individual therapy. He has been prescribed multiple medications, including psychotropic medications.

445. Despite John Doe 1's disabilities, DCS Defendants have denied him reasonable accommodations and subjected him to cruel abuse across several different placements.

### 1. John Doe 1's Placement at Upper East JDC

446. John Doe 1 was detained at Upper East JDC for one week in fall 2023, where he was placed in "23 and 1," meaning he was alone in his cell for twenty-three hours per day. He was allowed outdoors only once while at the facility.

447. He did not attend school and there were no mental health or counseling services available. Despite being prescribed multiple medications at the time of his arrest, including an antipsychotic, he was not given any testing, evaluation, or medication management. As a result, he abruptly stopped taking his medications without any oversight by a medical professional.

448. John Doe 1's solitary confinement made him feel angry and numb.

449.   Some of his only stimulation came when, while temporarily held in a separate facility in order to attend virtual court proceedings, he was allowed to watch television through the open tray slot in his door.

### 2. John Doe 1's Placement at Bean JDC

450.   After he was adjudicated delinquent, DCS Defendants placed John Doe 1 at Bean JDC for almost two months.

451.   He did not receive any psychological testing, assessments, or evaluations, and Bean JDC had no treatment services. DCS Defendants and Facility Staff did not follow up regarding his previously prescribed medications.

452.   John Doe 1 did attend school, but instruction consisted primarily of written packets and videos.

453.   John Doe 1 was placed in solitary confinement for three days for giving another resident a packet of hot sauce. While in solitary confinement, he was locked in his cell for twenty-four hours per day and was only allowed to leave to shower.

454.   DCS Defendants told John Doe 1 that Bean JDC was a temporary placement to give them time to find him a long-term one. However, they did not evaluate or interview him to determine what services he needed and where he should be placed.

### 3. John Doe 1's Placement at Wilder

455.   Without warning, DCS Defendants transported John Doe 1 to Wilder without telling him his destination.

456.   John Doe 1 was incarcerated at Wilder between late 2023 and early 2024, during which time he was violently beaten by other youth nearly thirty times.

457.   During his first night at Wilder, five youth attacked John Doe 1, injuring his jaw, giving him two black eyes, and causing him severe pain. He was attacked again the next night.

78

458. However, medical personnel did not examine John Doe 1 until a nurse saw him days later. Rather than help John Doe 1, Facility Staff at Wilder merely took a picture of his injuries and left.

459. John Doe 1 repeatedly told Facility Staff that he was not safe and needed protection. But they refused to help him, instead scolding him for standing near them for protection. DCS Defendants at one point provided a "safety plan" for John Doe 1, which severely restricted his movement but failed to protect him from further attacks.

460. On one occasion, a group of other young people cornered John Doe 1 and demanded he perform sexual acts on other youth. When John Doe 1 refused, the youth attacked him, including by choking him. Nearby Facility Staff stood idly by during the attack.

461. Following this assault, John Doe 1 filed a PREA grievance, but never received a written response. Instead, Facility Staff informed his peers that John Doe 1 had filed a grievance and encouraged other youth to beat him, which they did.

462. In December 2023, John Doe 1 requested a transfer to a dorm where he would be protected from unprovoked attacks. DCS Defendants refused, subjecting him to further assaults. As a result, he suffered black eyes, jaw injuries, and bruised ribs.

463. In January 2024, John Doe 1 begged Facility Staff to move him to another dorm or solitary confinement because other youth had said they would attack him. They again refused. Desperate to escape the imminent attack, John Doe 1 set off a sprinkler in his dorm in a last-ditch attempt to get moved. Facility Staff allowed youth to attack John Doe 1 anyway, walking away once the attack started. Two youths stomped John Doe 1's face, injuring his nose and breaking blood vessels in his eyes.

464.    While at Wilder, the DCS Defendants failed to provide John Doe 1 with any rehabilitative or mental health services that were specific to his needs. His individual treatment was limited to substance abuse, and he never received treatment specific to his PTSD and other diagnoses.

465.    DCS Defendants never gave John Doe 1 a treatment plan for his diagnoses or followed up about his previous prescriptions. DCS's intake paperwork upon his commitment to Wilder failed to document any history of prescriptions.

466.    DCS Defendants did not give John Doe 1 a single full day of educational instruction between November 2023 and Christmas break. He was sometimes allowed to go to school for a few hours at a time. There was no make-up instruction.

467.    The educational instruction DCS Defendants did give John Doe 1 was woefully inadequate, preventing him from progressing in school. While he was supposed to be in Algebra II, he was instead given the same instruction as all other Wilder residents—practicing simple multiplication.

**4.   John Doe 1's Placement at Memphis Youth Academy**

468.    After months of constant physical violence and neglect, DCS Defendants moved John Doe 1 to Memphis Youth Academy. He was soon after adjudicated as Dependent and Neglected and was placed with a foster parent, who later adopted him.

469.    John Doe 1's time in DCS Defendants' custody degraded his mental health, causing PTSD flashbacks and triggers. He also lost nearly an entire year of school, as his access to education was either sporadic or inappropriate for his grade level.

**B. Plaintiff John Doe 2**

470. DCS Defendants have deprived John Doe 2 of education, mental health treatment, disability accommodations, and an appropriate placement for his disability needs throughout his time in DCS custody.

471. John Doe 2 has severe developmental delays and learning disabilities, but DCS Defendants never assessed John Doe 2's need for reasonable accommodations, let alone provided them to him.

472. John Doe 2 has multiple mental health diagnoses and learning disabilities, including ADHD, unspecified type conduct disorder, PTSD, and developmental disorder of scholastic skills. He has an IQ of 63.

473. DCS opened a neglect investigation into John Doe 2's family in 2021 after John Doe 2, then only 10 years old, began to run away from home and school after the death of his brother.

474. DCS Defendants were aware of John Doe 2's mental health needs and long history of childhood trauma upon his commitment to DCS juvenile justice custody.

475. DCS Defendants acknowledged in December 2021 case notes relating to John Doe 2's neglect that he had multiple prior mental health assessments and that he had been recommended for trauma therapy.

476. Indeed, DCS Defendants never again referred to this assessment in case notes, case planning documents, evaluations, or other documentation related to John Doe 2's placement and treatment.

### 1. John Doe 2's Placement at Shelby JDC—Deprivation of Education and Mental Health Treatment

477. John Doe 2 was detained at Shelby JDC in December 2022 for eight months after being charged with a delinquent offense.

478. While at Shelby JDC, John Doe 2 was never sufficiently evaluated for his reasonable accommodation needs and did not receive mental health treatment. He received only 1.5 hours of school per day.

479. John Doe 2's mother raised concerns about this behavior and his need for mental health treatment, but DCS did not act.

480. DCS Defendants conducted a child and family team meeting ("CFTM") to discuss treatment and placement for John Doe 2 in May 2023. However, the portion of the CFTM form for documenting prior or current trauma or adverse experiences was left blank.

481. DCS Defendants failed to perform a mental health assessment of John Doe 2, citing his young age.

482. DCS Defendants acknowledged John Doe 2's need for a psychological evaluation in the form of a "Rapid Intake Assessment" in May 2023 case notes, but never performed one.

483. DCS Defendants' case notes incorrectly represented that John Doe 2 had no reported mental health history, ignoring his previous assessments.

### 2. John Doe 2's Placement at Natchez Trace—Deprivation of Education and Mental Health Treatment

484. In June 2023, DCS Defendants placed John Doe 2 at Natchez Trace, a facility licensed by DMHSAS. The on-site school at Natchez Trace is licensed as a Category I-SP school by TDOE and is authorized by DCS.

82

485. DCS Defendants stated on intake paperwork that John Doe 2 had "no significant prior psychiatric diagnosis, prior diagnosis, no past psych admissions and no past residential treatment." It listed initial diagnoses of ADHD, unspecified type conduct disorder, and PTSD.

486. DCS Defendants allowed John Doe 2 to attend school only intermittently during June and July 2023, placing him in school suspension multiple times.

487. John Doe 2 received individual and group therapy at Natchez Trace. However, as acknowledged by DCS Defendants in case notes, John Doe 2's documented intellectual disabilities prevented him from benefiting from these services.

488. DCS Defendants did not give John Doe 2 a full psychological assessment until summer 2023.

489. DCS Defendants' psychological assessment found that John Doe 2 had "a scary voice in his head telling him to do things" for the past two months.

490. It also found he had an IQ of 63, was almost unable to read, had an "extremely low" ability to understand, comprehend, and act, and "extremely low" ability in verbal comprehension, visual spatial, fluid reasoning, working memory, and processing speed. He could not define words such as "pilot," "thermometer," "prize," and "obey."

491. In response to this evaluation, John Doe 2's psychologist at Natchez Trace added "developmental disorder of scholastic skills" to his diagnoses and prescribed him medication for ADHD and hallucinations.

492. However, DCS Defendants did not provide John Doe 2 with reasonable accommodations for these disabilities at Natchez Trace, where he remained until December 2023.

493. After a CFTM meeting in fall 2023, DCS Defendants found that John Doe 2 should be transferred to a "development program to focus on his development deficiencies" because his

83

IQ was below the admission threshold for Natchez Trace. DCS Defendants also concluded that John Doe 2 "does not comprehend basic functions and would benefit from extensive psychotherapy."

494.   However, DCS Defendants still failed to provide reasonable accommodations or evidence-based treatment to John Doe 2.

495.   DCS Defendants' notes include multiple references to John Doe 2's limited comprehension and low reading ability, but DCS Monthly Reviews repeatedly include "read and adhere to the student handbook where he will find all of his student expectations" as one of his goals.

### 3.  John Doe 2's Placement at Davidson JDC—Deprivation of Education and Mental Health Treatment

496.   DCS Defendants placed John Doe 2 at Davidson JDC , a hardware secure facility overseen by DCS, on December 14, 2023.

497.   There, John Doe 2 received only 1.5 hours of school per day.

498.   John Doe 2 was repeatedly forced to go into his room at 4 pm and was not allowed out until the next day.

499.   As a result, he spent approximately sixteen hours a day alone in a cell.

500.   DCS Defendants did not provide John Doe 2 with any mental health treatment at Davidson JDC.

501.   At a CFTM meeting in early 2024, DCS incorrectly stated that John Doe 2's primary diagnosis is "Specific Learning Disability," with which he had never been diagnosed.

502.   DCS Defendants also incorrectly stated John Doe 2's prescription was for Clonidine, even though Natchez Trace had taken John Doe 2 off of Clonidine in favor of Qelbree and Abilify.

503.    DCS Defendants then failed to provide John Doe 2 with *any* Abilify, Qelbree, or Clonidine.

504.    Abruptly terminating an antipsychotic medication such as Abilify carries significant risk of anxiety, insomnia, depression, nausea, vomiting, migraine, agitation, and cognitive impairment.

505.    DCS Defendants acknowledged that it had no facility to accommodate John Doe 2's needs based on his age and developmental needs, and instructed John Doe 2's case worker to complete a waiver to allow John Doe 2's placement in a hardware secure facility.

506.    In early 2024, John Doe 2 was found incompetent to stand trial due to intellectual and academic delays and developmental immaturity.

507.    The court-ordered competency evaluation recommended "behavioral and psychiatric intervention" and "extensive psychotherapy," among other treatment.

### 4.    DCS Continues to Switch John Doe 2's Placement and Fails to Provide Adequate Educational and Mental Health Services

508.    DCS Defendants have placed John Doe 2 in at least five different facilities in two years.

509.    None have sufficiently evaluated John Doe 2's mental health or disability status or provided him with disability-related accommodations.

510.    DCS Defendants have deprived John Doe 2 of consistent mental health treatment, including medication, despite his lengthy history of serious mental health concerns.

511.    While in the custody of DCS Defendants and facilities that they oversee and license, John Doe 2 has been subjected to restraints, episodes of solitary confinement, and peer violence.

512.    He was also denied treatments recommended by expert evaluators to address his educational, behavioral, and mental health needs.

85

### C. Plaintiff Jane Doe 1

513. Jane Doe 1, a fifteen-year-old girl with a history of mental health issues and sexual abuse, has been in DCS Defendants' custody since 2022. DCS Defendants have failed to appropriately screen for or treat Jane Doe 1's mental health needs.

514. Instead, DCS Defendants placed her in highly restrictive facilities, ignored her requests for help, and subjected her to cruel punishments that worsened her mental condition.

515. Jane Doe 1 has diagnoses including DMDD, ADHD, PTSD, MDD, and ODD.

516. DCS Defendants failed to provide Jane Doe 1 with adequate screening, needs assessments, trauma-informed care, or the most integrated setting for services tailored to her mental health needs and history of traumatic experiences.

517. DCS Defendants initially held Jane Doe 1 in a respite commitment placement (a short-term placement intended to provide temporary relief to a child's caregivers), where she was denied individual therapy, despite her emotional issues.

518. After approximately nine months, DCS Defendants transferred Jane Doe 1 to a full commitment placement due to behavior exacerbated by their failure to treat her mental health problems. There, Jane Doe 1 was placed in an institutional hardware secure placement (Hollis RTC) without sufficient assessment, planning, or training of staff and without reasonable accommodations sufficient to allow her to be successful in improving her mood stability. Her institutionalization continued because of this failure by DCS Defendants.

519. Jane Doe 1 became suicidal while incarcerated at Hollis RTC.

520. Despite Jane Doe 1's records demonstrating her significant mental health needs and Jane Doe 1 telling Facility Staff that her mental health needs were not being met, DCS Defendants failed to provide Jane Doe 1 with adequate care.

86

521. DCS Defendants instead responded to her mental health symptoms with punishment.

522. In November 2023, Jane Doe 1 was yelling and refusing instructions. In response, Facility Staff at Hollis RTC shackled her ankles and dragged her body across the floor, causing deep bruising.

523. Facility Staff then placed Jane Doe 1 in solitary confinement for over twenty-four hours.

524. In December 2023, while Jane Doe 1 was naked, two male Facility Staff attempted to enter her cell. When she refused, the Facility Staff pepper sprayed her while she was naked in her cell.

525. After she was pepper sprayed, Jane Doe 1 was only allowed a few minutes to wash herself off. As a result, she could not adequately decontaminate and suffered extreme pain and distress.

526. She was also denied adequate medical attention after being sprayed. DCS records indicate that the medical department was "notified," but "no injuries [were] voiced or noted."

## CLASS ALLEGATIONS

### I. Class and Subclasses Definitions

527. Plaintiffs seek to certify, and to be appointed as representatives of, the following class and subclasses seeking declaratory and injunctive relief:

- **Class:** "All young people who have a disability or disabilities and are now, or are at imminent risk of being, in DCS custody and/or kept in a DCS-licensed or approved facility from which they cannot leave on their own by reason of either: (1) being found to be delinquent or unruly by a Juvenile Court in Tennessee and committed to DCS pursuant to Tenn. Code Ann. § 37-1-131 or Tenn. Code Ann.

87

§ 37-1-132 (Post-Adjudication); or (2) a finding of probable cause to believe that the child has committed a delinquent or unruly act with which the child is charged, pursuant to Tenn. Code Ann. § 37-1-114 (Pre-Adjudication) (collectively, "Youth")."

- **<u>Post-Adjudication Youth Subclass:</u>** "All youth who have a disability or disabilities and are now, or are at imminent risk of being, in DCS custody and/or kept in a DCS-licensed or approved facility from which they cannot leave on their own by reason of being found to be delinquent or unruly by a Juvenile Court in Tennessee and committed to DCS pursuant to Tenn. Code Ann. § 37-1-131 or Tenn. Code Ann. § 37-1-132 ("Post-Adjudication Youth")."

- **<u>Pre-Adjudication Youth Subclass:</u>** "All youth who have a disability or disabilities and are now, or are at imminent risk of being, in DCS custody and/or kept in a DCS-licensed or approved facility from which they cannot leave on their own by reason of a finding of probable cause to believe that the child has committed a delinquent or unruly act with which the child is charged, pursuant to Tenn. Code Ann. § 37-1-114 ("Pre-Adjudication Youth")."

## II. Rule 23 Requirements

### A. Numerosity

528. The members of each proposed class are so numerous that joining individual members is impracticable.

529. DCS estimated in March 2023 that it had 629 young people in juvenile justice custody on any given day.

88

530.     In the DCS Annual Report for Fical Year (FY) 2023, DCS Defendants reported that 1,294 juvenile justice youth were placed into state custody during FY 2023.[102]

531.     DCS Defendants also reported that 6,314 "non-custodial" youth, or Pre-Adjudication Youth, and 1,808 "custodial" youth, or Post-Adjudication Youth, exited JDCs in FY 2023.[103]

532.     Most, if not all, of the young people in DCS Defendants' custody have a diagnosed or undiagnosed disability or disabilities.

533.     The current DCS population does not even capture the full proposed class, which includes young people who will meet the class definition in the future.

534.     Proposed class members can readily be identified from records maintained by state and local DCS offices and agencies, or will be readily identifiable in the future.

**B.  Commonality**

535.     Numerous questions of law and fact are common to the proposed class and subclasses. These common questions predominate over any questions affecting only individual proposed class or subclass members.

536.     The questions of law and fact common to the proposed class and subclasses include, but are not limited to:

537.     Whether Defendants have policies and practices that violate Title II of the ADA and Section 504 of the Rehabilitation Act by failing to adequately assess Youth for disabilities, failing to provide adequate mental health treatment for Youth, and failing to provide reasonable

---

[102] *State Fiscal Year July 2022 – June 2023 Annual Report,* Tenn. Dep't of Child.'s Servs. at 5 (Dec. 1, 2023),     https://www.tn.gov/content/dam/tn/dcs/documents/quality_improvement/annual-reports/FY22-23_DCS_Annual_Report.pdf.
[103] *Id.* at 11. These numbers may count certain youth multiple times if they exited JDCs multiple times in FY 2023.

accommodations to allow Youth to meaningfully access services, programs, and/or activities they would otherwise be entitled to access;

538. Whether Defendants have policies and practices that violate Title II of the ADA and Section 504 of the Rehabilitation Act by impermissibly segregating Youth in institutions and other segregated settings, placing Youth at a serious risk of segregation, and/or impermissibly excluding Youth from medically necessary services based on the existence of co-occurring disabilities.

539. Whether Defendants enact and enforce official policies, practices, and procedures that intentionally and/or recklessly disregard the serious medical and mental health needs of Youth and/or recklessly fail to reasonably mitigate the risk of serious harm to Youth, in violation of the Fourteenth Amendment of the United States Constitution, and/or the Eighth Amendment of the United States Constitution.

540. Whether Defendants enact and enforce official policies, practices, and procedures that create and increase the risk that Youth would be exposed to private acts of violence and intentionally and/or recklessly disregard the serious risk to Youth and recklessly fail to reasonably mitigate the risk of serious harm to Youth, in violation of the Fourteenth Amendment of the United States Constitution, and/or the Eighth Amendment of the United States Constitution;

541. Whether Defendants deliberately ignore reports of solitary confinement of Youth; deliberately ignore reports of facilities disregarding and violating rules and regulations governing the use of solitary confinement for Youth; and enact and enforce official policies, practices, and procedures that allow and enable the restriction and confinement of Youth in solitary confinement, in violation of the Fourteenth Amendment of the United States Constitution, and/or the Eighth Amendment of the United States Constitution;

90

542. Whether Defendants create and increase the risk that Youth will be exposed to private acts of violence, and maliciously and sadistically incite youth-on-youth violence for the very purpose of causing harm, creating unnecessary and wanton infliction of pain, and punishing Youth with harm too barbarous to be consistent with societal standards of decency, in violation of the Fourteenth Amendment of the United States Constitution, and/or the Eighth Amendment of the United States Constitution; and

543. Whether Defendants enact and enforce official policies, practices, and procedures that require minimum levels of education that are inadequate to fulfill Youths' right to education, fail to guarantee even the inadequate minimum level of education provided for by policy, and deny Youth access to education during placement in solitary confinement, in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**C. Typicality**

544. The Doe Plaintiffs' claims are typical of those of the members of the proposed class and subclasses and are based on the same factual and legal theories. The wrongs suffered and remedies sought by the Doe Plaintiffs are identical to those of the proposed class and subclasses and result from a common course of conduct. Proposed class members and subclass members have suffered, or are at risk of suffering, the same violations as Doe Plaintiffs due to Defendants' actions and omissions.

545. Additionally, because DCS Defendants frequently move Youth between facilities, risk of future injuries is typical among and across Youth in all DCS-affiliated facilities and those at risk of being committed to DCS custody in the future.

546. Plaintiff DRT's organizational purpose is consistent with the interests of the proposed class and subclasses. DRT's mission is to protect the rights of Tennesseans with disabilities, including those with mental illness, intellectual disabilities, and behavior disorders.

91

DRT's constituents include the Doe Plaintiffs and members of the proposed class and subclasses. The claims of DRT's constituents in the proposed class and subclasses, which DRT pursues on their behalf, are typical of the claims of the proposed class and subclasses, respectively: they are based on the same legal theories and call for the same remedies. DRT possesses and asserts each of the claims it asserts on behalf of its constituents and the proposed class and subclasses.

### D. Adequacy of Representation

547.    The Doe Plaintiffs and Plaintiff DRT will fairly and adequately assert and protect the interests of all class members and subclasses members. They are seeking systemic relief that will benefit all members of their proposed class and subclasses, including both current and future class and subclass members. They do not have any known conflicts of interest with any proposed class members or subclass members, and their interests are not antagonistic to those of the proposed class members or subclass members. They have retained counsel experienced in handling class action and complex litigation, and Doe Plaintiffs' next friends have demonstrated interest in the welfare of children and families. Neither the Plaintiffs nor their counsel have any interest that might prevent them from actively and vigorously pursuing this action.

### E. Appropriateness of Class Treatment

548.    Certification of the proposed class and subclasses is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Plaintiffs and the class and subclass members.

549.    Plaintiffs' claims, as class representatives, require resolution of common questions concerning whether Defendants engage in illegal and unconstitutional practices that affect all class members and subclass members. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

92

550.   Defendants have acted or refused to act on grounds that apply generally to the proposed class and subclasses, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

551.   Joinder of all Youth is impracticable. This action seeks systemic injunctive and declaratory relief, and it is impracticable for individual members to enforce their rights through individual actions.

552.   A class action will result in an orderly and expeditious administration of the proposed class and subclass members' claims and will ensure judicial economy of time, effort, and expense, as well as uniformity of decision-making for the proposed class and subclasses.

### III. Rule 23(b)(2) Certification

553.   Certification under Rule 23(b)(2) is appropriate because the Defendants have acted or refused to act on grounds generally applicable to the proposed class and subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class and subclasses as a whole.

554.   Therefore, certification of the class and subclasses is proper under Fed. R. Civ. P. 23(b)(2).

### IV. Rule 23(b)(3) Certification

555.   Additionally, or in the alternative, this action may be certified as a class action under Rule 23(b)(3).

556.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, this action seeks injunctive and declaratory relief, and the common questions of law and fact predominate over individual questions. Additionally, since class and subclass members are Youth who are, or are at imminent risk of being, in DCS custody and/or in a DCS-licensed or approved facility, the class

93

members generally do not have ready recourse to bring these claims individually and it is impracticable for individual members to enforce their rights through individual actions.

557.    Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

558.     Therefore, certification of the class and subclasses is proper under Fed. R. Civ. P. 23(b)(3).

**V.  Rule 23(c)(4) Certification**

559.    Additionally, or alternatively, this action may be certified as to particular issues under Fed. R. Civ. P. 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all class members.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT ONE:**</u>
**Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132: Failure to Accommodate**
**Against State of Tennessee, DCS, and Commissioner Quin by All Plaintiffs**
**Seeking Injunctive and Declaratory Relief**

560.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

561.    Each Youth is an individual with a disability within the meaning of the ADA because they have disabilities that substantially limit one or more major life activities, such as learning, concentrating, and communicating. *See* 42 U.S.C. § 12102.

562.    Each Youth is also a qualified individual with a disability within the meaning of the ADA, *see* 42 U.S.C. § 12131(2), because they are eligible to participate in Defendants' programs, services, and activities, including educational and vocational programs and services, recreational

programs and activities, medical, mental, emotional, and behavioral health services and programs, and more integrated community and family, programs, services, and activities.

563. Each Youth is a DRT constituent.

564. Defendant State of Tennessee is a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1)(A). Defendant DCS is a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1)(B). Defendant Commissioner Quin, sued in her official capacity, is directly responsible for the operation of public entities covered by Title II of the ADA. *See id.* As such, the ADA prohibits these Defendants from discriminating against individuals with disabilities in their programs and services. *See* 42 U.S.C. §§ 12131, 12132.

565. Regulations implementing Title II of the ADA require that:

A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.[104]

566. These Defendants' official policies, practices, and procedures, as well as these Defendants' actions and inactions, violate the ADA by failing to provide Youth with reasonable accommodations, including, but not limited to, adequately assessing Youth for disabilities, providing Youth with mental, behavioral, and medical treatment, and administering programs, services, and activities in a way that would allow Youth to access them and obtain their benefits.

567. These Defendants unlawfully discriminate against Youth by subjecting them to abuse and/or punishment because of their improperly treated and accommodated disabilities or conduct attributable to their improperly treated and accommodated disabilities.

---

[104] 28 C.F.R. § 35.130(b)(3)(i), (ii).

568.   As a result of these failures, these Defendants routinely deny Youth meaningful access to services, programs, and/or activities, including educational and vocational programs and services, recreational programs and activities, facility privileges, medical, mental, and emotional health services and programs, and more integrated community and family, programs, services, and activities.

569.   These Defendants had notice of the Youths' disabilities because the Youth exhibited objectively obvious signs of disability, including intellectual, behavioral, and developmental issues. These Defendants further had notice of the prevalence of disabilities among Youth.

570.   These Defendants have acted with deliberate indifference to the needs and rights of Youth and subjected Youth to irrational treatment and irrational disability discrimination.

571.   The Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' violation of Title II of the ADA.

572.   The relief sought by the Plaintiffs would not require a fundamental alteration of these Defendants' programs, services, or activities. These Defendants are already required by federal law to provide reasonable accommodations and meaningful access to programs for Youth, and compliance with the ADA would not impose unreasonable costs on these Defendants.

**COUNT TWO:**
**Violation of Title II of the Americans with Disabilities Act, 42 U.S.C.§ 12132, 28 C.F.R.**
**§ 35.130(d), and *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999):**
**Failure to Provide Community Integration**
**Against State of Tennessee, DCS, and Commissioner Quin by All Plaintiffs**
**Seeking Injunctive and Declaratory Relief**

573.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

574.   Each Youth is an individual with a disability within the meaning of the ADA because they have disabilities that substantially limit one or more major life activities, such as learning, concentrating, and communicating. *See* 42 U.S.C. § 12102.

575.   Each Youth is also a qualified individual with a disability within the meaning of the ADA, *see* 42 U.S.C. § 12131(2), because they are qualified to participate in these Defendants' programs, services, and activities, including more integrated, community-based programs and services.

576.   Each Youth is a DRT constituent.

577.   Defendant State of Tennessee is a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1)(A). Defendant DCS is a public entity subject to Title II of the ADA. 42 U.S.C. § 12131(1)(B). Defendant Commissioner Quin, sued in her official capacity, is directly responsible for the operation of public entities covered by Title II of the ADA. *See id*. As such, the ADA prohibits these Defendants from discriminating against individuals with disabilities in their programs and services. *See* 42 U.S.C. §§ 12131, 12132.

578.   These Defendants' official policies, practices, and procedures have the effects of: (1) impermissibly segregating Youth in institutions and other segregated settings; (2) placing Youth at a serious risk of segregation; and/or (3) impermissibly excluding Youth from medically necessary services based on the existence of co-occurring disabilities. *See* 28 C.F.R. §§ 35.130(b)(3), (d).

579.   These Defendants further fail to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *See* 28 C.F.R. § 35.130(d).

580. Rather, these Defendants have caused Youth to be confined unnecessarily in hardware-secure and staff-secure youth prisons, rather than facilitate their transition to community-based placements with appropriate services and support.

581. These Defendants further fail to place Youth in the most integrated setting by placing them in facilities far from their families and communities, frequently transferring them between facilities, and failing to allow them to participate in services, programs, and activities in the community.

582. These Defendants have acted with deliberate indifference and subjected Youth to irrational treatment and irrational disability discrimination.

583. The Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' violation of Title II of the ADA and *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) ("*Olmstead*").

584. In *Olmstead*, the United States Supreme Court held that unnecessary institutionalization may constitute unlawful discrimination under the ADA. Under the *Olmstead* plurality decision, states must provide community-based treatment for individuals with disabilities when (1) such placement is appropriate; (2) the affected persons do not oppose such treatment; and (3) the placement can be reasonably accommodated, taking into account the resources available to the state and the needs of others with disabilities. *See id.* at 607 (Ginsburg, J., plurality).

585. The relief sought by Plaintiffs would not require a fundamental alteration of these Defendants' programs, services, or activities. These Defendants are already required by federal law to adequately assess and place Youth in the "most integrated setting," and compliance with the ADA and *Olmstead* would not impose unreasonable costs on Defendants.

**COUNT THREE:**
**Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794:**
**Failure to Accommodate**
**Against State of Tennessee, DCS, and Commissioner Quin by All Plaintiffs**
**Seeking Injunctive and Declaratory Relief**

586. Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

587. Each Youth is an individual with a disability within the meaning of the Rehabilitation Act because they have disabilities that substantially limit one or more major life activities, such as learning, concentrating, and communicating. *See* 29 U.S.C. § 705(20) (referencing 42 U.S.C. § 12102).

588. Each Youth is also a qualified individual with a disability because they are qualified to participate in Defendants' programs, services, and activities, including more integrated, community-based programs and services. *See* 29 U.S.C. § 794(a).

589. Each Youth is a DRT constituent.

590. Defendants State of Tennessee and DCS are, and at all relevant times have been, recipients of federal financial assistance, as defined by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794. Defendant Commissioner Quin, sued in her official capacity, is directly responsible for the operation of entities that receive funds under the Rehabilitation Act.

591. Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

592. Regulations implementing the Rehabilitation Act prohibit recipients of federal financial assistance from:

[U]tiliz[ing] criteria or methods of administration . . . (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons.
45 C.F.R. § 84.4(b)(4); 28 C.F.R. § 41.51(b)(3)(i), (ii).

593. The Rehabilitation Act defines a "program or activity," in pertinent part, as "all of the operations of a department [or] agency . . . of a State or of a local government." 29 U.S.C. § 794(b)(1)(A).

594. These Defendants' official policies, practices, and procedures, as well as these Defendants' actions and inactions, violate the Rehabilitation Act by failing to provide Youth with reasonable accommodations, including, but not limited to, adequately assessing Youth for disabilities, providing Youth with mental, behavioral, and medical treatment, and administering programs, services, and activities in a way that would allow Youth to access them and obtain their benefits.

595. These Defendants unlawfully discriminate against Youth by subjecting them to abuse and/or punishment because of their improperly treated and accommodated disabilities or conduct attributable to their improperly treated and accommodated disabilities.

596. As a result, these Defendants routinely deny Youth meaningful access to services, programs, and/or activities, including educational and vocational programs and services, recreational programs and activities, medical, mental, and emotional health services and programs, and community and family, programs, services, and activities. These Defendants also routinely punish Youth for behaviors caused by or associated with the Youths' improperly treated and accommodated disabilities.

597. These Defendants had notice of Youths' disabilities because Youth exhibited objectively obvious signs of disability, including intellectual, behavioral, and developmental issues. These Defendants further had notice of the prevalence of disabilities among Youth.

598. These Defendants have acted with deliberate indifference and subjected Youth to irrational treatment and irrational disability discrimination.

599. The Plaintiffs are entitled to declaratory and injunctive relief to remedy these Defendants' violation of Section 504 of the Rehabilitation Act.

600. The relief sought by the Plaintiffs would not require a fundamental alteration of these Defendants' programs, services, or activities. These Defendants are already required by federal law to provide reasonable accommodations and meaningful access to programs for Youth, and compliance with Section 504 of the Rehabilitation Act would not impose unreasonable costs on these Defendants.

**<u>COUNT FOUR:</u>**
**Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, 28 C.F.R. § 41.51(d), 45 C.F.R. § 84.4(b)(2), and *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999):**
**Failure to Provide Community Integration**
**Against State of Tennessee, DCS, and Commissioner Quin by All Plaintiffs**
**Seeking Injunctive and Declaratory Relief**

601. Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

602. Each Youth is an individual with a disability within the meaning of the Rehabilitation Act because they have disabilities that substantially limit one or more major life activities, such as learning, concentrating, and communicating. *See* 29 U.S.C. § 705(20) (referencing 42 U.S.C. § 12102).

603.   Each Youth is also a qualified individual with a disability because they are qualified to participate in Defendants' programs, services, and activities, including more integrated, community-based programs and services. *See* 29 U.S.C. § 794(a).

604.   Each Youth is a DRT constituent.

605.   Defendants State of Tennessee and DCS are, and at all relevant times have been, recipients of federal financial assistance, as defined by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794. Defendant Commissioner Quin, sued in her official capacity, is directly responsible for the operation of entities that receive funds under the Rehabilitation Act.

606.   Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

607.   Regulations implementing the Rehabilitation Act require that a public entity administer its services, programs, and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 41.51(d).

608.   These Defendants' official policies, practices, and procedures have the effects of: (1) impermissibly segregating Youth in institutions and other segregated settings; (2) placing Youth at a serious risk of segregation; and/or (3) impermissibly excluding Youth from medically necessary services based on the existence of co-occurring disabilities. *See* 28 C.F.R. §§ 35.130(b)(3), (d).

609.   These Defendants further fail to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *See* 28 C.F.R. § 35.130(d).

610. Rather, these Defendants have caused Youth to be unnecessarily confined in juvenile detention facilities, rather than facilitate their transition to community-based placements with appropriate services and supports.

611. Defendants further fail to place Youth in the most integrated setting by placing them in facilities far from their families and communities, frequently transferring them between facilities, and failing to allow them to participate in services, programs, and activities in the community.

612. These Defendants have acted with deliberate indifference and subjected Youth to irrational treatment and irrational disability discrimination.

613. The Plaintiffs are entitled to declaratory and injunctive relief to remedy Defendants' violation of Section 504 of the Rehabilitation Act and *Olmstead*.

614. The relief sought by Plaintiffs would not require a fundamental alteration of these Defendants' programs, services, or activities. These Defendants are already required by federal law to adequately assess and place Youth in the "most integrated setting," and compliance with Section 504 of the Rehabilitation Act and *Olmstead* would not impose unreasonable costs on these Defendants.

**COUNT FIVE:**
**Violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983:**
**Failure to Provide Medical and Mental Health Treatment**
**Against Defendant Commissioner Quin in her Official Capacity by All Plaintiffs**
**Seeking Injunctive and Declaratory Relief**

615. Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

616.   Defendant Commissioner Quin, in her official capacity, has a special relationship with Youth, who are in involuntary state custody. Accordingly, Defendant Commissioner Quin owes Youth an affirmative duty of protection and care.

617.   Youth in custody experience objectively serious medical needs that have been diagnosed by physicians as needing treatment or are so obvious that a lay person would easily recognize the need for a doctor's attention, including but not limited to serious injury, broken bones, sickness, infections, dental problems, self-harm, and suicide attempts.

618.   Youth in custody have objectively serious mental health needs that have been diagnosed by physicians as needing treatment or that are so obvious that a lay person would easily recognize the need for attention from a mental health provider, including but not limited to bipolar disorder, depression, anxiety, PTSD, ADHD, MDD, ODD, conduct disorder, self-harm, and suicidal ideation.

619.   Among other actions, Defendant Commissioner Quin establishes and enforces policies, practices, and procedures that routinely deny Youth access to mental healthcare for months on end; fail to properly administer medications; and withhold medical treatment for both acute and chronic illnesses.

620.   The history of widespread failures to provide medical and mental health treatment to Youth, the prevalence of medical and mental health issues among Youth, as well as reports and communications from DRT, Youth, and other stakeholders about these issues, put Defendant Commissioner Quin on notice of the need to treat Youths' serious medical and mental health needs and the unjustifiable risk of harm that their failure to provide treatment would cause. Commissioner Quin deliberately and recklessly ignored this risk and failed to treat Youths' medical and mental health needs.

621.   Defendant Commissioner Quin, acting under color of law, establishes and enforces policies, practices, and procedures that are deliberately indifferent to the objectively serious medical and mental health needs of Youth.

622.   Defendant Commissioner Quin, acting under color of law, establishes and enforces policies, practices, and procedures that intentionally and/or recklessly disregard the serious medical and mental health needs of Youth and recklessly fail to reasonably mitigate the risk of serious harm to Youth.

623.   The affirmative actions and deliberate indifference of Defendant Commissioner Quin have placed Youth at substantial risk of harm, without reasonable actions to abate that risk, and caused numerous actual injuries.

**COUNT SIX:**
**Violation of the Eighth Amendment to the United States Constitution, 42 U.S.C. § 1983:**
**Failure to Provide Medical and Mental Health Treatment**
**Against Defendant Commissioner Quin in her Official Capacity by Plaintiff DRT and the First Proposed Subclass ("Post-Adjudication Youth")**
**Seeking Injunctive and Declaratory Relief**

624.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

625.   Plaintiffs bring this claim under the Eighth Amendment in the alternative for Post-Adjudication Youth bringing claims under the Fourteenth Amendment, alleged as Count Five.

626.   Defendant Commissioner Quin, in her official capacity, has a special relationship with Post-Adjudication Youth, who are in involuntary state custody. Accordingly, Defendant Commissioner Quin owes the Doe Plaintiffs and proposed subclass members an affirmative duty of protection and care.

627.   Post-Adjudication Youth in custody experience objectively serious medical needs that have been diagnosed by physicians as needing treatment or are so obvious that a lay person

would easily recognize the need for a doctor's attention, including but not limited to serious injury, broken bones, sickness, infections, dental problems, self-harm, and suicide attempts.

628. Post-Adjudication Youth in custody have objectively serious mental health needs that have been diagnosed by physicians as needing treatment or that are so obvious that a lay person would easily recognize the need for attention from a mental health provider, including but not limited to bipolar disorder, depression, anxiety, PTSD, ADHD, MDD, ODD, conduct disorder, self-harm, and suicidal ideation.

629. Among other actions, Defendant Commissioner Quin establishes and enforces policies, practices, and procedures that routinely deny Post-Adjudication Youth access to mental healthcare for months on end; fail to properly administer medications; and withhold medical treatment for both acute and chronic illnesses.

630. Defendant Commission Quin was subjectively aware of, yet disregarded, the excessive risk that this mistreatment created to the safety of Post-Adjudication Youth.

631. The history of widespread failures to provide medical and mental health treatment to Post-Adjudication Youth, the prevalence of medical and mental health issues among Post-Adjudication Youth, as well as reports and communications from DRT, Youth, and other stakeholders about these issues, put Defendant Commissioner Quin on notice of the need to treat Post-Adjudication Youth's serious medical and mental health needs and the unjustifiably risk of harm that their failure to provide treatment would cause.

632. Defendant Commissioner Quin, acting under color of law, establishes and enforces policies, practices, and procedures that are deliberately indifferent to the objectively serious medical and mental health needs of Post-Adjudication Youth.

106

633.   Defendant Commissioner Quin, acting under color of law, establishes and enforces policies, practices, and procedures that intentionally and/or recklessly disregard the serious medical and mental health needs of Post-Adjudication Youth and recklessly fail to reasonably mitigate the risk of serious harm to Post-Adjudication Youth.

634.   The affirmative actions and deliberate indifference of Defendant Commissioner Quin have placed Post-Adjudication Youth at substantial risk of harm, without reasonable actions to abate that risk, and caused numerous actual injuries.

**COUNT SEVEN:**
**Violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C.**
**§ 1983:**
**State-Created Danger and Failure to Protect**
**Against Defendant Commissioner Quin in her Official Capacity by All Plaintiffs**
**Seeking Injunctive and Declaratory Relief**

635.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

636.   Defendant Commissioner Quin, in her official capacity, has a special relationship with Youth, who are in involuntary state custody. Accordingly, Defendant Commissioner Quin owes the Doe Plaintiffs and proposed class members an affirmative duty of protection and care. By virtue of their age and incarceration, Youth are in special danger from Facility-Staff-incited violence. Youth have Fourteenth Amendment rights to be protected from state-created danger.

637.   Defendant Commissioner Quin, acting under color of law, deliberately ignores reports of Facility-Staff-incited youth-on-Youth violence from DRT, Youth, and other stakeholders, deliberately ignores reports of violence against Youth by Facility Staff, including the damning conclusions of the Tennessee Comptrollers' Audit reports regarding violence against Youth by Facility Staff, and establishes and enforces policies, practices, and procedures that (1) create and increase the risk that the Youth would be exposed to private acts of violence; and

107

(2) intentionally and/or recklessly disregard the serious risk to Youth and recklessly fail to reasonably mitigate the risk of serious harm to Youth.

638.    The affirmative actions and deliberate indifference of Defendant Commissioner Quin shock the conscience and have placed Youth at substantial risk of harm, without reasonable actions to abate that risk, and caused numerous actual injuries.

**COUNT EIGHT:**
**Violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983:**
**Excessive Force**
**Against Defendant Commissioner Quin in her Official Capacity by All Plaintiffs Seeking Injunctive and Declaratory Relief**

639.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

640.    Defendant Commissioner Quin, in her official capacity, has a special relationship with Youth, who are in involuntary state custody. Accordingly, Defendant Commissioner Quin owes Youth an affirmative duty of protection and care. Youth have Fourteenth Amendment rights to be protected from excessive force by government actors.

641.    Defendant Commissioner Quin, acting under color of law, deliberately ignores reports of the misuse of pepper spray on Youth from DRT, Youth, and other stakeholders, as well as DCS's own admissions that pepper spray causes harm to Youth, and enacts and enforces official policies, practices, and procedures that allow and enable the use of pepper spray on Youth.

642.    The affirmative actions and deliberate indifference of Defendant Commissioner Quin shock the conscience, are objectively unreasonable, and have placed Youth at substantial risk of harm, without reasonable actions to abate that risk, and caused numerous actual injuries.

**COUNT NINE:**
**Violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983:**

**Conditions of Confinement**
**Against Defendant Commissioner Quin in her Official Capacity by All Plaintiffs**
**Seeking Declaratory and Injunctive Relief**

643.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

644.    Defendant Commissioner Quin, in her official capacity, has a special relationship with Youth, who are in involuntary state custody. Accordingly, Defendant Commissioner Quin owes the Youth an affirmative duty of protection and care. Youth have Fourteenth Amendment rights to be protected from conditions of confinement constituting a restriction or condition not rationally related to a legitimate government objective or excessive in relation to that purpose.

645.    Defendant Commissioner Quin, acting under color of law, deliberately ignores reports of improper solitary confinement of Youth from DRT, Youth, and other stakeholders, deliberately ignores the strong body of evidence that solitary confinement causes substantial harm to Youth, and enacts and enforces official policies, practices, and procedures that allow and enable the restriction and confinement of Youth in solitary confinement.

646.    Defendant Commissioner Quin routinely uses solitary confinement to punish Youth, deliberately acting in direct contradiction to applicable state regulations and the requirements of DCS's 2019 settlement regarding the use of solitary confinement for punishment.

647.    Defendant Commissioner Quin's  actions in allowing and enabling placement of Youth in solitary confinement impose a restriction or condition of confinement that is not rationally related to a legitimate government objective, and, in the alternative, is excessive in relation to any conceivable government objective.

648.    The affirmative actions and deliberate indifference of Defendant Commissioner Quin are objectively unreasonable and have placed Youth at substantial risk of harm, without reasonable actions to abate that risk, and caused numerous actual injuries.

**COUNT TEN:**
**Violation of the Eighth Amendment to the United States Constitution, 42 U.S.C. § 1983:**
**Cruel and Unusual Punishment**
**Against Defendant Commissioner Quin in her Official Capacity by Plaintiff DRT and the**
**First Proposed Subclass ("Post-Adjudication Youth")**
**Seeking Injunctive and Declaratory Relief**

649.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

650.    Plaintiffs bring this claim under the Eighth Amendment in the alternative for Post-Adjudication Youth bringing claims under the Fourteenth Amendment, alleged as Counts Seven, Eight, and Nine.

651.    Defendant Commissioner Quin, in her official capacity, has a special relationship with Post-Adjudication Youth, who are in involuntary state custody. Accordingly, Defendant Commissioner Quin owes the Post-Adjudication Youth an affirmative duty of protection and care. By virtue of their age and incarceration, Post-Adjudication Youth are in special danger from Facility-Staff-incited violence. Post-Adjudication Youth have Eighth Amendment rights to be protected from cruel and unusual punishment.

652.    Defendant Commissioner Quin, acting under color of law, deliberately ignores reports of Facility Staff-incited youth-on-Post-Adjudication Youth violence from DRT, Youth, and other stakeholders, deliberately ignores reports of violence against Post-Adjudication Youth by Facility Staff, including the damning conclusions of the Tennessee Comptrollers' Audit reports regarding violence against Post-Adjudication Youth by Facility Staff, and enacts and enforces official policies, practices, and procedures that (1) create and increase the risk that the Post-Adjudication Youth would be exposed to private acts of violence; (2) maliciously and sadistically incite youth-on-Post-Adjudication Youth violence for the very purpose of causing harm; (3) create

110

unnecessary and wanton infliction of pain; and (4) punish Post-Adjudication Youth with harm too barbarous to be consistent with societal standards of decency.

653.   Defendant Commissioner Quin, acting under color of law, deliberately ignores reports of the misuse of pepper spray against Post-Adjudication Youth from DRT, Youth, and other stakeholders, deliberately ignores DCS's own admissions that pepper spray causes harm to Youth, and enacts and enforces official policies, practices, and procedures that (1) maliciously and sadistically expose Post-Adjudication Youth to pepper spray for the very purpose of causing harm; (2) create unnecessary and wanton infliction of pain; and (3) punish Post-Adjudication Youth with harm too barbarous to be consistent with societal standards of decency.

654.   Defendant Commissioner Quin, acting under color of law, deliberately ignores reports of the misuse of solitary confinement against Post-Adjudication Youth from DRT, Youth, and other stakeholders, and enacts and enforces official policies, practices, and procedures that (1) confine Post-Adjudication Youth in solitary confinement for punitive or disciplinary reasons, often for extended period of time; (2) maliciously and sadistically isolate Post-Adjudication Youth in contravention to DCS policies for the very purpose of causing harm; (3) create unnecessary and wanton infliction of pain; and (4) punish Post-Adjudication Youth with harm too barbarous to be consistent with societal standards of decency.

655.   Defendant Commissioner Quin routinely uses solitary confinement to punish Post-Adjudication Youth, deliberately acting in direct contradiction to applicable state regulations and the requirements of DCS's 2019 settlement regarding the use of solitary confinement for punishment.

656.   The actions Defendant Commissioner Quin has taken against Post-Adjudication Youth created objectively serious and substantial risks to the safety of Post-Adjudication Youth.

657. Defendant Commissioner Quin was subjectively aware of and deliberately indifferent to, these objectively serious and substantial risks to the safety of Post-Adjudication Youth.

658. The affirmative actions and deliberate indifference of Defendant Commissioner Quin have placed Post-Adjudication Youth at substantial risk of harm, without reasonable actions to abate that risk, and caused numerous actual injuries.

## COUNT ELEVEN:
**Violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983**
**Procedural Due Process**
**Against Defendant Commissioner Quin in her Official Capacity and Defendant**
**Commissioner Gonzalez Reynolds in her Official Capacity by All Plaintiffs**
**Seeking Injunctive and Declaratory Relief**

659. Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

660. Tennessee law provides for the right to free and equal public education. Tenn. Const. art. XI, § 12; *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 140-41 (Tenn. 1993); *see also* Tenn. Code Ann. § 49-6-3001. Accordingly, Youth have a protected property interest in free and equal public education.

661. Defendant Commissioner Quin and Defendant Commissioner Gonzalez Reynolds, acting under color of law, enact and enforce official policies, practices, and procedures that deprive Youth of the education to which they are entitled under Tennessee law by providing less than the minimum level of education required under state statutes and regulations and in many instances, denying Youth access to education entirely.

662. These policies, practices, and procedures deprive Youth of their protected property interest in free and equal public education without adequate process, and instead provide Youth with education that is significantly inferior to that guaranteed to them by law.

## PRAYER FOR RELIEF ON CLAIMS

WHEREFORE, Plaintiffs prays that this Court:

663.    Certify the Class and Subclasses defined in Paragraph 527 above;

664.    Appoint DRT and the Doe Plaintiffs as representatives for the class and their counsel as class counsel;

665.    Issue declaratory relief determining that Defendants' policies, practices, actions, and omissions as described above violate Title II of the ADA, Section 504 of the Rehabilitation Act, and the Fourteenth Amendment, or, in the alternative for Post-Adjudication Youth, the Eighth Amendment, to the United States Constitution;

666.    Issue injunctive relief requiring Defendants to comply with the requirements of Title II of the ADA, Section 504 of the Rehabilitation Act, and the Fourteenth Amendment or, in the alternative for Post-Adjudication Youth, the Eighth Amendment, to the United States Constitution;

667.    Grant Plaintiffs all attorneys' fees, costs, and expenses available under law; and

668.    Grant Plaintiffs such additional and further relief as this Court may deem just and proper.


Dated: June 26, 2024                           Respectfully submitted,

                                               **SANFORD HEISLER SHARP, LLP**

                                               */s/ Jonathan Tepe*
                                               Jonathan Tepe (TN BPR #037266)
                                               Kevin Sharp (TN BPR # 016287)
                                               Kasi Wautlet (TN BPR #038688)
                                               611 Commerce Street, Suite 3100
                                               Nashville, TN 37203
                                               Phone: (615) 434-7000
                                               jtepe@sanfordheisler.com
                                               ksharp@sanfordheisler.com

113

kwautlet@sanfordheisler.com

David Tracey*
17 State Street, 37th Floor
New York, NY 10004
Phone: (646) 402-5650
dtracey@sanfordheisler.com

Shannon Henris*
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Phone: (202) 499-5200
shenris@sanfordheisler.com


**DISABILITY RIGHTS TENNESSEE**

Jack Derryberry, Jr. (TN BPR #003870)
Sherry Wilds (TN BPR #024756)
2 International Plaza, Suite 825
Nashville, TN 37217
Phone: (615) 298-1080
jackd@disabilityrightstn.org
sherryw@disabilityrightstn.org

Jeremiah Jones (TN BPR #040551)
9050 Executive Park Drive, Suite B-101
Knoxville, TN 37923
Phone: (865) 670-2944
jeremiahj@disabilityrightstn.org

**YOUTH LAW CENTER**

Jasmine Miller (TN BPR #039598)
Emily Satifka*
832 Folsom Street, Suite 700
San Francisco, CA 94107
Phone: (415) 413-0174
jmiller@ylc.org
esatifka@ylc.org

*Attorneys for Plaintiffs*


*\*Pro Hac Vice forthcoming*

114