# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOHN DOE 1, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24-cv-00777** |
| | ) | |
| **STATE OF TENNESSEE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This putative class action challenges several policies and practices that allegedly harm the rights of disabled children in Tennessee's juvenile justice system. Before the Court are two Motions to Dismiss (Doc. Nos. 59, 61) that have been fully briefed and are ripe for decision (see Doc. Nos. 60, 62, 65, 66, 67). For the following reasons, the motion brought by Lizzette Reynolds will be denied, and the motion brought by the other defendants will be granted in part and denied in part.

## I. FACTUAL ALLEGATIONS AND BACKGROUND

The Court takes the following allegations from the 147-page, 860-paragraph First Amended Class Action Complaint ("Complaint"), accepts them as true, and draws all reasonable inferences in Plaintiffs' favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007). Due to the protracted nature of the Complaint, however, the Court will recite only those allegations necessary to resolve the pending motions.

The named Plaintiffs in this case are four individuals and a representative organization known as Disability Rights Tennessee ("DRT"). The Complaint alleges that the individual Plaintiffs—John Doe 1, John Doe 2, John Doe 3, and Jane Doe 1—are children with one or more

disabilities who are now, or are at imminent risk of being" detained in Tennessee's juvenile justice system.[1]  (Doc. No. 53 ¶¶ 2 n.1; 37–62).  The Complaint refers to these Plaintiffs and other similarly situated children with disabilities as "Youth."  (Id. ¶ 2 n.1).  DRT is a "Protection and Advocacy Organization" designated by Congress "to protect and advocate for the rights of people with disabilities" in Tennessee.  (Id. ¶¶ 24–36).  DRT brought this lawsuit in its "associational capacity" on behalf of the named plaintiffs and six of its constituents identified as S.W., J.T., O.V., R.A., C.K., and M.G.  (Id. ¶ 20).

The four Defendants in this case are the State of Tennessee, the Tennessee Department of Children's Services ("DCS"), Margie Quin, and Lizzette Gonzalez Reynolds.  The State of Tennessee "operates and oversees the administration of" DCS and the Tennessee Department of Education ("TDOE"), both of which are state agencies that receive federal funds.  (Id. ¶¶ 67–68, 90).  DCS "oversees Tennessee's juvenile justice" system, (id. ¶ 68), and has the power to "[a]dminister, develop or oversee programs" and services "reasonably necessary for unruly [and] delinquent" children.  Tenn. Code Ann. § 37-5-106(a)(1).  TDOE "oversees public education in Tennessee."  (Doc. No. 53 ¶¶ 68, 90).  Quin is the Commissioner of DCS.  (Id. ¶ 78).  Reynolds is the Commissioner of Education and chief executive of TDOE.  (Id. ¶ 88).

The allegations in this case begin when Youth first enter the Tennessee juvenile justice system after being charged with committing a "delinquent or unruly act."  (Id. ¶¶ 2 n.1, 71, 106; see also Tenn. Code Ann. §§ 37-1-102(b)(10), (b)(33).  Tennessee juvenile courts then hold proceedings to determine whether these children are guilty or innocent of the charges.  See Tenn. Code Ann. § 37-1-103(a).  Juvenile courts may detain Youth "prior to adjudication" if, among

---

[1] The terms children or "child" refer to a "person under eighteen (18) years of age" or a "person under nineteen (19) years of age" under certain qualifying circumstances.  Tenn. Code. Ann. § 37-1-102 (b)(5).

other things, there is "probable cause" to believe they committed the acts with which they are charged. (Doc. No. 53 ¶¶ 63, 107). Courts typically send these "Pre-Adjudication Youth" to Juvenile Detention Centers ("JDC") "designated or operated by the court." (Id. ¶ 108; Tenn. Code. Ann. § 37-1-116(a)(4)). DCS and Quin ("DCS Defendants") "are responsible for oversight of JDCs, which are either licensed by DCS Defendants or approved by them[.]" (Doc. No. 53 ¶¶ 71, 108, 125 (alleging that "Tennessee has seventeen JDCS")).

When a juvenile court adjudicates a Youth as "delinquent or unruly," the court may commit the Youth to DCS custody for "post-adjudication services." (Id. ¶¶ 70, 110). The DCS Defendants have sole "authority over placement decisions for young people committed to their custody; judges are not permitted to order that Post-Adjudication Youth be placed in a specific facility." (Id. ¶¶ 111, 121). "The facilities where DCS Defendants confine Post-Adjudication Youth" include, but are not limited to: (i) Youth Development Centers ("YDCs"); (ii) Residential Child Care Agencies; (iii) other facilities licensed by the Tennessee Department of Mental Health and Substance Abuse Services; and (iv) out-of-state contracted facilities. (Id. ¶ 114). The Complaint collectively refers to the facilities that hold Pre-Adjudication Youth (including JDCs) and Post-Adjudication Youth (including YDCs) as "DCS and DCS-licensed or approved facilities." (Id. ¶¶ 69-72, 78, 184).

Plaintiffs raise numerous allegations about the experiences of the individual Plaintiffs during the time they were detained in the Tennessee juvenile justice system. They also allege a laundry list of ways in which Defendants' policies, practices, methods of administration, and procedures violate the rights of both Pre-Adjudication Youth and Post-Adjudication Youth. Plaintiffs contend, among other things, that "DCS and its agents (1) fail to assess and accommodate Youths' disabilities; (2) fail to administer services, programs, and activities in the most integrated setting appropriate to the needs of Youth; (3) fail to provide Youth with medical and mental health

3

treatment; (4) expose Youth to violence; (5) subject Youth to excessive force through the use of pepper spray; (6) place Youth in solitary confinement in circumstances that constitute cruel and unusual punishment and are not rationally related to any legitimate government objective or are excessive in relation to that purpose; and (7) deny Youth education." (Id. ¶ 83; see also id. ¶¶ 195–503). As a result, Plaintiffs asserts the following eleven causes of action against Defendants:

- <u>State of Tennessee</u>: Failure to Accommodate, in violation of Title II of the Americans with Disabilities Act ("ADA") (Count One) and Section 504 of the Rehabilitation Act ("Section 504") (Count Three).

- <u>DCS</u>: Failure to Accommodate, in violation of the ADA (Count One) and Section 504 (Count Three); and Failure to Provide Community Integration, in violation of the ADA (Count Two) and Section 504 (Count Four).

- <u>Quin (official capacity)</u>: Section 1983 claims based on violations of the Fourteenth Amendment for: Failure to Provide Medical and Mental Health Treatment (Count Five); State-Created Danger and Failure to Protect (Count Seven); Excessive Force (Count Eight); and Conditions of Confinement (Count Nine). In the alternative, § 1983 claims on behalf of Post-Adjudication Youth for Failure to Provide Medical and Mental Health Treatment (Count Six) and Cruel and Unusual Punishment (Count Ten), in violation of the Eighth Amendment.

- <u>Quin and Reynolds (official capacities)</u>: Section 1983 claim based on Violation of Procedural Due Process under the Fourteenth Amendment (Count Eleven).

(Id. ¶¶ 730–854). Plaintiffs seek to represent a class of other similarly situated Youth in pursuit of: (1) a declaratory judgment determining that Defendants' policies and practices violate the ADA, Section 504, the Fourteenth Amendment, and the Eighth Amendment; and (2) an injunction requiring Defendants to reform their policies, practices, and procedures to comply with these laws. (Id. ¶¶ 857–58).

The DCS Defendants (along with the State) and Reynolds now move to dismiss the Complaint on four grounds: (i) lack of standing, (ii) sovereign immunity, (iii) failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and (iv) failure to join necessary parties

under Rule 12(b)(7).  (Doc. Nos. 59, 61).  Given that each ground for dismissal involves a different legal standard, the Court will address these arguments separately.

## II.      DISMISSAL UNDER RULE 12(b)(1) FOR LACK OF STANDING

The DCS Defendants argue that John Doe 1 and DRT lack standing to bring any claims against them.  (Doc. No. 62 at 26–31).  Reynolds contends that none of the Plaintiffs have standing to bring a procedural due process claim against her.  (Doc. No. 60 at 9–15).

A motion to dismiss for lack of standing is properly characterized as a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Forest City Residential Mgmt., Inc. ex rel. Plymouth Square Ltd. Dividend Hous. Ass'n v. Beasley, 71 F. Supp. 3d 715, 722–23 (E.D. Mich. 2014) (citing Stalley v. Methodist Healthcare, 517 F.3d 911, 916 (6th Cir. 2008)).  "A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)."  Cartwright v. Garner, 751 F.3d 752, 759 (6th Cir. 2014) (citing United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994)).  Where, as here, defendants make a facial attack, the Court must take all the allegations in the Complaint as true and determine "whether the plaintiff has *alleged* a basis for subject matter jurisdiction."  Id. (emphasis added).

To establish standing at the pleading stage, a plaintiff must allege facts plausibly demonstrating that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo Inc. v. Robbins, 578 U.S. 330, 338 (2016) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)); see also Soehnlen v. Fleet Owners Ins. Fund, 844 F.3d 576, 581 (6th Cir. 2016).  "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  Spokeo, 578 U.S. at 339 (quoting Lujan, 504 U.S. at 560) (internal quotation

marks omitted).  "For an injury to be concrete, it must be real, and not abstract, and for an injury to be particularized, it must affect the plaintiff in a personal and individual way."  Fishon v. Mars Petcare US, Inc., 501 F. Supp. 3d 555, 563 (M.D. Tenn. 2020) (citing Spokeo, 578 U.S. at 339).  "Plaintiffs seeking injunctive relief must make an additional showing that they suffered 'both past injury and a real and immediate threat of *future* injury.'"  Id. (quoting Mosley v. Kohl's Dep't. Stores, Inc., 942 F.3d 752, 756 (6th Cir. 2019)) (emphasis added).

A.    John Doe 1

As a named plaintiff, John Doe 1 must demonstrate his own individual standing regardless of whether he seeks to represent a putative class.  Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 423 (6th Cir. 1998); see also Rikos v. Procter & Gamble Co., 782 F. Supp. 2d 522, 532 (S.D. Ohio 2011).  This means he must show he suffered a "past injury and a real and immediate threat of future injury" for his requested declaratory and injunctive relief in this case.  Mosley, 942 F.3d at 756.  The DCS Defendants argue that John Doe 1 cannot meet these requirements because he is no longer a minor or in DCS custody, and therefore it is not plausible he faces any "imminent risk of being in DCS custody and/or kept in a DCS-licensed or approved facility" in the future.  (Doc. No. 62 at 26–28).

John Doe 1 responds that he *had* standing when the original complaint was filed on June 26, 2024.  (Doc. No. 66 at 6).  That may be true, but that is not the standard the Court must apply here.  Instead, the Court determines standing based on the facts that exist at the time the amended complaint is filed.  See Ohio Citizen Action v. City of Englewood, 671 F.3d 564, 580 (6th Cir. 2012).  "That means a plaintiff's standing must be assessed anew any time he seeks to amend his complaint."  Bare v. Cardinal Health, Inc., 2023 WL 395026, at *2 (6th Cir. Jan. 25, 2023) (citing Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473–74 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended

complaint to determine jurisdiction."); see also Shaw v. Serv. One Credit Union, Inc., 2023 WL 9059668, at *2 (W.D. Ky. Nov. 9, 2023). The Court therefore must determine whether John Doe 1 had standing when the *amended complaint* was filed on November 22, 2024.

When the amended complaint was filed, John Doe 1 had already reached the age of majority at eighteen years old. (Doc. No. 53 ¶¶ 37, 41). There are certain circumstances where juveniles may remain "under the jurisdiction of the juvenile court" until their nineteenth birthday based on conduct that occurred before they turned eighteen, but there are no allegations that implicate any of those limited circumstances here. See Tenn. Code Ann. § 37-1-102(b)(5)(B). Thus, John Doe 1 was no longer a child who could be detained by a Tennessee juvenile court or DCS at the time the amended complaint was filed. See id. This made it impossible (let alone implausible) that he "remained at imminent risk of being in DCS custody and/or kept in a DCS-licensed or approved facility." (See Doc. No. 53 ¶ 41).

The Court is concerned about John Doe 1's negative experiences within the Tennessee juvenile justice system. For example, he alleges that he spent up to twenty-three or twenty-four hours in solitary confinement some days, "was violently beaten by other youth nearly thirty times," missed "nearly an entire year of school," and was retaliated against when he filed a grievance for improper sexual activity. (See id. ¶¶ 362–63, 509–32). He further alleges that his time in DCS custody "degraded his mental health" and exacerbated his "depression, PTSD, [ADHD], and anxiety disorder." (Id. ¶¶ 37–38, 506–07). These allegations are worrisome. Nevertheless, they do not plausibly demonstrate that eighteen-year-old John Doe 1 faces any immediate threat of *future* injury for his requested injunctive relief.

Accordingly, the Court must dismiss John Doe 1's claims under Rule 12(b)(1) for lack of standing. With this holding, there is no need for the Court to address the DCS Defendants'

alternative argument that his claims are moot.  (See Doc. Nos. 66 at 9–11; 67 at 3 n.3).

B.    DRT

The DCS Defendants next argue that DRT does not have associational standing to bring claims in this case.  (Doc. No. 62 at 28–31).  A protection and advocacy organization, like DRT, may "bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim requested nor the relief requested requires the participation of individual members in the lawsuit."  Waskul v. Washtenaw Cnty. Cmty. Mental Health, 900 F.3d 250, 254–55 (6th Cir. 2018) (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 181 (2000)).  The DCS Defendants contend that DRT cannot satisfy the first and third prongs of this test.

As to whether DRT's members would have standing (prong 1), the DCS Defendants argue that DRT's constituents are not "members," and therefore none of DRT's "members" have standing to sue on their own right.  (Doc. No. 62 at 30).  Multiple "federal statutes" authorize DRT to, among other things, "pursue administrative, legal and other remedies on behalf of people with disabilities."  (Doc. No. 53 ¶¶ 24–27); see also 42 U.S.C. § 15043(a)(2)(A)(i).  In a recent published decision, this Court recognized that the individuals whom DRT "is called on to protect are not members of the organization but . . . something more like constituents or beneficiaries." Trivette v. Tenn. Dep't of Corr., 739 F. Supp. 3d 663, 689 (M.D. Tenn.).  Indeed, all "Youth described in the Complaint" are "DRT Constituents who have disabilities that limit one or more of their major life activities."  (Doc. No. 53 ¶ 35).  But even if DRT does not have "a formal membership roster," it can still rely on associational standing to sue on behalf of its constituents if those constituents have "indicia of membership."  Trivette, 739 F. Supp. 3d at 689 (citing Hunt v.

Wash. State Apple Advert. Comm'n, 432 U.S. 333, 344 (1977)); see also Nestle Ice Cream Co. v. NLRB, 46 F.3d 578, 586 (6th Cir. 1995).

The DCS Defendants contend that DRT's constituents do not "possess all of the indicia of membership" because they do not control DRT's "activities and finances," "serve on the board," or "fund" the organization. (Doc. No. 62 at 30). While true, that is not what associational standing requires. Instead, as this Court previously held, "sufficient indicia of membership are present with regard to those specific, named individuals who have directly participated in DRT's litigation efforts in this case." Trivette, 739 F. Supp. 3d at 689. "DRT's demonstrated relationship with the specifically identified [Youth] who have participated in this litigation is significantly closer than many relationships that meet the formal definition of 'membership.'" Id. The Complaint alleges that "DRT has worked extensively with the Doe Plaintiffs, as well as various other Youth, to monitor their treatment, investigate claims of abuse and/or neglect involving them, and to advocate for appropriate services for them." (See Doc. No. 53 ¶ 36). Given that the named Plaintiffs are DRT constituents, voluntarily joined this case, and seek the same remedies as DRT, the Court finds that DRT plausibly satisfies prong one of the associational standing test. (See id.).

As to whether DRT's constituents will be required to participate in this lawsuit, the DCS Defendants argue that the Court cannot adjudicate Plaintiffs' "claims, nor issue the relief DRT requests, without the individual participation of every one of those constituents." (Doc. No. 62 at 30–31). "This prong of the associational standing test is a prudential standing requirement, not a constitutional requirement." Dayton Area Chambers of Commerce v. Becerra, 2024 WL 3741510, at *6 (S.D. Ohio Aug. 8, 2024) (citing United Food and Com. Workers Union Loc. 75, 517 U.S. 546, 555 (1996)). "[T]he general rule is that individual participation of members 'is not normally necessary when an association seeks prospective or injunctive relief for its members[,]' but may

be required when the association is seeking damages." Id. (quoting United Food, 517 U.S. at 546). Here, Plaintiffs seek purely prospective systemic injunctive relief, and there is no reason to believe that individual participation of all of DRT's members is necessary for the Court to grant that relief.

Last, the DCS Defendants argue, in the alternative, that even if DRT has standing with respect to the named Plaintiffs, it does not have broad standing to seek relief on behalf of all disabled youth in general. (Doc. No. 62 at 29–30). This argument is premature because "the issue here is not what standing DRT might be able to establish" in the future, "but what standing it has actually demonstrated in court." Trivette, 739 F. Supp. 3d at 690. For now, it is sufficient that DRT has associational standing to challenge "the policies alleged to have injured its identified constituents—that is, the plaintiffs and the [six] additional individuals identified." Id. The Court will revisit this issue later, if needed, when determining the scope of any relief.

C.     Reynolds

Reynolds argues that Plaintiffs' procedural-due-process claim in Count Eleven (the only claim against her) should be dismissed for lack of standing. (Doc. No. 60 at 9–15). Count Eleven alleges that Youth in Tennessee's juvenile justice system are subject to ongoing policies and procedures that deprive them of their property interest in an education without due process. (Doc. No. 53 ¶¶ 850–54). It alleges that Reynolds, as the Commissioner of TDOE, is responsible for developing rules to ensure that Pre-Adjudication Youth and Post-Adjudication Youth receive the education to which they are entitled under Tennessee law. (Id.). But Reynolds allegedly failed in this role by adopting and enforcing "official policies, practices, and procedures (including an official policy of inaction) that deprive Youth of" this protected right "without being provided with notice of the reason for the deprivation, an opportunity to be heard, or other procedural safeguards to protect their entitlement to education. (Id. ¶¶ 88, 91, 852). The Complaint further alleges that Youth are deprived of their right to education without notice when, among other things, they are

shuffled between DCS-licensed or DCS-approved facilities in a way that disrupts their education (id. ¶¶ 313–14), held in solitary confinement for twenty-three hours a day (id. ¶¶ 308, 356, 402), removed from school for administrative or disciplinary reasons (id. ¶ 550), coerced into opting out of school (id. ¶ 403), given instruction that does not allow them to progress towards graduation (id. ¶ 651–52), and given fewer hours of instruction than the law requires (id. ¶¶ 301, 305, 542, 561, 632, 682). The Court finds that these allegations satisfy the injury-in-fact, traceability, and redressability requirements for standing.

It is well settled that Youth in Tennessee "have a legitimate property interest in educational benefits and, therefore, in actually attending school." Laney v. Farley, 501 F.3d 577, 581 (6th Cir. 2007); see also Seal v. Morgan, 229 F.3d 567, 574 (6th Cir. 2000). Plaintiffs allege that Reynolds's policies and lack of policies deprive them their property interest in education without constitutionally adequate process, such as pre-deprivation notice or a hearing. (Doc. No. 53 ¶ 852). This injury is both concrete and particularized because each Plaintiff alleges they suffered a deprivation of their education experience and rights without procedural due process while detained in the Tennessee juvenile justice system. (See id. ¶¶ 542, 561, 620–21, 682). It is plausible that John Doe 2, John Doe 3, and Jane Doe 1 face a "real and immediate" threat of future deprivations because they were each detained in pre-adjudication or post-adjudication custody when the amended Complaint was filed. (Id. ¶¶ 43, 61). Accordingly, the Court finds that at the pleading stage, the individual Plaintiffs have plausibly alleged an Article III injury for their claim against Reynolds.

Reynolds urges the Court to reach a different result because the Complaint ignores "the existence of statutory grievance processes" available for juveniles who allege they receive inadequate education. (Doc. No. 60 at 11–13). The Court does not find that the potential

availability of post-deprivation grievance procedures is relevant to the standing analysis. This is because it is plausible that Plaintiffs' procedural due process claim is based on a lack of *pre-deprivation* procedures, such as notice and an opportunity to be heard. (See Doc. No. 53 ¶ 852). This factual argument about the adequacy or availability of post-deprivation procedures also goes to the *merits* of Plaintiffs' claims, rather than whether Plaintiffs asserted an Article III injury. See, e.g. CHKRS, LLC v. City of Dublin, 984 F.3d 483, 488–89 (6th Cir. 2021); see also Brooks v. Butler Cnty., 2022 WL 2526601, at *3 (6th Cir. Jul. 7, 2022) (noting that courts are especially cautious with the injury-in-fact analysis in procedural due process cases because it often overlaps with "the merits of whether a protected property interest exists"). "The standing inquiry is not a merits inquiry." Gerber v. Herskovitz, 14 F.4th 500, 505 (6th Cir. 2021) (citation omitted). For now, it is enough that Plaintiffs plausibly alleged an injury-in-fact for injunctive relief based on their allegations that Reynold's policies do not provide any pre-deprivation procedural safeguards for Youth.

The remaining requirements for standing—traceability and redressability—are relaxed where Plaintiffs allege procedural injuries. For traceability, "a defendant's actions must have a 'causal connection to the plaintiff's injury.'" Id. (citing Lujan, 504 U.S. at 561). Here, Plaintiffs' injuries are fairly traceable to Reynolds' conduct. The Complaint alleges her policies, including an "official policy of inaction," deny Youth their right to education in detention without pre-deprivation notice or an opportunity to be heard. These allegations satisfy the "relatively modest" burden of demonstrating traceability at the pleading stage. See Buchholz v. Meyer Njus Tanick, PA, 946 F.3d 855, 866 (6th Cir. 2020). Plaintiffs also satisfy the redressability requirement because they seek an injunction requiring Reynolds to reform her policies to ensure that Youth are not deprived of their property interest in education without due process of law. If Reynolds is

required to implement policies that protect Youth education rights, "then the harms that allegedly flow from the current system will be prevented, and thus Plaintiffs' claimed injuries redressed." Bull v. Carter, 2025 WL 2201101, at *5 (M.D. Tenn. Aug. 1, 2025). The Court further finds that because the individual Plaintiffs have standing to bring their procedural due process claims against Reynolds, DRT also has associational standing to bring these claims.

## III. DISMISSAL BECAUSE OF SOVEREIGN IMMUNITY

The next issue is whether Defendants are entitled to sovereign immunity. Reynolds argues that sovereign immunity shields her from this lawsuit entirely, (Doc. No. 60 at 15–20), and the State and DCS Defendants contend that sovereign immunity shields them from claims brought by Pre-Adjudication Youth or Youth at "imminent risk" of returning to DCS custody, (Doc. No. 62 at 31–33). The Court is not persuaded by their arguments.

The doctrine of sovereign immunity normally deprives federal courts of subject matter jurisdiction when a citizen sues a State or state official in her official capacity. Russell v. Lundergan-Grimes, 784 F.3d 1037, 1046 (6th Cir. 2015); Courser v. Allard, 969 F.3d 604, 618 (6th Cir. 2020). Plaintiffs argue that sovereign immunity does not bar their claims because the Ex parte Young exception applies here. (Doc. Nos. 65 at 23–27; 66 at 14–15). The Ex parte Young exception to sovereign immunity allows plaintiffs to bring "a suit challenging the constitutionality of a state official's action." Kaplan v. Univ. of Louisville, 10 F.4th 569, 577 (6th Cir. 2021). "To determine if Ex parte Young applies, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Lee, 2022 WL 982667, at *5 (citations and internal quotation marks omitted). "Whether the state official's challenged action is actually inconsistent with federal law is not part of the inquiry into whether suit lies under Ex parte Young." Id. (citing Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002)).

Reynolds argues that "nearly all the specific facts" alleged in the Complaint "concern *past* events," and therefore the Complaint does not allege that any Plaintiffs are suffering an "ongoing violation" of the education rights. (Doc. No. 60 at 16–17). The Complaint discusses past events to provide "illustrative examples" of how "Defendants' *ongoing* policies, practices, and procedures . . . violate the statutory and constitutional rights of Youth." (Doc. No. 53 ¶ 20 n.5 (emphasis added)). Viewing the Complaint in the light most favorable to Plaintiffs, the Court finds that it sufficiently alleges "ongoing policies, practices, and procedures" that violate Plaintiffs' rights under the ADA and Rehabilitation Act (Counts One, Two, Three, and Four), the Fourteenth Amendment (Counts Five, Seven, Eight, Nine, and Eleven), and the Eighth Amendment (Counts Six and Ten). (See id. ¶ 20 n.5). The Complaint also seeks purely prospective relief "requiring Defendants to reform" these "policies, practices, and procedures" to comply with the law. (Id. ¶ 858). These allegations are "sufficient to invoke the Young fiction." Telespectrum, Inc. v. Pub. Serv. Com'n of Ky., 227 F.3d 414, 419 (6th Cir. 2000) (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 281 (1997)).

The State and DCS Defendants similarly argue that claims involving Youth not in DCS custody, Pre-Adjudication Youth, and Youth at "imminent risk" of returning to DCS custody are speculative and request relief for no other reason "to right past wrongs." (Doc. No. 62 at 32–33). This argument reflects a premature merits challenge to the Complaint's class allegations that can be raised when Plaintiffs move to certify a class. "[T]he inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim[s]." Verizon, 535 U.S. at 646. For now, the Court is only concerned with whether the named Plaintiffs have alleged an ongoing

violation of federal law and seek prospective relief.  Because Plaintiffs satisfy both conditions, the Ex parte Young exception applies.  Plaintiffs' claims are not barred by sovereign immunity.[2]

## IV.     DISMISSAL FOR FAILURE TO STATE A CLAIM

Defendants next move to dismiss several claims under Rule 12(b)(6).  Rule 12(b)(6) authorizes the Court to dismiss the Complaint if it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In making this determination at the motion to dismiss stage, the Court must accept as true all plausible factual allegations in the complaint, draw all reasonable inferences in the plaintiffs' favor, and determine whether they plausibly give rise to an entitlement to relief.  Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018); see also Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The Court considers each of Defendants' specific challenges below.[3]

### A.     Claims Against the State of Tennessee (Counts One and Two)

Defendants argue that the Court should dismiss the two ADA claims against the State of Tennessee because the Complaint alleges "broad and conclusory claims against all Defendants without stating "with any level of specificity how the State, rather than DCS, has violated the ADA."  (Doc. No. 67 at 7–8).  Without any allegations specific to the State of Tennessee, Defendants contend "there is no cognizable legal theory to include the State as a defendant in this action."  (Doc. No. 62 at 13).

_____

[2] Given this conclusion, the Court need not decide whether Congress abrogated sovereign immunity over Plaintiffs' specific claims under the ADA and Rehabilitation Act in this case.  (See Doc. No. 66 at 15); see also United States v. Georgia, 546 U.S. 151, 154 (2006) (holding that Congress unequivocally intended to abrogate state sovereign immunity over Title II ADA claims premised on conduct that independently violates the Fourteenth Amendment).

[3] Defendants do not move under Rule 12(b)(6) to dismiss Plaintiffs' § 1983 Fourteenth Amendment claims in Counts Five, Seven, Eight, or Nine.  (See Doc. No. 62 at 2–3).

The Court agrees that the Complaint repeatedly lumps the State and the DCS together as "Defendants," and that it says very little about the State specifically. But that does not mean Plaintiffs fail to state a claim against the State. The Complaint specifically alleges that the "State of Tennessee operates and oversees the administration of DCS and TDOE." (Doc. No. 53 ¶ 67). And it alleges that "Defendants' official policies, practices, and procedures . . . violate the ADA by failing to provide Youth with reasonable accommodations" (Count One), and by failing to detain Youth in least restrictive and most integrated setting of community placement with appropriate services and support (Count Two) (Id. ¶¶ 730–60). These allegations at least give the State "fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555. Of course, whether Plaintiffs will ultimately prevail against the State on summary judgment or at trial is a different story, as that will depend on what *evidence* they can show to demonstrate that the State is personally responsible for the policies at issue here. Plaintiffs are reminded that merely showing that Tennessee is responsible for DCS, and DCS violated the ADA, is not enough. See Jones v. City of Detroit, 20 F.4th 1117, 1119–22 (6th Cir. 2021) (holding that vicarious liability does not apply to Title II of the ADA or the Rehabilitation Act). At this time, however, on a Rule 12(b)(6) motion, the Court will not dismiss the State as a defendant for lack of specificity.

B.   Claims Brought by Pre-Adjudication Youth" or Youth at "Imminent Risk" of Being in DCS Custody (All Counts)

Defendants move to dismiss "Plaintiffs' *class allegations* regarding Pre-Adjudication Youth (including those at 'imminent risk' of being in DCS custody)" for failure to state a claim because juvenile courts, "not DCS or the State, are responsible for the custody" and well-being "of Pre-Adjudication Youth." (Doc. No. 62 at 18 (emphases added)). As the Court previously mentioned in its analysis of sovereign immunity, this argument strikes the Court as a premature

attack on Plaintiffs' proposed class and subclasses. It is true that the Complaint alleges that Plaintiffs seek to certify a class that includes Youth who "are now, or are at imminent risk of being, in DCS custody and/or kept in a DCS-licensed or approved facility." (Doc. No. 53 ¶ 697). It is also true that Plaintiffs seek to certify a Pre-Adjudication Youth subclass. (Id.). It is also true that Rule 23 requires the Court to decide whether to certify a class or subclasses "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1). Nevertheless, the Court finds that the better approach is to address these issues in the context of a motion for class certification under Rule 23 after the relevant discovery is complete. See Lammert v. Auto-Owners (Mutual) Ins. Co., 415 F. Supp. 3d 807, 810 (M.D. Tenn. 2019); see also Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 423–24 (6th Cir. 1998) (holding that once a "class representative establishes his individual standing to sue," the issue of whether he can represent the putative class "depends solely on whether he is able to meet the *additional* criteria encompassed in Rule 23") (emphasis added).

For present purposes, the Court finds that the Complaint plausibly alleges facts to survive dismissal. The Complaint alleges that the State oversees DCS, and that DCS oversees JDCs and other facilities where Pre-Adjudication Youth typically are detained. (Doc. No. 53 ¶ 108). It is unclear what this oversight entails, but the Complaint raises plausible allegations that the State and the DCS Defendants failed to perform their oversight functions for both Pre-Adjudication Youth and Post-Adjudication Youth. (Id. ¶¶ 179–94). Accordingly, the Court does not have a sufficient basis to remove Pre-Adjudication Youth from the case at this time. After discovery is complete, Defendants are free to revisit this issue if they can demonstrate, based on evidence, that DCS has no control over, or responsibility to, Pre-Adjudication Youth or those at imminent risk of being placed in DCS custody.

17

C. Failure to Accommodate Under the ADA and Rehabilitation Act (Counts One and Three)

Defendants move to dismiss Plaintiffs' failure-to-accommodate claims on several grounds, including that "allegations of inadequate mental, behavioral, and medical health treatment cannot form the basis of an ADA or Section 504 claim." (Doc. No. 62 at 14–17). Plaintiffs respond that this argument is a red herring because their failure-to-accommodate claims do not seek to address the sufficiency of medical or mental health treatment. (Doc. No. 66 at 18).

"Claims brought under the ADA and Section 504 generally are evaluated together." M.G. ex rel. C.G. v. Williamson Cnty. Schs., 720 F. App'x 280, 287 (6th Cir. 2018). Plaintiffs "seeking to state a claim under either the ADA or § 504 against a school receiving federal financial assistance must show that he or she is (1) disabled under the statute, (2) 'otherwise qualified' for participation in the program, and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the program by reason of his or her disability." S.S. v. E. Ky. Univ., 532 F.3d 445, 453 (6th Cir. 2008) (citation omitted). For the third element, a "plaintiff may allege disability discrimination under two theories: intentional discrimination and failure to reasonably accommodate." Knox Cnty. v. M.Q., 62 F.4th 978, 1000 (6th Cir. 2023) (citations omitted). Plaintiffs argue that they "pleaded failure to accommodate claims, rather than intentional discrimination claims, under the ADA and Section 504." (Doc. No. 66 at 16).

The Court finds that the Complaint plausibly alleges facts to satisfy the three elements for a failure to accommodate claim. First, it alleges that Plaintiffs are disabled within the meaning of the ADA and Section 504. (Doc. No. 53 ¶¶ 46–48 (John Doe 2), 52–53, 591–92 (Jane Doe 1), 58–59 (John Doe 3); see also id. ¶¶ 731, 762). Second, it alleges that Plaintiffs are eligible to participate in DCS's services, programs, or activities while being detained in the Tennessee juvenile justice system. (Id. ¶¶ 239 (alleging that John Doe 2, Jane Doe 1, and John Doe 3 "are in

juvenile justice custody"), 732, 746, 763). Third, it alleges that Defendants (namely the State and DCS) refused to provide Plaintiffs with reasonable accommodations for certain programs, including the "Point and Level Systems" and "Youth Commitment Reduction Credit" program. (Id. ¶¶ 534, 542, 556, 558 (John Doe 2), 595 (Jane Doe 1), 62 (John Doe 3); see also id. ¶¶ 196, 269–96). DCS-licensed or approved facilities use these two programs to reward "good" behavior and punish "bad" behavior. (Id. ¶ 269). For example, Youth that perform well in these programs could receive additional recreation time or contact with family members, whereas those who do not comply with program requirements may receive additional restrictions and longer sentences. (Id. ¶¶ 275–77). Plaintiffs allege that Defendants utilize these programs without giving Youth any reasonable accommodations, which effectively punishes Youth for their disabilities. (Id. ¶¶ 278–79). The Complaint provides a specific example in which T.K., a Youth, lost points and access to activities when she refused to clean her room because of her severe mental and behavioral disabilities. (Id. ¶ 282). Another example is when a Youth with ADHD "lost points" for "talking out loud," without receiving any reasonable accommodations for their disability. (Id. ¶ 294). Plaintiffs' inability to participate in these programs without reasonable accommodations, if true, means it is plausible that they are being excluded from or denied the benefits of services, programs, or activities because of their disabilities. (Id. ¶¶ 2–3, 196, 533, 595, 680). (Id. ¶¶ 287–96).

Accordingly, the Court will deny Defendants' motion to dismiss Counts One and Three because the allegations above give Defendants' "fair notice" of Plaintiffs' claims and the grounds upon which they rest. See Vasser v. Shiroki N. Am., Inc., 2021 WL 1088181, at *7 (M.D. Tenn. Mar. 22, 2021) (citation omitted). Those grounds, according to Plaintiffs, do not include "allegations of inadequate mental, behavioral, and medical health treatment." (Doc. No. 62 at 14–17).

D.     Eighth Amendment Claims (Counts Six and Ten)

On behalf of "Post-Adjudication Youth," Plaintiffs bring § 1983 claims against Quin under the Eighth Amendment for failure to provide medical and mental health treatment (Count Six) and for cruel and unusual punishment (Count Ten).  Plaintiffs bring Count Six "in the alternative" to their Fourteenth Amendment claim for failure to provide medical and mental health treatment (Count Five), and they bring Count Ten "in the alternative" to their Fourteenth Amendment claims for state-created danger and failure to protect (Count Seven), excessive force (Count Eight), and conditions of confinement (Count Nine).  (Doc. No. 53 ¶¶ 806, 836).  Quin argues that these "alternative" claims should be dismissed because the Fourteenth Amendment, rather than the Eighth Amendment, applies to Post-Adjudication Youth.  (Doc. No. 62 at 19–20).

Plaintiffs concede that their Fourteenth Amendment claims in Counts Five, Seven, Eight, and Nine challenge the same conduct as their Eighth Amendment claims in Counts Six and Ten, and that the Eighth Amendment does not apply in this case because "[n]either pre-adjudication nor post-adjudication Youth have been convicted of a crime."  (Doc. No. 53 at n.137); see also Harris v. Brooks, 2023 WL 6964751, at *2 (M.D. Tenn. Oct. 20, 2023) (quoting Ingraham v. Wright, 430 U.S. 651, 664 (1977)) (noting that "the Eighth Amendment applies only to 'those convicted of crimes'").  Nevertheless, Plaintiffs ask the Court not to dismiss their Eighth Amendment claims simply because they pled these claims "in the alternative" to their Fourteenth Amendment claims. (Doc. No. 66 at 28–30).

This is not a situation where the Complaint alleges *viable* theories of liability in the alternative, such as when a plaintiff pleads a breach of contract claim and an equitable contract-based claim, even though Plaintiffs cannot ultimately prevail on *both* theories.  Instead, Plaintiffs concede that Post-Adjudication Youth are not protected by the Eighth Amendment because they have not been convicted of crimes.  Because the parties agree that the Eighth Amendment does not

apply here, the Court will dismiss the alternative Eighth Amendment claims in Counts Six and Ten under Rule 12(b)(6) for failure to state a claim.

E.    State Education-Based Claims (Counts One, Two, Three, and Four)

Defendants next move to dismiss Counts One, Two, Three, and Four to the extent they allege a failure to provide educational services.  (Doc. No. 62 at 20–26).  Defendants argue that the gravamen of these claims seek relief under the Individuals with Disabilities Education Act ("IDEA"), and therefore the Court should dismiss these claims for failing to exhaust administrative remedies.  "The IDEA's exhaustion requirement grew out of the reality that three laws potentially allow children with disabilities to seek relief for difficulties that they encounter at school: the ADA, the Rehabilitation Act, and the IDEA."  Doe by K.M. v. Knox Cnty. Bd. of Educ., 56 F.4th 1076, 1080 (6th Cir. 2023) (citing Fry ex rel. E.F. v. Napoleon Cmty. Schs., 580 U.S. 154, 170–71 (2017)).  The ADA and the Rehabilitation Act "protect all individuals with disabilities," whereas the IDA "protects only children with disabilities."  Id. (citations omitted).  The IDEA conditions federal funding on states making a "free appropriate public education" ("FAPE") "available to all children with disabilities residing in the State."  Id. (quoting 20 U.S.C. § 1412(a)(1)(A)).

Plaintiffs may "pursue overlapping claims under the ADA or Rehabilitation Act, but they must complete the IDEA's administrative process if they are 'seeking relief that is also available under'" the IDEA.  Id. (quoting 20 U.S.C. § 1415(l)).  The "IDEA allows parents to seek relief only for one injury: the denial of a" FAPE.  Id. (citation omitted).  Plaintiffs do not need to exhaust administrative remedies under the IDEA if they seek relief other than a FAPE—"even if they *could have* sought" a FAPE as their relief.  Id. (citation omitted).  To determine whether a Complaint seeks a FAPE as the remedy, the Court asks two hypothetical questions:  (1) could the plaintiff have "sought the relief if the challenged conduct had arisen outside school in, say, a public theater

or library," and (2) "could a teacher or guest at the school (rather than a student) have requested the same relief?"  If the answer is "no" to these questions, then the plaintiff likely seeks a FAPE. Id.  The Sixth Circuit summarized the standard from these hypotheticals as follows:  Plaintiffs "seek 'relief' that is 'available' under the IDEA only if a child needs an *instructional change*, not just a *non-instructional accommodation* to some school rule or policy."  Id. (citing 20 U.S.C. § 1415(l)).

Viewing the Complaint in the light most favorable to Plaintiffs, it is plausible that the failure-to-accommodate claims are directed at the disciplinary and behavioral management practices that prevent Youth from going to school at all, rather than to any instructional changes. (Id. at 1083; see also, e.g., Doc. No. 53 ¶¶ 277, 281 (alleging that the Points and Levels System deprives Youth, including John Doe 3, from attending school at all).  For example, a reasonable accommodation for Youth participating in the Points and Levels System to ensure they can attend school would have "nothing to do with the child's instruction."  Doe by K.M., 56 F. 4th at 1083. Moreover, the Complaint does not allege that DCS failed to provide "special education" to Plaintiffs who, by reason of their disabilities, need special education and related services.  Id.  Nor does it allege that Plaintiffs requested "uniquely tailored teaching."  Id.  Based on the allegations in the Complaint alone, the Court finds that Plaintiffs have met the pleading requirements for their failure to accommodate claims, and that it is at least plausible they are not seeking a FAPE.  This is enough to survive dismissal.

F.    Procedural Due Process (Count Eleven)

Last, Quinn and Reynolds argue that the Court should dismiss the procedural due process claim in Count Eleven because the Complaint does not "identify the inadequacies of the procedural mechanisms available to them that protect disabled Tennessee students' interest in a FAPE."  (Doc. Nos. 62 at 26; 60 at 20–22).  The Court already addressed this issue in the context of whether

Plaintiffs have standing to sue Reynolds in her official capacity. As the Court explained, the crux of Count Eleven is that Quin's and Reynold's policies or lack of same deny Youth their right to an education in Tennessee without any pre-deprivation procedural safeguards for Youth. Based on these allegations, the Court cannot conclude that Count Eleven is about the denial of a FAPE.

For these reasons, the Court is not persuaded that Plaintiffs' procedural due process claim is deficient merely because the Complaint does not allege anything about post-deprivation grievance procedures. There is a "critical" difference "between a procedural due process claim arising from a deprivation which requires a [pre-deprivation] or a [post-deprivation] process, each of which are evaluated under different legal standards." Cranberry Promenade, Inc. v. Cranberry Tp., 2010 WL 653915, at *5 (W.D. Pa. Feb. 22, 2010) (citation omitted). "When a deprivation occurs through an established state procedure," as is alleged here, "then it is both practical and feasible for the state to provide pre-deprivation process, and the state must do so regardless of the adequacy of any post-deprivation remedy." Johnson v. City of Saginaw, 980 F.3d 497, 508 (6th Cir. 2020) (citation and internal quotation marks omitted). "An aggrieved individual can bring a § 1983 claim for a deprivation which requires a [pre-deprivation] process immediately, as the harm to that individual from the alleged due process violation has already occurred." Cranberry Promenade, 2010 WL 653915, at *5.

Here, the Complaint plausibly alleges that Quin's and Reynold's policies deprive Plaintiffs and other Youth "of education for extended or indefinite periods of time . . . without being provided with notice of the reason for the deprivation, an opportunity to be heard, or other procedural safeguards to protect their entitlement to education." (Doc. No. 53 ¶ 852). This suggests that Count Eleven asserts a *pre*-deprivation due process claim. Accordingly, the Court cannot dismiss

Count Eleven at this time merely because Defendants raise a factual dispute about whether there were post-deprivation procedures available.

## V.    DISMISSAL FOR FAILING TO JOIN NECESSARY PARTIES

Defendants' final argument is that the Court cannot accord complete relief among existing parties without joining the nonparty "facilities that are licensed, contracted, or approved by DCS, but that are owned and/or operated by other entities." (Doc. No. 62 at 33–35). As such, Defendants ask the Court to either dismiss this case under Rule 12(b)(7), or find that the DCS-licensed or approved facilities must be joined as necessary parties.

A defendant may move to dismiss the complaint under Rule 12(b)(7) for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). "Dismissal under Rule 12(b)(7) is appropriate 'when there is an absent person without whom complete relief cannot be granted." SDC Fin., LLC v. Bremer, 2019 WL 4393543, at *11 (M.D. Tenn. Sept. 13, 2019) (citation omitted). This "analysis under Rule 19 involves two steps: (1) the court must determine whether the absent parties are required parties; and if so, (2) the court must determine whether, in their absence, equity and good conscience require that the case be dismissed." Id. (citing School Dist. of Pontiac v. Sec'y of U.S. Dept. of Educ., 584 F.3d 253, 264 (6th Cir. 2009) (en banc)). "If the answer to either question is no, then Rule 19 does not" require dismissal. School Dist. of Pontiac, 584 F.3d at 265.

Here, the Court does not find that the DCS-licensed or approved facilities are necessary for the Court to grant Plaintiffs' requests for declaratory or injunctive relief. Plaintiffs "seek relief only against Defendants' policies and practices," and "[t]he mere fact that relief against Defendants might affect third parties does not make those parties necessary under Rule 19." (Doc. No. 66 at 30). Based on the allegations in the Complaint, it does not appear that the Court needs to join the facilities to require *Defendants* to reform *their* own policies, practices, and procedures.

The DCS Defendants argue that "the relief requested in this case would later impact parties in a manner that could expose the DCS Defendants to obligations inconsistent with their authority or control," but they do not offer any analysis or explanation about how this could happen.  (Doc. No. 62 at 35).  This naked assertion is insufficient for the Court to make a reasoned decision about whether Plaintiffs' requested relief will impose inconsistent obligations on the DCS Defendants.  Accordingly, the Court will deny Defendants' motion under 12(b)(7) without prejudice to them renewing their motion if discovery reveals that one or more of the DCS-licensed or approved facilities are required parties to this action under Rule 19.

## VI.    CONCLUSION

For the foregoing reasons, the Court will deny Reynold's Motion to Dismiss (Doc. No. 59), and deny in part and grant in part the State and DCS Defendants' Motion to Dismiss (Doc. No. 61).  The Court will dismiss John Doe 1 as a plaintiff for lack of standing, and it will dismiss Counts Six and Ten for failure to state a claim.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE