# EXHIBIT 44

# Deposition Transcript

Case Number: 3:24-cv-00777
Date: May 7, 2026

In the matter of:

# JOHN DOE 2, et al. v STATE OF TENNESSEE, et al.

# FRANK MIX - 30(b)(6)

CERTIFIED COPY

Reported by:
Heather Evans Willard

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

JOHN DOE 2, et al., )
)
Plaintiff, )
vs. ) Case No.
) 3:24-cv-00777
STATE OF TENNESSEE, et al., )
)
Defendants. )

---

Rule 30(b)(6) Deposition of:

DEPARTMENT OF CHILDREN'S SERVICES

DESIGNEE: FRANK MIX

(Via Zoom Conferencing)

Taken on Behalf of the Plaintiff

May 7, 2026

---

Reporter: Heather Evans Willard, RMR, LCR
Tennessee License No. 135
STENO.COM

A P P E A R A N C E S:

For the Plaintiff: Mr. Jonathan Tepe, Esq.
Ms. Kasi Wautlet, Esq.
Ms. Shannon Henris, Esq.
Sanford, Heisler, Sharp, McKnight, LLP
611 Commerce Street
Suite 3100
Nashville, TN 37203
jtepe@sanfordheisler.com
kwautlet@sanfordheisler.com

For the Defendants: Ms. Sarah E. Stuart, Esq.
Mr. Jonathan P. Lakey, Esq.
Ms. Reagan Fondren, Esq.
Ms. Katherine Adams, Esq.
Burch Porter & Johnson, PLLC
130 N. Court Avenue
Memphis, TN 38103
sstuart@bpjlaw.com
jlakey@bpjlaw.com

On Behalf of the Department of Education:

Ms. Dawn Jordan, Esq.
Mr. Jay C. Ballard, Esq.
Mr. David Wickenheiser, Esq.
Tennessee Attorney General's Office
500 Charlotte Avenue
P.O. Box 20207
Nashville, TN 37202
dawn.jordan@ag.tn.gov
jay.ballard@ag.tn.gov
david.wickenheiser@ag.tn.gov

On Behalf of the Youth Law Center:

Mr. Stuart Seaborn, Esq.
Ms. Jasmine Miller, Esq.
Ms. Diane Smith Howard, Esq.
Youth Law Center
832 Folsom Street
Suite 700
San Francisco, CA 94107
sseaborn@ylc.org

Disability Rights Tennessee:

Mr. Jack Derryberry, Jr., Esq.
Attorney at Law
2 Internatinal Plaza
Suite 825
Nashville, TN 37217
jackd@disabilityrightstn.org

Disability Rights Tennessee:

Mr. Bruce H. Little, Esq.
Attorney at Law
9050 Executive Park Drive
Suite B-101
Knoxville, TN 37923
brucel@disabilityrightstn.org

Also Present:

Linda Nieles
Kathryn Ahillen
Rajanae Jones

# I N D E X

Examination by Mr. Tepe..................... 6

# E X H I B I T S

No. 1...1-21-26 letter and notice........... 16
No. 2...October 20, 2024 email.............. 76
No. 3...September 30, 2024 email............124
No. 4...July 26, 2022 compliance review.....195
No. 5...Documents used to refresh recollection.........................271

S T I P U L A T I O N

The Rule 30(b)(6) deposition of FRANK MIX was taken by counsel for the Plaintiff, by agreement, via Zoom Conferencing, at 10:14 a.m., on May 7, 2026, for all purposes under the Federal Rules of Civil Procedure.

All formalities as to notice, caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agreed that Heather Evans Willard, being a Licensed Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness was not discussed.

* * * *

FRANK MIX

was called as a witness, and after having been first duly sworn, testified as follows:

EXAMINATION BY MR. TEPE:

Q. All right. Hello, Mr. Mix. My name is Jonathan Tepe. I represent the Plaintiffs in this case. I'm going to start today by talking to you a little bit about how the deposition's going to work, and then I'll ask a few preliminary questions to get us started.

Is there any reason why you wouldn't be able to tell the truth today?

A. No, sir.

Q. And any reason, physically or mentally, that you can't accurately testify about past events today?

A. No, sir.

Q. Have you taken any medications, substances over the last 24 hours that might affect your memory, ability to answer questions, anything like that?

A. No, sir.

Q. Great. All right. Everything we're saying here is written down by a court reporter.

Q. (BY MR. TEPE) All right. What about, Mr. Mix, did you review anything that you didn't provide to your counsel or let your counsel know about those documents to prepare?

A. No, sir.

Q. Okay. And, Mr. Mix, can you please state your full name for the record?

A. Yes. It's Frank Harold Mix.

Q. And what's your current job title?

A. I am the executive director of network development and provider relations with the Department of Children's Services.

Q. How long have you been in that role?

A. Five years.

Q. And what are your job duties in that position?

A. I oversee the placement network that supports children in DCS custody. And I also supervise the staff who refer children for placement.

Q. And what other roles have you had at DCS?

A. I've been a case manager.

COURT REPORTER: Repeat that. Repeat that.

THE WITNESS: Case manager. I've been a team leader or supervisor. I've been a resource management unit coordinator, team coordinator. I've been a director. I have been a data analytics supervisor, and as well as my current role.

Q. (BY MR. TEPE) Great. So how long in total have you been with DCS?

A. So I have been with the department 25 years and worked with an agency that supported the department for the seven years prior to that.

Q. Okay. What agency was that?

A. Cumberland Community Services Agency.

Q. And how does that agency support DCS?

A. It does not support the department any longer.

Q. Okay. How did it back then?

MS. STUART: Objection. Scope. You can answer.

THE WITNESS: We provided case management and coordination services between the custodial department that preceded the systems for the Department of Children's Services.

Q. (BY MR. TEPE) Okay. And have you had any other positions with the State of Tennessee

besides working for DCS?
A. No, sir. Allow me to correct that.
Q. Sure.
A. There was a brief period of time where my role was transitioned to the Department of Finance and Administration as part of the strategic technology solutions reorganization, and then I returned to the department after that.
Q. Okay. And what role was that that got transitioned briefly?
A. It was data analytics work.
Q. Okay. And just like roughly what -- what time period was that that it got switched?
A. Late '95.
Q. Okay.
A. I returned to the department in '97.
Q. Great. All right. So I'm going to pull up the first exhibit for us to look at. All right.
So I'm going to introduce Exhibit 1. So you should see it come through. I can present it as well so you can see it. Are you able to see this exhibit?
A. Yes.
Q. All right. Can you read it?

Q. And what about the specific services offered at each facility, is that documented anywhere?

A. That is not documentation that the Department maintains.

Q. So when DCS is deciding where to place a youth, how do they know what services are offered at a facility?

A. So we -- based on our contractual relationships with our provider community, we have a broad general understanding of the presenting issues and agency has the capacity to treat. Part of the referral process is that agency assessing their capacity to deliver the unique services they feel is most appropriate to support that young person's needs.

Q. So DCS relies on the facilities to decide what treatment is appropriate for the young person's needs?

A. The specific interventions, yes, sir.

Q. So does DCS have a practice of specifically requesting that a facility provide services that DCS has determined the youth needs?

A. That would not be routine practice, but there are times when that does occur.

Q. So other than the facility saying that they can provide the treatment a youth needs, DCS does not know exactly what treatment a facility is going to provide?

MS. STUART: Object to the form.

THE WITNESS: That's not what I said there.

Q. (BY MR. TEPE) So when DCS decides to place a youth at a facility, DCS knows exactly what services that facility is going to provide and how frequently?

A. We know how frequently they will be providing services. We also have a clear picture of the treatment issues we are sending that young person to placement to treat. The facility, in cooperation with the Department, outlines an individualized treatment plan for that specific young person that takes the specific modalities and applied that they will utilize for that specific child.

Q. So does the facility give that treatment plan to DCS before or after DCS decides to place the youth there?

A. That would occur after.

Q. So when DCS places a youth there,

they have not gotten confirmation of what the services are going to be?

MS. STUART: Object to the form.

THE WITNESS: No, sir, that is not our process.

Q. (BY MR. TEPE) What is the intensity of services at a hardware secure facility?

A. So that is also going to involve daily interventions, both of a therapeutic nature, as well as to ensure that the behavior is safely managed.

Q. So you said that Level 3 has daily intervention and so does Level 4. So what's the difference?

A. The presenting issues of the young person and the behavioral and clinical profile the young person presents with, as well as the intensity of their treatment needs are going to vary.

Q. What's the difference in the intensity of services at Level 3 versus 4?

A. It's frequency and time. Again, there is daily interventions occurring at the highest levels of care. They are unique to the young person and are defined in that provider

Q. Under what circumstances is a youth appropriate for a family-based placement?

MS. STUART: Object to scope.

THE WITNESS: That is an incredibly broad question. But it is really based on their specific treatment needs and whether those needs can be met in a community-based setting, as well as the safety of the young person and other people around that young person. So all those factors are a part of that determination.

Q. (BY MR. TEPE) Does the intake team have a rubric or any written guidance about making that determination?

A. They have the Contract Provider Manual as their guide.

Q. Does DCS consider certain data points when making that decision?

A. We do.

Q. What would those be?

A. It would be primarily the results of our standardized assessment tool and the level of service recommendation included.

Q. And by assessment tool, do you mean the CANS assessment?

A. Yes, sir. Yes, sir.

Q. So how would the CANS assessment indicate that a youth was appropriate for a family placement?

A. Yes. It doesn't -- it will not specifically address family first as residential care, but it will provide a profile of that young person's treatment needs. And it would -- it is also aligned with our foster care levels of service in terms of service intensity. So it will provide guidance to staff that are looking at the placement for a specific young person.

Q. What are the responsibilities of the juvenile social worker with respect to youth?

MS. STUART: Object to scope.

THE WITNESS: So operating off the understanding we're referring to the juvenile justice family service worker, they are the primary assignment -- primary DCS representative for that young person and their family. They're responsible for the assessment of the young person's needs, the implementation -- the development of the service plan or permanency plan for a child in custody.

They also support non-conciliated youth, so there are some variations there.

determine that, yes, sir.

Q. So when the CANS is not administered timely, what happens to the youth?

A. That --

MS. STUART: Object to the scope. You can answer.

THE WITNESS: That young person is still referred for services based on the other available information.

Q. (BY MR. TEPE) So by referred for services, you mean they would be placed somewhere without the CANS?

A. Yes, sir. Yes, sir.

Q. And what other information would DCS be considering typically in a situation where there's not a CANS assessment?

A. So I described part of -- I really described that earlier. But that would be the information gathered from the young person, their family, other involved parties, the court of jurisdiction, or any other past history, any other treatment records they've had, their educational history, as well as any other assessments that we may have on our -- on our own determined would be helpful for making that determination.

Q. And would all of that be documented in TFACTS?

A. Yes, sir. That's our system. TFACTS is our system of record.

Q. And where are the results of a youth's computer adapted -- adaptive testing mental health assessment documented?

MS. STUART: Object to the scope.

THE WITNESS: I don't think I'm following your question. If you don't mind asking it again, please.

Q. (BY MR. TEPE) So DCS uses a computer adapted testing mental health assessments to assess whether a youth needs intervention for suicidality, right?

MS. STUART: Object to the scope.

THE WITNESS: We do use a suicide risk assessment tool for part of our population, yes, sir.

Q. (BY MR. TEPE) So what does DCS call the suicide risk assessment tool?

A. I can't -- I don't know the formal name. I know the function of the assessment. It is a formal tool. And it is administered to our young people who are in juvenile detention

Q. (BY MR. TEPE) So why is Mr. Flanery-Gray the one informing you of this in this instance rather than your team?

MS. STUART: Object to the form and scope.

THE WITNESS: I can't speak to why Mr. Flanery-Gray chose to communicate that.

Q. (BY MR. TEPE) Okay. All right. We will move on from that exhibit.

DCS operates the Wilder facility, right?

A. Yes, sir.

Q. Wilder used to be a Level 4 hardware secure facility, right?

A. No, sir. As we discussed before, hardware secure falls outside the level system.

Q. Well, Wilder used to be a Level 4 facility, right?

A. No, sir.

Q. Wilder is currently a Level 3 staff secure facility; is that accurate?

A. Not exactly. Wilder is currently a youth development center, but they are serving a Level 3 staff secure population.

Q. You testified earlier that YDCs are

hardware secure, didn't you?

A. Yes, sir.

Q. So Wilder is a YDC that isn't hardware secure?

A. It has some of the hardware secure components to it. They are serving a staff secure population.

Q. Has Wilder's designation changed in the last five years?

MS. STUART: Object to the scope. You can answer.

THE WITNESS: Can you clarify designation, please?

Q. (BY MR. TEPE) Has Wilder's level changed?

MS. STUART: Object to the scope. You can answer.

THE WITNESS: Wilder is a stage-designated youth development center. We chose to alter the population they are serving, and they currently serve a Level 3 staff secure population.

Q. (BY MR. TEPE) So Wilder used to serve a Level 4 population; is that right?

MS. STUART: Objection. Scope.

THE WITNESS: No, sir. They used to serve a hardware secure population.

Q. (BY MR. TEPE) Why is it appropriate to place a staff secure population in a hardware secure facility?

MS. STUART: Object to the scope.

THE WITNESS: That change was made to support the facility's ability to serve young people and adjusted the population served there to the capacity of the staff and the setting.

Q. (BY MR. TEPE) Where does DCS define a Level 3 staff secure population?

MS. STUART: Object to the scope.

THE WITNESS: A Level 3 staff secure population is defined in the Contract Provider Manual.

Q. (BY MR. TEPE) What about Wilder required adjusting the population of place there?

MS. STUART: Objection. Scope.

THE WITNESS: There were limitations in the physical plant, as well as staffing limitations that caused us to make that change.

Q. (BY MR. TEPE) What staffing limitations?

A. They were -- they were unable to

maintain sufficient staff to operate that program.
Q. So they were unable to meet the staffing ratios required?
A. That was one component, yes.
Q. So Wilder has a lower staffing ratio now?
A. No, sir.
MS. STUART: Object to the --
THE WITNESS: Sorry.
MS. STUART: -- scope. You can answer.
THE WITNESS: No. The staffing ratio, as we described earlier, for hardware secure and staff secure is the same.
Q. (BY MR. TEPE) So changing the population served there did not help resolve the staff ratio problem at Wilder?
MS. STUART: Object to the scope.
THE WITNESS: No, that's not correct.
Q. (BY MR. TEPE) How did it help?
A. It allowed us to reduce the young people served at that facility to bring the numbers served in line with the staffing ratio requirements.
Q. So there are -- there are still --

the hardware secure elements of the Wilder facility, those did not change with the change in population, right?

MS. STUART: Object to the scope. You can answer.

THE WITNESS: There were some changes made to the campus.

Q. (BY MR. TEPE) So the facility is no longer capable of being locked, where youth are not locked in the facility?

A. Youth are not locked in -- in their individual sleeping quarters.

Q. But they are otherwise -- but they are locked in the facility generally --

MS. STUART: Object to the scope.

Q. (BY MR. TEPE) -- right? Okay.

A. There is a fence and a gate around the facility, yes.

Q. Did DCS move all of the youth out of Wilder when it changed the population being served there?

MS. STUART: Object to the scope.

THE WITNESS: Yes, we did.

Q. (BY MR. TEPE) So how did that work logistically? Did that -- did the youth move

out -- the population of youth change before DCS changed the category of youth being served there or after?

MS. STUART: Object to the form and scope.

THE WITNESS: I'm not sure I'm following that question. If you don't mind repeating that.

Q. (BY MR. TEPE) So, I guess, is there an official designation that DCS gives to Wilder that reflects the population it's currently serving? Like, is it designated as a Level 3 staff secure population?

A. Yes. That's the designation for the population.

Q. And how does DCS handle transitioning the population of youth at a facility when it changes the population designation like that?

MS. STUART: Objection. Scope.

THE WITNESS: That will vary based on the circumstances of that specific transition.

Q. (BY MR. TEPE) Why did changing Wilder to serving a staff secure population allow DCS to place fewer youth at the facility?

A. The Department had additional staff

secure resources at our disposal.

Q. And by that, you mean additional facility placement options?

A. Yes, sir.

Q. DCS controls staffing and service provision at Wilder, right?

A. We are responsible for staffing Wilder, yes, that's correct. We're also responsible for the provision of services. We don't provide all of those directly.

Q. What do you mean they don't -- that you don't provide them directly?

A. There are some services provided at Wilder through contractual arrangements with third-party vendors.

Q. DCS directly controls youth assessment practices at Wilder, right?

A. Yes, sir.

Q. Can Wilder reject placement requests from DCS?

A. They can.

Q. What circumstances can they reject a placement?

A. They can reject a placement if they believe the young person falls outside of the

MS. STUART: Object to scope.

THE WITNESS: There's a trauma screening in the CANS assessment.

Q. (BY MR. TEPE) Are there any circumstances where that would automatically trigger a disability assessment?

A. No, sir.

Q. How does DCS define whether a disability is obvious?

MS. STUART: Object to scope.

THE WITNESS: I don't think I understand that question.

Q. (BY MR. TEPE) When a youth's -- DCS policies refer to obvious disability, don't they?

MS. STUART: Object to form.

THE WITNESS: Our policies require us to assess each young person based on the information presented to us, including our observation of young people.

Q. (BY MR. TEPE) So DCS does not make decisions based on whether or not a youth has an obvious disability?

MS. STUART: Object to scope.

THE WITNESS: No, sir.

Q. (BY MR. TEPE) DCS -- so what

triggers -- in what circumstances is DCS required to engage in an interactive process to determine what accommodations will be provided to youth for their disability?

A. We are required to respond to a specific request for accommodation for young people. That being said, we are going to naturally, through our assessment process, evaluate and determine how to best meet the needs of each unique child we're responsible for.

Q. Would a youth being prescribed psychotropic medication trigger a requirement to engage in the interactive process?

MS. STUART: Object to scope.

THE WITNESS: Not as a sole factor, no, sir.

Q. (BY MR. TEPE) What about a certain mental health diagnosis, would that potentially trigger that?

MS. STUART: Object to scope.

Potentially, yes.

Q. (BY MR. TEPE) What -- what kinds of diagnoses would trigger that requirement?

MS. STUART: Object to scope.

THE WITNESS: That answer is in the

diagnosis and the presenting symptom -- symptoms for the young person.

Q. (BY MR. TEPE) So are the criteria that would trigger the requirement to engage in the interactive process documented anywhere?

A. I don't believe there's specific criteria outlined anywhere.

Q. DCS policy requires that DCS should indicate that a youth needs an accommodation in TFACTS, right?

A. No, sir.

Q. Does DCS policy require that a youth's need for accommodation be documented anywhere?

A. A request for accommodation would be documented somewhere, yes, sir.

Q. I'm not -- I'm not asking about a request for accommodation. I'm asking if a youth's been determined to need an accommodation, where is that documented?

A. It is likely documented in their case plan and service provision history.

Q. It's not -- DCS doesn't have a policy requiring that that be documented in a particular place?

A. No, sir.
Q. Does DCS have a policy or practice to look at a youth's history of receiving Social Security Disability benefits as an indication that they may need disability accommodations?
MS. STUART: Object to scope.
THE WITNESS: We look at all the presenting information available to us for a young person to make determinations and meet our young people's needs, including that one.
Q. (BY MR. TEPE) And if a youth has a history of receiving Social Security Disability benefits, does that require DCS to engage in the interactive process regarding accommodations?
A. I'm not aware that it does.
Q. What procedures -- scratch that.
When a youth first enters a facility, can DCS see the youth's history of assessments and screening?
A. Could you ask that again, please?
Q. When a youth is placed at a facility -- or when a youth first enters DCS custody, can DCS see the youth's history of assessments and screenings?
A. That answer is going to be depend --

(Whereupon, a recess was taken from 6:19 p.m. to 6:19 p.m.)

MR. TEPE: Okay. Back on.

Q. (BY MR. TEPE) Go ahead.

A. Okay. So, yes, we did.

Q. What did you do?

A. So we have worked to hold the facilities accountable. Following the audit, we -- our leadership commissioner issued a specific letter regarding staffing ratios and our intent to hold people accountable.

We've also been monitoring the statutory licensing rolls related to juvenile detention centers that are publicly operated and proposed some changes that will allow us to take additional actions.

Q. Okay. And in deciding on a course of action in the real estate plan, did DCS consider whether to invest in less restrictive alternatives to the facilities it decided on?

MS. STUART: Object to scope, form.

THE WITNESS: So contextually for the real estate plan, the real estate plan was built around the current and future predicted needs of the Department to bring our portfolio of

facilities up to a modern and therapeutic standard.

In that process, we determined that what's in that real estate plan is what we need to move forward to augment the programming that we already have in place.

Q. (BY MR. TEPE) And as part of that process, did DCS consider whether less restrictive alternatives should be built?

MS. STUART: Mr. Tepe, I believe we're out of time.

MR. TEPE: I think we have a minute left, but --

MS. STUART: No, we don't.

MALE SPEAKER: No, you do not.

MS. STUART: We've been running the timer.

MALE SPEAKER: He can answer that question.

MS. STUART: He can answer the question, and then we're done.

THE WITNESS: If you would not mind asking that question again, please, sir.

Q. (BY MR. TEPE) I -- I was just asking, in part of that process, did you -- did DCS

specifically consider less restrictive alternatives to the facilities it decided to build?

A. So I need to provide context here.

The answer is no, but that was not the point of the studies we did to make the determination we needed to build that.

We already have less restrictive environments in our portfolio that exist within our private provider community. The specific real estate plan is -- or the real estate plan is specific to the Department of Children's Services portfolio of -- of facilities which are nonexistent or the most recent one was built in the '80s or '90s. So they were outdated.

MR. TEPE: Okay. All right. Thank you for your testimony. We appreciate your time.

THE WITNESS: Thank you.

MS. STUART: DCS has no questions.

MR. TEPE: I assume TDOE doesn't have any?

MS. JORDAN: That is correct, yes.

MR. TEPE: Great. All right. I also want to note that, you know, as we documented upfront, you know, we're going to review and we

STATE OF TENNESSEE )
) S.S.
COUNTY OF DAVIDSON )

I, Heather Evans Willard, Licensed Court Reporter for the State of Tennessee,

DO HEREBY CERTIFY that the foregoing deposition was taken at the time and place set forth in the caption thereof; that the witness was duly sworn or affirmed to tell the truth; that the said deposition was stenographically reported by me in shorthand; and that the foregoing pages constitute a true and correct transcription of said proceedings to the best of my ability.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties hereto, nor a relative or employee of such attorney or counsel, nor do I have any interest in the outcome or events of this action.

IN WITNESS WHEREOF, I have hereunto affixed my official signature this 14th day of May, 2026.

Heather Evans Willard
Tennessee License No. 135
Expires June 30, 2026

Job No. 2541198

Date: May 07, 2026

Witness Name: FRANK MIX - 30(b)(6)

Case: JOHN DOE 2, et al. v STATE OF TENNESSEE, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 17th day of June, 2026.

Frank Mix (Jun 17, 2026 11:13:58 CDT)

Signature FRANK MIX - 30(b)(6)

DEPOSITION ERRATA SHEET

Page No. 15 Line No. 13
Change: Inser "Mid" before "Cumberland
Reason for change: Missed word in transcription
Page No. 15 Line No. 22
Change: Insert "s" after "department"
Reason for change: should be plural, missed in transcription
Page No. 16 Line No. 14
Change: Late 95 should be 2012
Reason for change: error in response
Page No. 16 Line No. 16
Change: ""97" should be 2017
Reason for change: error in response
Page No. 21 Line No. 6
Change: Replace "Gwen" with "Glenn"
Reason for change: error in transcription
Page No. 21 Line No. 25
Change: Remove "s" in "plan" - should be singular
Reason for change: error in transcription
Page No. 30 Line No. 23
Change: Replace "base" with "placed"
Reason for change: error in transcription

PAGE 2 OF 3

DEPOSITION ERRATA SHEET

Page No. 38 Line No. 2
Change: Replace "pole" with "tool"
Reason for change: error in transcription

Page No. 39 Line No. 6
Change: Replace "particular" with "particularly"
Reason for change: error in transcription

Page No. 46 Line No. 20
Change: Replace "assigned" with "aligned"
Reason for change: error in transcription

Page No. 50 Line No. 25
Change: Replace "provider" with "provider's"
Reason for change: error in transcription

Page No. 57 Line No. 1
Change: Should read "processes referrals", add "es" to process, remove "is", add "s" to referral
Reason for change: error in transcription

Page No. 57 Line No. 8
Change: Replace "additional" with "initial"
Reason for change: error in transcription

Signed on the 17th day of June, 2026.

Frank Mix (Jun 17, 2026 11:13:58 CDT)

Signature FRANK MIX - 30(b)(6)

PAGE 3 OF 3

DEPOSITION ERRATA SHEET

Page No. 15 Line No. 13
Change: Inser "Mid" before "Cumberland
Reason for change: Missed word in transcription

Page No. 15 Line No. 22
Change: Insert "s" after "department"
Reason for change: should be plural, missed in transcription

Page No. 16 Line No. 14
Change: Late 95 should be 2012
Reason for change: error in response

Page No. 16 Line No. 16
Change: "'97" should be 2017
Reason for change: error in response

Page No. 21 Line No. 6
Change: Replace "Gwen" with "Glenn"
Reason for change: error in transcription

Page No. 21 Line No. 25
Change: Remove "s" in "plan" - should be singular
Reason for change: error in transcription

Page No. 30 Line No. 23
Change: Replace "base" with "placed"
Reason for change: error in transcription

PAGE 2 OF 3

DEPOSITION ERRATA SHEET

Page No. 38 Line No. 2

Change: Replace "pole" with "tool"

Reason for change: error in transcription

Page No. 39 Line No. 6

Change: Replace "particular" with "particularly"

Reason for change: error in transcription

Page No. 46 Line No. 20

Change: Replace "assigned" with "aligned"

Reason for change: error in transcription

Page No. 50 Line No. 25

Change: Replace "provider" with "provider's"

Reason for change: error in transcription

Page No. 57 Line No. 1

Change: Should read "processes referrals", add "es" to process, remove "is", add "s" to referral

Reason for change: error in transcription

Page No. 57 Line No. 8

Change: Replace "additional" with "initial"

Reason for change: error in transcription

Signed on the 17th day of June, 2026.

Frank Mix (Jun 17, 2026 11:13:58 CDT)

Signature FRANK MIX - 30(b)(6)

PAGE 3 OF 3

DEPOSITION ERRATA SHEET

Page No. 15 Line No. 13
Change: Inser "Mid" before "Cumberland
Reason for change: Missed word in transcription
Page No. 15 Line No. 22
Change: Insert "s" after "department"
Reason for change: should be plural, missed in transcription
Page No. 16 Line No. 14
Change: Late 95 should be 2012
Reason for change: error in response
Page No. 16 Line No. 16
Change: "'97" should be 2017
Reason for change: error in response
Page No. 21 Line No. 6
Change: Replace "Gwen" with "Glenn"
Reason for change: error in transcription
Page No. 21 Line No. 25
Change: Remove "s" in "plan" - should be singular
Reason for change: error in transcription
Page No. 30 Line No. 23
Change: Replace "base" with "placed"
Reason for change: error in transcription

PAGE 2 OF 3

DEPOSITION ERRATA SHEET

Page No. 38 Line No. 2
Change: Replace "pole" with "tool"
Reason for change: error in transcription

Page No. 39 Line No. 6
Change: Replace "particular" with "particularly"
Reason for change: error in transcription

Page No. 46 Line No. 20
Change: Replace "assigned" with "aligned"
Reason for change: error in transcription

Page No. 50 Line No. 25
Change: Replace "provider" with "provider's"
Reason for change: error in transcription

Page No. 57 Line No. 1
Change: Should read "processes referrals", add "es" to process, remove "is", add "s" to referral
Reason for change: error in transcription

Page No. 57 Line No. 8
Change: Replace "additional" with "initial"
Reason for change: error in transcription

Signed on the 17th day of June, 2026.

Frank Mix (Jun 17, 2026 11:13:58 CDT)

Signature FRANK MIX - 30(b)(6)

PAGE 3 OF 3